# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSHUA PENEYCAD, Individually and on behalf of all others similarly situated,

Plaintiff,

vs.

RTX CORPORATION f/k/a RAYTHEON TECHNOLOGIES CORPORATION, GREGORY HAYES, NEIL MITCHILL, ANTHONY F. O'BRIEN, CHRISTOPHER T. CALIO, and SHANE EDDY

Defendants.

No. 3:23-cv-01035-JAM-RAR

**CLASS ACTION**

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Hon. Jeffery Alker Meyer

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Jacqueline R. Meyers (*pro hac vice*)
Kaicheng Yu *(pro hac vice)*
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
Email: mcantylabaton.com
        jchristie@labaton.com
        jmeyers@labaton.com
        nyu@labaton.com

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice forthcoming*)
Kyla Grant (*pro hac vice*)
Joshua H. Saltzman (*pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
Email: ssinger@saxenawhite.com
        kgrant@saxenawhite.com
        jsaltzman@saxenawhite.com

- and –

Lester R. Hooker (*pro hac vice forthcoming*)
Scott Koren (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
Email: lhooker@saxenawhite.com
        skoren@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ...................................................................... 2

    A.  Defendants Pushed Pratt & Whitney's Prized GTF Fleet into Flight Service to Get Closer to Profitability at the Expense of Manufacturing Quality ................... 6

    B.  Pratt & Whitney Ramped Up GTF Engine Production as Its Powdered Metal Defect Created Weakened Engine Parts Across Various Engine Families .......... 10

    C.  Pratt & Whitney's Powdered Metal Defect Caused an Emergency Aborted Takeoff in the GTF's Predecessor, the V2500 Engine ........................................ 12

    D.  Defendants Misled Investors About the GTF Engine's Airworthiness and Profitability and Concealed the Powdered Metal Defect's Impact on the Fleet... 14

    E.  RTX Disclosed Its Expanded Root Cause Analysis to the FAA and Continued to Misleadingly Downplay the Extent of the Problem.......................................... 16

    F.  As Defendants' Fraud Began to Unravel, Defendants Minimized the Extent of Problems in the GTF Engine Fleet......................................................................... 18

    G.  On July 25, 2023, Defendants Shockingly Revealed the Powdered Metal Defect and Continued to Mislead Investors as to its Impact on the GTF Fleet.... 19

    H.  On September 11, 2023, Defendants Disclosed the Full $3 Billion Impact of the Powdered Metal Defect on the GTF Engine Fleet.......................................... 20

II.  JURISDICTION AND VENUE ................................................................ 22

III.  PARTIES .................................................................................................... 23

    A.  Lead Plaintiffs......................................................................................... 23

    B.  Defendants .............................................................................................. 24

    C.  Relevant Third Parties – Former Employees ......................................... 26

IV.  SUBSTANTIVE ALLEGATIONS OF FRAUD....................................... 29

    A.  RTX's Background & Business............................................................... 29

    B.  RTX's Crown Jewel – Pratt & Whitney's GTF Family ......................... 30

    C.  RTX's Scramble to Meet Demand for GTFs Led to Rampant Quality Control Problems and Defects................................................................................. 35

D.      By No Later Than March 2020, Defendants Discovered that Pratt & Whitney Was Manufacturing GTF Engine Parts Using Contaminated Powdered Metal ... 41

E.      RTX's Dangerous Wait-and-See Approach to its Powdered Metal Defect Caused Engine Failures ........................................................................................ 50

F.      Defendants Discovered the Severe, Wide-Ranging Implications of the Powdered Metal Defect No Later Than 2020 ...................................................... 53

G.      Prior To and During the Class Period, Defendants Spent Eighteen Months Attempting to Cure the Powdered Metal Defect Without Success...................... 55

H.      The Class Period Began as Defendants Misled Investors as to the GTF Engine Fleet's Airworthiness and Profitability .................................................................. 58

I.      As Pratt & Whitney Identified Additional "High-Risk" Parts in the V2500, the FAA Pressed Pratt & Whitney to Expand Its Root Cause Analysis .................... 60

J.      RTX Disclosed Its Expanded Root Cause Analysis to the FAA and Continued to Misleadingly Downplay the Extent of the Problem in the GTF Engines ......... 62

K.      Despite Pratt & Whitney's Expanded Root Cause Findings, Defendants Hid the Impact of the Powdered Metal Defect on the GTF Engine Fleet................... 66

L.      The Class Period Continued as Defendants Downplayed the Extent of Problems in the GTF Fleet ........................................................................................ 69

M.      Defendants Falsely Touted the Viability and Profitability of the GTF Engine Fleet at the Paris Air Show's Investor Meeting ................................................... 74

N.      The Truth Began to Emerge on July 25, 2023 ...................................................... 75

O.      On September 11, 2023, Defendants Disclosed the Full Impact of Manufacturing Defect on the GTF Engine Fleet .................................................. 81

V.      POST CLASS PERIOD EVENTS................................................................................... 86

A.      Additional FAA Airworthiness Directives ........................................................... 86

B.      SEC Investigation ................................................................................................. 88

C.      CEO Hayes Resigns.............................................................................................. 88

D.      RTX's Fleet Management Plan & Company Layoffs............................................ 88

E.      Impacts to Airlines and to RTX Continue to Worsen........................................... 89

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 91

A.  February 8, 2021 Annual 10-K Report ................................................. 91

    1.  Management's Discussion and Analysis of Financial Condition and Results of Operations – Contingent Liabilities ......................... 91

    2.  Risk Factors – Operational Risks ....................................... 94

    3.  Risk Factors – Industry Risks ........................................... 96

B.  February 17, 2021 Barclays Industrial Select Conference .................... 98

C.  June 8, 2021 UBS Global Industrials and Transportation Virtual Conference ... 100

D.  October 26, 2021 3Q 2021 Earnings Call ........................................ 102

E.  November 9, 2021 Baird Global Industrial Conference ..................... 103

F.  January 25, 2022 4Q 2022 Earnings Call ........................................ 104

G.  February 11, 2022 Annual 10-K Report ......................................... 107

H.  January 24, 2023 4Q 2023 Earnings Call ....................................... 108

I.  April 25, 2023 1Q 2023 Earnings Call .......................................... 111

J.  June 19, 2023 Investor Meeting at the Paris Air Show ...................... 113

K.  July 25, 2023 – Partial Corrective Disclosure/Materialization of Risk ............. 117

VII.  ADDITIONAL INDICIA OF SCIENTER ....................................... 119

A.  The Company Has Admitted Scienter .............................................. 119

B.  The Sale of GTF Engines Is Critical to RTX's Core Operations ..................... 122

C.  The Magnitude and Duration of The Powdered Metal Defect Supports Scienter ................................................................................ 124

D.  Defendants' Business Motives to Conceal the Defect Support Scienter ........... 124

E.  Additional Flight Safety Incidents Identified Quality Failures in Pratt & Whitney's Metal Manufacturing Process ......................................... 126

F.  RTX Was Embroiled in Client Disputes Concerning the GTF Engines ............. 127

G.  Analyst Reaction to Defendants' Non-Disclosure of the GTF Defect Supports Scienter ................................................................... 128

H.  The Mandate to Cut Corners in Manufacturing Was Directed by Defendants ... 129

I.    The Individual Defendants' Direct Involvement in The GTF Program Supports Their Scienter ................................................................................. 131

J.    Prior to the Class Period, Defendants Minimized Known Quality Defects ........ 132

VIII.    LOSS CAUSATION AND ECONOMIC LOSS ............................................. 133

A.    July 25, 2023 – Initial Partial Corrective Disclosure ............................ 135

B.    September 11, 2023 – Final Corrective Disclosure ............................. 139

IX.    PRESUMPTION OF RELIANCE ................................................................ 142

X.    NO SAFE HARBOR; BESPEAKS CAUTION IS NOT APPLICABLE ..................... 143

XI.    CLASS ACTION ALLEGATIONS ............................................................. 144

XII.    CAUSES OF ACTION .......................................................................... 147

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against Defendant RTX and the Individual Defendants) ........................................................................... 147

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against Defendants Hayes, O'Brien, Mitchill, Calio, and Eddy) ................................. 149

XIII.    PRAYER FOR RELIEF ........................................................................ 151

XIV.    DEMAND FOR TRIAL BY JURY ........................................................... 152

Lead Plaintiffs the New England Teamsters Pension Fund ("New England Teamsters"), Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund ("Laborers Local 60"), and United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund ("Roofers Local 8") (collectively "Lead Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of RTX Corporation[1] f/k/a Raytheon Technologies Corporation ("RTX" or the "Company") during the period from February 8, 2021 through September 8, 2023, inclusive (the "Class Period") and who were damaged thereby, subject to certain exclusions (the "Class"), against Defendants RTX, Gregory Hayes ("Hayes"), Neil Mitchill ("Mitchill"), Anthony F. O'Brien ("O'Brien"), Christopher T. Calio ("Calio"), and Shane Eddy ("Eddy") (the "Individual Defendants," and collectively with RTX, "Defendants").[2]

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and beliefs are based on, among other things, the independent investigation of Court-appointed Co-Lead Counsel Labaton Keller Sucharow LLP and Saxena White P.A. This investigation has included, among other things, a review and analysis of: (i) public filings by RTX with the SEC;

---

[1] RTX's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RTX."

[2] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of RTX during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) RTX's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

(ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of investor calls with RTX senior management; (vi) publicly available legal proceedings; (vii) an investigation conducted by and through Lead Plaintiffs' attorneys and their investigators, including but not limited to interviews and discussions with former RTX employees; (viii) documents produced by the Federal Aviation Administration ("FAA") pursuant to a Freedom of Information Act, 5 U.S.C. § 552, request; and (ix) other publicly available material and data identified herein.

Co-Lead Counsel's investigation regarding the factual allegations contained herein is ongoing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This case presents a classic example of a Company concealing from the market a known defect in its flagship product line in order to maintain its stock price and profitability. In 2020, RTX—through its subsidiary, jet engine manufacturer Pratt & Whitney—was poised to hit a lucrative homerun with its newest product suite, the Geared Turbofan ("GTF") engine family. Since Pratt & Whitney first released the GTF engine into commercial flight service in 2016, it became an immediate sensation due to its purported fuel efficiency and reduced environmental emissions. While the GTF fleet experienced early growing pains that prevented Pratt & Whitney from achieving the success it had promised investors, by 2020, RTX assured the market that the problems were entirely typical for a new engine and had already been fully addressed.

2.      In reality, and unbeknownst to investors, Defendants knew that virtually every single GTF engine Pratt & Whitney sold from 2015 to 2021 contained defective parts

manufactured from contaminated powdered metal (the "Powdered Metal Defect") that could cause a catastrophic engine failure mid-flight. Critically, the Powdered Metal Defect could only be fixed by grounding the GTF fleet for a lengthy, costly inspection and removal process that would gut the engine program's profitability. In 2023, after concealing the Powdered Metal Defect for years to avoid the staggering financial consequences—following a series of in-flight engine failures and regulatory pressure—Defendants admitted that they knew of the Powdered Metal Defect by no later than 2020 and that remediating the defect would cost the Company billions of dollars.

3.      Indeed, RTX's own CEO admitted that Defendants knew of the pervasive Powdered Metal Defect since at least March 2020, when an older model Pratt & Whitney engine ripped apart after a high-pressure turbine ("HPT") disk constructed from the contaminated powdered metal shattered, forcing the commercial flight crew to abort takeoff. Defendants also admitted that this incident prompted Pratt & Whitney to change its manufacturing process no fewer than nine separate times between March 2020 and December 2021 before it was finally able to ensure that it could produce jet engines that were free from contamination. This remained hidden from investors, as did Pratt & Whitney's "root cause" analyses of the incident, which found that the same Powdered Metal Defect that caused the March 2020 engine failure was also used to manufacture RTX's prized GTF engine fleet.

4.      Moreover, despite knowing full well that Pratt & Whitney's manufacturing process had for years produced engines with the Powdered Metal Defect, Defendants not only refused to stop production of the GTF engines, but they continued to manufacture and sell defective GTF engines that they indisputably knew were made with the Powdered Metal Defect. Astonishingly, Defendants did so during the exact same time that the Company was desperately, and unsuccessfully, trying to fix the Powdered Metal Defect from affecting new engine production.

3

All the while, Defendants deliberately concealed these extraordinarily material facts from investors, RTX's customers, the FAA, and the flying public.

5.  During the Class Period, Defendants were highly motivated to mislead investors about the Powdered Metal Defect because disclosing this pervasive problem would require RTX to take the GTF engines out of service for lengthy and costly inspections prior to the end of their warranty periods, which would cost the Company billions of dollars in repair and compensation costs. Indeed, such a step would not only require RTX to pay for the inspections and repairs to the GTF engine fleet, but also force the Company to compensate airlines for grounding their planes **for up to ten months** to facilitate those repairs, thereby tanking the profitability of the GTF program and, in turn, RTX's share price.

6.  Accordingly, throughout the Class Period, beginning on February 8, 2021, Defendants falsely assured investors that any current issues with the GTF fleet were "***usual for new engines and new aerospace technologies***," and that those issues had already been fully "***addressed***," despite knowing full well that a significant issue—the Powdered Metal Defect— plagued nearly all in-service GTF engines. Meanwhile, behind the scenes, Defendants were frantically racing to prospectively cure the Powdered Metal Defect from new production without remedying the contaminated engine parts in active commercial flight service. Nevertheless, on June 8, 2021, Defendants touted that RTX was "***99% complete with retrofitting a couple of the issues that we were facing***," even though Defendants were keeping compromised airplane engines in service to log flight hours and turn a profit. Compounding the fraud, Defendants also slow played the issue with the FAA by focusing the regulator on RTX's predecessor engine family, while deliberately concealing that they knew the Powdered Metal Defect predominantly impacted its prized GTF fleet.

7.      RTX's gamble with investors' money and passenger safety ultimately failed and, when the truth was revealed, the fallout was enormous.  Defendants' fraud began to unravel on December 24, 2022, when yet another commercial aircraft—equipped with a GTF engine—departing from Mexico experienced engine failure and was forced to perform an aborted takeoff.  For months thereafter, Defendants downplayed the effect of the Powdered Metal Defect to investors, claiming that any issues on the GTF engine fleet would have a *de minimus* impact on RTX's financial outlook, and falsely stated that the Company's financial outlook "***today contemplate[s] everything that we know about the*** [GTF] ***engine***."

8.      In reality, and unbeknownst to investors, Defendants knew of the Powdered Metal Defect on in-service planes by 2020.  More importantly, Defendants knew that fixing the Powdered Metal Defect would cost RTX billions of dollars because it required taking the engines out of service for nearly a full year.

9.      Indeed, on July 25, 2023, Defendant Hayes belatedly revealed the Powdered Metal Defect to investors, admitted that Defendants knew of the Powdered Metal Defect by no later than 2020, and disclosed that the removal and inspections due to the Powdered Metal Defect would reduce RTX's cashflow expectations by no less than **$500 million** in 2023.  Investors were shocked, and RTX's share price plummeted by over 10% on the news.

10.      Despite these revelations, RTX did not fully disclose the full impact of the Powdered Metal Defect until September 11, 2023, when it finally revealed that the defect impacted **all GTF engines that were manufactured from 2015 through 2021**—or approximately 3,000 in-service engines.  RTX further admitted that the financial impact of the removals and inspections was actually **$3 billion to $3.5 billion**, six to seven times worse than previously announced, because airlines around the world would need to ground their GTF engine-equipped planes for up

to 300 days. In response, RTX's share price fell an additional 8%, further injuring investors. Analysts excoriated the Company for its lack of candor, highlighting "**questions about management, given the time it took [Defendants] to fully raise the issue**." In the wake of these devastating disclosures, the SEC launched an "investigation relating to the Company's disclosures" concerning the Powdered Metal Defect. In total, the Company's stock price plummeted by over 27% from its Class Period high, wiping out billions of dollars in shareholder value.

**A.    Defendants Pushed Pratt & Whitney's Prized GTF Fleet into Flight Service to Get Closer to Profitability at the Expense of Manufacturing Quality**

11.    Formed on April 3, 2020 via merger, RTX is an American, multinational aerospace and defense corporation.[3] Pratt & Whitney, an industry-leading airplane engine manufacturer and former subsidiary of UTC, is now one of RTX's subsidiaries and principal business segments. Pratt & Whitney's commercial engine sales are a critical driver of RTX's success. For example, in 2022, Pratt & Whitney's $20.5 billion in revenue accounted for approximately 30% of RTX's total net sales. Pratt & Whitney is an original equipment manufacturer ("OEM") that generates the bulk of its profits through commercial aircraft engine sales and aftermarket maintenance, repair, and overhaul ("Aftermarket MRO") sales and services on its in-service engines.

12.    Pratt & Whitney's most significant product line is the GTF engine family, which RTX hailed as "the architecture of the future" and a "huge driver" of future growth because the engine promised revolutionary gains in fuel efficiency, emissions reduction, and noise reduction.

---

[3] The April 3, 2020 $121 billion merger (the "Merger") creating RTX occurred between United Technologies Corporation ("UTC") and Raytheon Corporation ("RTN"). Pratt & Whitney is a former UTC subsidiary. Defendants Hayes, Mitchill, Calio, and Eddy each worked for UTC prior to the Merger and were each senior officers responsible for overseeing Pratt & Whitney's GTF program. The definition and use of "RTX" and the "Company" herein includes Pratt & Whitney (also referred to as "P&W," "PW," or "Pratt").

After Pratt & Whitney launched the GTF engine into commercial service in 2016, demand for the engine skyrocketed, particularly from Airbus SE ("Airbus"), which used the GTF engines in popular airplane models purchased by operators including, among others, Delta Air Lines ("Delta"), JetBlue Airways ("JetBlue"), and Spirit Airlines ("Spirit"). By the start of the Class Period in February 2021, the GTF had become so popular that RTX had amassed a massive backlog of 10,000 orders for the GTF engine.

13.    Despite their purported appeal, RTX initially sold its GTF engines at a $1 million loss because of their expensive design and construction. Since their initial sale was not profitable, RTX generated the cashflow to breakeven and recoup those initial losses through Aftermarket MRO. However, RTX could only charge for these Aftermarket MRO sales and services after the warranties expired on already-installed engines—typically up to **five years** from the time the aircraft entered flight service. Analysts described Pratt & Whitney's Aftermarket MRO program in 2022 as the "total driver" of the GTF engine fleet's profitability, explicitly noting that "transitioning the GTF to high aftermarket profitability will be a critical part of the investment case for Pratt."

14.    Accordingly, Defendants had a strong incentive to ramp up GTF engine production and get them into commercial service as quickly as possible. Most importantly, RTX needed to keep the GTF engines in flight service so they could exhaust their warranties, which would then allow RTX to generate cash flow from its lucrative Aftermarket MRO services. However, following the GTF engine's commercial release in 2016, Pratt & Whitney struggled to increase capacity and thus began cutting corners in quality control for its GTF production.

15.    This fact was corroborated by several high-ranking former RTX employees ("FEs"), who were interviewed as part of Lead Plaintiffs' independent investigation and who had

first-hand knowledge of Pratt & Whitney's manufacturing procedures. These FEs confirmed that these defects arose because Pratt & Whitney prioritized speed over safety in getting the GTF engines out the door and onto planes' wings. Specifically, according to FE-8, Pratt & Whitney "pushed production over everything." FE-8 stated that Pratt & Whitney sent customers GTF 30K engine parts with known defects because the Company was behind on production and needed to get certain parts "out the door." Similarly, FE-4 recalled that after he was moved from quality control to production, he felt pressure from his supervisors to get the GTF engine to market, even though there were problems with the engine. FE-4 noted that despite problems with the GTF engine, the engines were still delivered to Pratt & Whitney's customers.

16.    More egregious, RTX formalized this incentive through a top-down directive to find cost savings in any way possible with respect to manufacturing. For example, FE-2, indicated that he was aware of the quality control issues at Pratt & Whitney which led to the recall of the GTF series of engines. FE-2 advised that the quality control problems were caused by changes in the Company's procurement process; specifically, the Company switched from reliable suppliers to much less expensive suppliers to save money, but the materials sourced from the cheaper suppliers were much poorer in quality. FE-2 advised that the cost-cutting measures which forced Pratt & Whitney to switch to unqualified suppliers came from former RTX CEO Gregory Hayes. FE-2 noted that Hayes was recently replaced as CEO by Christopher Calio, and that Calio had also been responsible for creating the cost-cutting policies that led to the quality control problems.[4] FE-2 noted that the Sourcing Team earned bonuses for achieving certain levels of cost savings.

---

[4] As noted throughout, Defendants Hayes and Calio were senior leaders of Pratt & Whitney prior to the Merger, when it was a subsidiary of UTC.

17.     Similarly, FE-1 explained that in an ideal world, the Company's number one priority is safety, quality is number two, and cost and delivery are number three.  He added that the top priority of the Manufacturing department is cost and delivery.  He further noted that the focus of the Company has become cost and delivery first, then safety, then quality.  He added that the Company is "all about delivery," even if the quality is not "up to snuff."

18.     Throughout the GTF engine fleet's early years of commercial service, numerous manufacturing defects and quality escapes led to concerns from investors and customers alike.[5] For example, leading up to the Class Period, analysts and investors were troubled by a host of defects with the GTF engine fleet that stood to prevent the program from generating the unprecedented growth that RTX had promised.  Indeed, these problems became so prevalent that Airbus temporarily stopped taking delivery of new GTF engines from Pratt & Whitney in 2018.  FEs recalled the full scope of Pratt & Whitney's customers arising from these issues.  Specifically, FE-3 recalled that Pratt & Whitney's customers—most notably Airbus, the Company's key customer with the largest contract—were threatening to cancel their contracts if there were any more delays with the GTF engines.  He first recalled hearing about these customers' threats to pull contracts at work sometime in 2018.  Defendants, however, minimized these other issues as mere "teething problems" and assured investors throughout the Class Period that these problems were cured and that the GTF engines were airworthy and profitable.

19.     As Defendants desperately pushed to get the GTF engines out the door at the expense of manufacturing quality, one specific manufacturing defect—contaminated powder metal—became particularly widespread and entrenched in the GTF fleet.  Pratt & Whitney's

---

[5] The aviation industry often refers to manufacturing quality defects as "escapes," signaling that the manufactured part does not conform to its specifications.

Powdered Metal Defect resulted in the Company manufacturing weakened, structurally compromised engine parts that experienced catastrophic cracking.

**B.**     **Pratt & Whitney Ramped Up GTF Engine Production as Its Powdered Metal Defect Created Weakened Engine Parts Across Various Engine Families**

20.     Since the 1960s, Pratt & Whitney has manufactured its engines' component parts— including the GTF—using powdered metal. This manufacturing process involves creating a powdered metal alloy from raw materials, bonding the powder through compression and heat into a solid metal "forging," and finally, machining the metal forging to part specification. Contamination is a significant risk when manufacturing parts from powdered metal. When contaminants enter the manufacturing process, they cause the powdered metal to bond improperly, leaving weak spots in the metal part. And when subjected to the extreme temperature and movement variations that occur during typical flight conditions, the compromised metal will crack and rip apart, leading to catastrophic fractures, engine fires and ultimately, the loss of an airplane.

21.     Since 1966, Pratt & Whitney has sourced its powdered metal from a company called HMI Metal Powders ("HMI"). Pratt & Whitney acquired HMI in 1975, and HMI is now a wholly-owned subsidiary of RTX, with its powdered metal facility located in Clayville, New York. In 2023, RTX admitted that Pratt & Whitney added "additional capacity" and a new manufacturing "tower"—the multi-story structure used to manufacture the powdered metal from raw materials— at HMI in late 2015 as part of its effort to scale up production of GTF engines and get them to market. Among the panoply of manufacturing defects plaguing the GTF engine production ramp-up, was Pratt & Whitney's introduction of foreign contaminants into its powdered metal. Consistent with Defendant Hayes's admission in 2023 that the Company was aware of the Powdered Metal Defect by no later than 2020, numerous former RTX employees recounted how

manufacturing quality defects occurred in Pratt & Whitney's powdered metal manufacturing process from the Company's frantic effort to push the GTF engine fleet into flight service.

22.     Specifically, FE-1 advised that there was a "telcon" or conference call meeting in approximately August 2019 to discuss the powdered metal problems. FE-1 recalled that the person who called the meeting was Sarah Toomey, Chief Engineer. FE-1 recalled that the meeting was led by the Director of the GTF 1100 engine program, for the A321neo / A320neo aircraft. FE-1 indicated that this meeting was specifically about contamination in the powdered metal supplied by Pratt & Whitney's source, an entity called *HMI*, based in Clayville, New York. He noted that materials problems – such as contaminated components – are the "worst you can have" because they go to the life of the component, and therefore the life of the engine. FE-1 articulated that the contaminated powdered metal problems were not limited to the GTF series of engines. As an example, he mentioned that the problem also affected the V2500 engines.

23.     Moreover, FE-1 confirmed that senior leadership at Pratt & Whitney were aware of the contaminated powdered metals and titanium problems. He indicated specifically that Frank (Francis) Preli, currently Vice President, Propulsion and Materials Technology and Chief Engineer, Materials and Processes Engineering at the Company, and Geoff Hunt, Senior Vice President, Engineering, were aware of the problems. He elaborated that if the Company did not meet the production numbers, or if the Company had to bring in engines earlier than promised for inspection and repairs, then the cost was on Pratt & Whitney.

24.     Relatedly, FE-5, who was employed with Pratt & Whitney as a Mechanical Engineer at Pratt & Whitney's HMI Metal Powders facility in Clayville, New York, recalled that in approximately 2020, foreign objects were occasionally identified in the powder metal as it was forming. Similarly, FE-9 who worked with multiple engines, including the Geared Turbofan

11

(GTF) engine, detailed how colleagues from Pratt & Whitney's metallurgical testing labs told him that there had been a problem with its powdered metal since approximately 2016 and that the Company was planning a recall because of this problem.

25.     Pratt & Whitney applied the same, problematic wait-and-see approach to the Powdered Metal Defect as it did the numerous other manufacturing problems with the GTF engine fleet.  However, the nature of the Powdered Metal Defect meant that foreign particles were dispersed and suspended—at random—throughout Pratt & Whitney's in-service engines parts, and grew into catastrophic fractures with every flight.  Nevertheless, Defendants assured investors that the GTF engine fleet would soon mature beyond its early growing pains and reach its promised levels of profitability.  In sum, Defendants opted to conceal the pervasive Powdered Metal Defect and keep the contaminated GTF engines in flight in order to capture lucrative Aftermarket MRO profits.

### C.   Pratt & Whitney's Powdered Metal Defect Caused an Emergency Aborted Takeoff in the GTF's Predecessor, the V2500 Engine

26.     It was not long before Defendants' gamble began to backfire.  On March 18, 2020, Vietnam Airlines Flight VN-920 experienced an HPT disk fracture, leading the Pratt & Whitney engine to rip apart and forcing a high-speed aborted takeoff.  The aircraft was equipped with a V2500 series engine manufactured by Pratt & Whitney using the same powdered metal manufacturing process and materials as the GTF engine family, at the exact same facility located in Clayville, New York.  Pratt & Whitney's examination of the aircraft purportedly showed that the fractured turbine disk was attributable to "a material anomaly," or contamination resulting from "deficiencies in the manufacturing process."

27.     As Defendants would later admit, by this point in 2020, RTX knew that the Powdered Metal Defect was a systemic, serious problem afflicting all Pratt & Whitney engines

equipped with parts constructed from the faulty, contaminated material. Moreover, by the time of this discovery in 2020, Defendants knew that revealing the pervasive and costly Powdered Metal Defect to investors would have a cataclysmic impact on RTX's stock price.

28. Immediately after the March 2020 incident, the FAA issued Emergency Airworthiness Directives and Airworthiness Directives requiring Pratt & Whitney to remove all affected HPT disks within the V2500 engine family from service.[6] The FAA's directives also required Pratt & Whitney to investigate and determine a "root cause" of the flight safety event. As Defendants would later admit, and Pratt & Whitney's root cause analysis determined, the HPT disks were defective due to contamination of the powdered metal from which they were made.

29. Moreover, Defendants later admitted in 2023 that this defective powdered metal was used to produce HPT disks across Pratt & Whitney's engines for all six years, "from approximately Q4 2015 into Q3 2021." Critically, because the HPT disks for both the V2500 and GTF families were manufactured using the same process and using the same contaminated material, Defendants knew that Pratt & Whitney's use of contaminated powdered metal meant that the same Powdered Metal Defect in the HPT disks of the V2500 was also present in the GTF engine series.

30. The widespread Powdered Metal Defect was enormously problematic for RTX. Indeed, to remedy the Powdered Metal Defect, the Company would be required to take each engine out of service for numerous months prior to the end of its warranty period. Doing so would cost RTX **billions of dollars** in emergency inspections and repairs, as well as compensation to airlines

---

[6] The FAA issues Airworthiness Directives ("ADs") when an "unsafe condition" either "exists in a product" or "is likely to exist or develop in other products of the same type design." ADs typically specify inspections, conditions, limitations, and actions required to resolve an unsafe condition. FAA Emergency Airworthiness Directives ("EADs") are ADs that typically require immediate action by the aircraft owner or operator due to the severity of the safety issue involved.

for prolonged grounding of planes equipped with the GTF engines with the Powdered Metal Defect. Moreover, the public revelation of such a serious and widespread defect in RTX's prized GTF engine fleet would be disastrous for the Company during a critical period when RTX was faced with increasing competition, growing customer demand for cutting-edge engine technology, and supply shortages.

31.     Accordingly, rather than disclose the full extent of the issue, Defendants repeatedly obfuscated and minimized the defect to investors and the FAA throughout the Class Period. Indeed, in service bulletins, inspection reports, and other materials provided to the FAA, airlines, and operators, RTX falsely and misleadingly asserted that the problem was largely contained to only V2500 engines, that the cracking in the HPT disks was not urgent and could be addressed during routine inspections, and, most importantly, that the Powdered Metal Defect did not significantly impact any other engine types—including the GTF.

**D.     Defendants Misled Investors About the GTF Engine's Airworthiness and Profitability and Concealed the Powdered Metal Defect's Impact on the Fleet**

32.     The Class Period begins on February 8, 2021, as Defendants engaged in a series of material misrepresentations and omissions designed to conceal the Powdered Metal Defect's impact on the prized GTF engine fleet from investors. Defendants' misrepresentations and omissions were specifically crafted to deceive the investing public into believing that RTX's GTF engine family was airworthy and to downplay any perceived issues with the engines. Unbeknownst to investors, by the start of the Class Period, Defendants had known for at least a year that the pervasive, dangerous, and costly Powdered Metal Defect stood in the way of the GTF engine fleet's airworthiness and, therefore, profitability.

33.     For example, on February 8, 2021, RTX's annual 10-K report stated that "***technical issues have been identified and experienced***" with the GTF engine, which the Company described

as "***usual for new engines and new aerospace technologies***."  RTX assured investors that "***Pratt & Whitney has addressed these issues through various improvements and modifications***." Regardless of whether RTX intended to include Powdered Metal Defect in the unspecified "***technical issues***," Defendants' statements were highly misleading.  Indeed, if RTX intended for this disclosure to encompass the Powdered Metal Defect, it falsely and misleadingly left investors with the understanding that the Powdered Metal Defect had been "***addressed . . . through various improvements and modifications***," when the exact opposite was true:  as evidenced by Defendants' 2023 admissions, Pratt & Whitney's Powdered Metal Defect was still present on engines manufactured from 2015 through 2021, and the defective engine parts were installed on planes that remained in commercial service.  Thus, at the time of this disclosure, the Powdered Metal Defect had not been "***addressed***" with respect to in-service GTF engines.  Therefore, Defendants' statements falsely led investors to believe that any risk posed by the Powdered Metal Defect had been resolved, when in reality, an even greater risk was still very present.

34.    Alternatively, if RTX did not intend for the "***technical issues***" referenced in this disclosure to encompass the Powdered Metal Defect, Defendants kicked off the Class Period by speaking affirmatively on technical issues while failing to disclose a much larger, known technical issue affecting the GTF engine family—the Powdered Metal Defect—that caused critical engine parts to crack and fail.  In reality, the significance of the Powdered Metal Defect meant that, if discovered by the public or the FAA, RTX would be required to recall the engines and perform costly safety inspections on them.  Therefore, Defendants' omission of the Powdered Metal Defect from its affirmative statements touting "***addressed***" "***technical issues***" that have been "***identified and experienced***" led investors to believe that no such risk existed, when Defendants knew that it did.

35.     Contrary to their representations to investors, behind the scenes, Defendants' own actions told a far different story.  Indeed, the Powdered Metal Defect was so urgent, so pervasive, and so entrenched that, for **eighteen months** following the March 2020 incident, Defendants desperately tried to find a solution to remove the contaminant from the powdered metal used to manufacture the engines.  Indeed, at the time the February 8, 2021 statements were made, Defendants were still actively trying to cure the Powdered Metal Defect from affecting new manufacturing production.  In fact, as Defendant Hayes would ultimately be forced to admit at the end of the Class Period in 2023, it was not until the fourth quarter of 2021 that the Company was finally able to produce engines that were free from contamination.

36.     Nevertheless, during this time, Defendants made no mention of the existing Powdered Metal Defect affecting active-service GTF engines, nor of RTX's ongoing effort to prevent the problem from recurring in newly manufactured engines.  Meanwhile, the FAA pressed Pratt & Whitney to expand its findings and acknowledge all products affected by the Powdered Metal Defect.

**E.     RTX Disclosed Its Expanded Root Cause Analysis to the FAA and Continued to Misleadingly Downplay the Extent of the Problem**

37.     With investors in the dark, and after more than fifteen months had passed since the March 2020 Vietnam Airlines Flight incident, Pratt & Whitney finally provided the FAA with an "expanded" non-public root cause analysis on July 29, 2021, identifying the same Powdered Metal Defect in the GTF engine fleet that caused the March 18, 2020 engine failure in Vietnam. Critically, however, because a subsequent September 10, 2021 FAA Airworthiness Directive referencing the expanded root cause report was based on Pratt & Whitney's own analysis, the directive was ultimately limited to a small subset of the GTF engines in service that were registered in the United States.  Specifically, the FAA's Airworthiness Directive only related to a total of

**three** GTF engines, which allowed RTX to continue to conceal the scope of the impact of the defect on the GTF fleet and minimize any investor concerns about financial ramifications to the Company.[7]

38.    While knowing that the Company was concealing a major defect and safety issue, Defendants nonetheless continued to mislead the market about the GTF engine. For example, on November 9, 2021, Defendant Mitchill assured investors that the GTF "***engine is performing very, very well***" having "***flown nearly 11 million hours***" with a dispatch reliability rate "***well over 99%***." This further lulled investors into falsely believing that the GTF engines were flying safely toward profitability. In reality, Defendants knew that, because of the Powdered Metal Defect, the hours of service were simply a stopgap to squeeze life out of the engines, knowing that they would need to be grounded for costly inspection and removal of their defective parts. Further, by touting a near-perfect dispatch reliability rate—a metric important to RTX's customers—Defendants gave investors the false impression that the GTF engines were taking off without issue and meeting airline operators' expectations. Defendants' statements had their intended effect, as RTX's stock price reached a Class Period high of $106.02 on April 20, 2022. Unbeknownst to investors, failed takeoffs (a failure to reliably dispatch the aircraft) were a significant result of the Company's undisclosed Powdered Metal Defect. In tandem, these statements gave investors the false and misleading impression that the GTF engine was "***performing very, very well***" when, in reality,

---

[7] Based on its jurisdiction, the FAA's ADs provide information related to airplanes affected by its directives that are registered in the United States. Only manufacturers, like Pratt & Whitney, have access to the total figures of the airplanes worldwide that are affected by the FAA's ADs and associated manufacturer's investigations. Accordingly, the FAA's ADs often provide an incomplete figure of the total number of affected airplanes, especially in instances where a manufacturing defect disproportionately affects airplanes that are not registered in the United States.

Defendants knew that the GTF engines were not airworthy because of the Powdered Metal Defect and, therefore, needed to be removed from service.

### F. As Defendants' Fraud Began to Unravel, Defendants Minimized the Extent of Problems in the GTF Engine Fleet

39.     It was not long before yet another near-catastrophic event on a commercial flight occurred as a result of RTX's undisclosed Powdered Metal Defect.  Specifically, on December 24, 2022, a Viva Aerobus flight—this time equipped with a GTF engine—caught fire and aborted takeoff in Mexico.  Knowing that this event meant increased scrutiny from investors and the FAA on the Powdered Metal Defect and the GTF engine family, Defendants nevertheless continued to tout its airworthiness and profitability.

40.     Most notably, on June 19, 2023, Defendant Eddy spoke at RTX's Investor Day at the Paris Air Show and continued to downplay the significance of any manufacturing issues and the risks they posed to Pratt & Whitney's and the GTF program's profitability.  For example, Defendant Eddy falsely claimed that the GTF fleet had "***significant life remaining***" and noted that "***we've assumed all of these activities and the related costs in our contract modeling and of course, in our financial guidance***."  Unbeknownst to investors, the GTF engine fleet was on the precipice of incurring significant time out of service for inspection and removal of engine parts that Defendants knew to be defective since 2020.  By representing that RTX's financial estimates contained assumptions related to "***all of these activities***" to fix technical issues, Defendants misled investors to believe that the GTF engine fleet's success was unblemished.  Despite these unequivocal assurances, Defendants revealed the falsity of their statements to investors by disclosing the Powdered Metal Defect shortly thereafter.

**G.    On July 25, 2023, Defendants Shockingly Revealed the Powdered Metal Defect and Continued to Mislead Investors as to its Impact on the GTF Fleet**

41.    Approximately one month after Defendants' statements at the Paris Airshow, on July 25, 2023, Defendants shocked investors when RTX issued an 8-K Press Release disclosing a "***rare condition***" in its powdered metal that "will require Pratt & Whitney to remove some engines from service for inspection earlier than expected."  On the ensuing earnings call, Defendants disclosed that the Powdered Metal Defect was so urgent and serious that RTX would immediately pull approximately 200 GTF engines for emergency "enhanced inspection," with approximately 1,000 more needing to be removed and inspected within the next 9 to 12 months, causing a $500 million hit to RTX's free cashflow.  Defendants further revealed that these contaminants were introduced into "powdered metal produced from approximately Q4 2015 into Q3 2021"—a full **six years' worth of GTF engines**, during a time when more GTF engines were produced than any other engine type.

42.    Significantly, during the earnings call held that same day, Defendant Hayes expressly admitted for the first time that Defendants were well aware of this issue throughout the Class Period.  Specifically, Defendant Hayes stated:

> This is an issue that **we first uncovered back in 2020 when we had an incident with the V2500 turbine disc**.  As a result of that investigation, **we determined at that point that we had some contamination in this powdered metal that we make**.  It occurred very, very rarely, but it did happen, and it actually resulted in the turbine disc failure on an airline . . . .  At the same time, we knew that this contamination had occurred between late 2015 and late 2020, early 2021.  **So we knew we had a suspect population in the fleet**.

43.    On this news, RTX's share price fell $9.91 per share, or 10.2%, to close at $87.10 on July 25, 2023.  Analysts were shocked at the "negative surprise" of "another issue with the GTF engine," and lambasted the company for its lack of candor, asking: "**how could you guys possibly not know about this at Paris when you did this major investor event?**"  Analysts immediately

19

picked up on the manner in which investors were misled by Defendant Eddy's remarks the month prior, in which Eddy misleadingly boasted that the GTF engine had "***significant life remaining***." Defendant Eddy's misstatements sat in stark contrast with Defendants' admission that they had allowed a known, pervasive, dangerous, and costly manufacturing defect to remain in active, commercial airplanes for years.

44.    Despite these revelations, Defendants continued to downplay the problem, claiming that the issue was "***fixed***" and that RTX's investigation had "***yielded a very, very small fallout rate***" of the problematic disks. Moreover, Defendants misleadingly described the Powdered Metal Defect as "***rare***," giving investors the false impression that the contamination did not occur often when, in reality, the contamination was endemic to Pratt & Whitney's powdered metal manufacturing process and appeared across numerous engine families and products, including the GTF engine line.

**H.    On September 11, 2023, Defendants Disclosed the Full $3 Billion Impact of the Powdered Metal Defect on the GTF Engine Fleet**

45.    Finally, on September 11, 2023, RTX issued a Press Release and Form 8-K providing an update on Pratt & Whitney's Powdered Metal Defect. Defendants revealed the full truth during an unscheduled "Special Call" to address the GTF engine.

46.    Defendants now admitted that the Powdered Metal Defect was even more widespread than they had previously acknowledged, **impacting the entire 3,000 engine GTF fleet**, and requiring 600-700 engines to be removed for inspection in the near term. These intensive inspections would require each engine to be out of service for as much as **250 to 300 days each**, grounding massive numbers of commercial airplanes for extended time periods, which RTX was on the hook to pay for. The impact to RTX's bottom line was now projected to be a staggering **$3 to 3.5 billion** to repair the engines and compensate the Company's airline customers for the lost

use of their planes.  Strikingly, Defendant Hayes again admitted that the contaminant had been introduced "back in late 2015" as Pratt & Whitney ramped up production to meet GTF demand, and that, by 2021, the Company had understood that the issue was so serious and pervasive that it had secretly spent **eighteen months** making "**nine changes to the process to ensure the purity of the powder** [metal]."

47.    The market was shocked by these revelations, with analysts again excoriating RTX management's credibility.  For example, a Bank of America analyst was incredulous at "a quality escape[] . . . of this magnitude." A J.P. Morgan analyst similarly stated that "we're about as surprised as most of the rest of us at the magnitude of this, which is, I think, much different than what you guys discussed . . . ."  An RBC report noted that "the financial and operational impact identified today is more substantial than we had expected."  Similarly, a J.P. Morgan report lamented "an impact from metal contamination that was worse than the Company indicated in July, triggering 10% [stock price] underperformance the past two days," and noted that "it's hard to have full confidence given how this issue has emerged and worsened."  Barclays downgraded RTX stock because of "the uncertainty related to the duration and cost of the GTF fix along with long-term market share and profitability." And Bernstein Research emphasized "investor concerns" regarding the magnitude and disclosure of the issue, including "questions about management, given the time it took Pratt to fully raise the issue."

48.    On this news, RTX's share price fell an additional $6.58 per share, or 7.9%, to close at $76.90 on September 11, 2023—over 27% below the stock's Class Period high.

49.    Since the end of the Class Period, the immense fallout for RTX and its customers has only continued.  The FAA has issued multiple ADs expanding the need for "accelerated replacement" of parts made from the contaminated powdered metal to additional components and

additional engines, as these components "are susceptible to failure significantly earlier than previously determined." Airlines around the globe have been forced to ground planes and make dramatic service cuts—for example, Spirit announced that it has been forced to completely cease all service at Denver International Airport due to grounded planes. Finally, in November and December 2023, the SEC subpoenaed RTX for:

> [E]ngineering, operational, organizational, accounting, and financial documents in connection with **an investigation relating to the Company's disclosures in 2023 of issues arising from Pratt & Whitney's use of powder metal in manufacturing various engine parts**, its identification of certain risks associated with those manufacturing processes, and corrective actions identified by Pratt & Whitney to mitigate those risks.

## II.    JURISDICTION AND VENUE

50. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

51. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

52. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

53. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

### III.    PARTIES

#### A.    Lead Plaintiffs

54.    Lead Plaintiff New England Teamsters was established in 1958 to provide retirement income to eligible participants and their beneficiaries.  New England Teamsters manages more than $2.4 billion in assets for the benefit of its approximately 72,000 participants. The Fund is jointly administered by an eight-member Board of Trustees—four Trustees representing the Local Unions and four Trustees representing the Contributing Employers.  All claims are processed at the Fund Office, which is located in Burlington, MA.  The Fund is qualified under Internal Revenue Code ("IRC") Section 401(a) and acts as a multi-employer, defined benefit plan within the meaning of IRC Sections 414(f) and (j).  On May 2, 2024, the Court appointed New England Teamsters as Lead Plaintiff for this litigation.  As reflected in its previously filed certification (*see* ECF No. 17-1), New England Teamsters purchased RTX common stock during the Class Period and suffered damages as a result of Defendants' fraud.

55.    Lead Plaintiff Laborers Local 60, based in Hawthorne, New York, provides pension and other benefits for union members.  Laborers Local 60 manages approximately $250 million in assets for the benefit of more than 2,400 participants. On May 2, 2024, the Court appointed Roofers Local 8 as Lead Plaintiff for this litigation.  As reflected in its previously filed certification (*see* ECF No. 17-1), Laborers Local 60 purchased RTX common stock during the Class Period and suffered damages as a result of Defendants' fraud.

56.    Lead Plaintiff Roofers Local 8, based in Long Island City, New York, provides pension and other benefits for union members. Roofers Local 8 manages approximately $250 million in assets for the benefit of its approximately 5,000 participants.  On May 2, 2024, the Court appointed Roofers Local 8 as Lead Plaintiff for this litigation.  As reflected in its previously filed

certification (*see* ECF No. 17-1), Roofers Local 8 purchased RTX common stock during the Class Period and suffered damages as a result of Defendants' fraud.

**B.    Defendants**

57.    Defendant RTX is an "an aerospace and defense company that provides advanced systems and services for commercial, military and government customers worldwide." RTX has three principal business segments including, pertinent to this action, Pratt & Whitney. The Company describes Pratt & Whitney as "among the world's leading suppliers of aircraft engines for commercial, military, business jet and general aviation customers." RTX is incorporated in Delaware, and its head office is located at 1000 Wilson Boulevard, Arlington, Virginia 22209. RTX's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RTX." Pratt & Whitney's corporate headquarters are located at 400 Main Street, East Hartford, Connecticut 06118.

58.    Defendant Gregory Hayes served as RTX's Chief Executive Officer ("CEO") from April 2020 to May 2024. During that time, and through the present, Hayes has served as the Chairman of RTX's Board of Directors (the "Board") and currently as the Executive Chairman of the Board. Prior to the Merger creating RTX, Defendant Hayes was the CEO and Chairman of UTC since 2016. Defendant Hayes also participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the GTF engines.

59.    Defendant Neil Mitchill has served as RTX's Chief Financial Officer ("CFO") since April 2021. Prior to the Merger creating RTX, Defendant Mitchill was the senior vice president and CFO of UTC. As CFO of RTX, Defendant Mitchill is responsible for the Company's financial reporting and controls, planning and analysis, investor relations, internal audit, tax, and treasury. Defendant Mitchill also participated in earnings calls and conferences with securities

analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the GTF engines.

60.     Defendant Anthony F. O'Brien was RTX's CFO from March 2015 through April 9, 2021.  As then-CFO, Defendant O'Brien participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the GTF engines.

61.     Defendant Christopher T. Calio has served as RTX's President and CEO since May 2024.  He is also a member of the Board.  Prior to his appointment as CEO of RTX, Calio was Chief Operating Officer ("COO") of RTX and former President of Pratt & Whitney.  Calio has worked with the Pratt & Whitney since 2005, through UTC as Chief of Staff to Defendant Hayes and head of Pratt & Whitney's legal department.  Defendant Calio also participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omission of material fact, among other things, relating to the GTF engines.

62.     Defendant Shane G. Eddy has served as President of Pratt & Whitney since March 2022.  Before the Merger, he was Pratt & Whitney's senior vice president and chief operations officer, "responsible for meeting Pratt & Whitney's commitments to safety, quality, on-time delivery and cost."  Defendant Eddy also participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the GTF engines.

63.     Defendants Hayes, Mitchill, O'Brien, Calio, and Eddy are collectively referred to as the "Individual Defendants" and, together with RTX, as the "Defendants." The Individual Defendants directly participated in the management of RTX's operations, including its accounting and reporting functions, had the ability to and did control RTX's financial reporting, and were

privy to confidential information concerning RTX and its business, operations, and financial statements, as alleged herein. They were also involved in drafting, reviewing, publishing, and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

### C.    Relevant Third Parties – Former Employees[8]

64.    FE-1 was formerly employed at Pratt & Whitney from January 2019 through December 2021 as a Validation Expert. Prior to that, from approximately 1996 through 2013, FE-1 had been employed at Pratt & Whitney as a Design Metallurgist and then Manager, Materials/Structures. During the last years of his employment, FE-1 reported to Michael Karnas, Designated Engineering Representative and Manager, and ODA (Organizational Designation Authority) Unit member. Karnas is still employed at Pratt & Whitney. FE-1 advised that part of the reason he retired when he did was because the Company was not addressing problems involving contaminated materials, specifically powdered metal.

65.    FE-2 was employed at Pratt & Whitney from early 2020 through mid-2023. While at Pratt & Whitney, FE-2 was a high-level discipline officer in its Sales Operation Planning department. In this capacity, FE-2 oversaw Pratt & Whitney's Sales, Inventory, and Operations Planning ("SIOP") process. FE-2 responsibilities applied to all of Pratt & Whitney and included training, deploying new computer operating systems, improving customer service, and working on policies regarding sales demand and procurement forecasting. FE-2's role in Pratt & Whitney's SIOP process involved all aspects of planning, procurement, inventory, and execution of sales. FE-2 reported to Pratt & Whitney's Executive Director of SIOP and Inventory Transformation,

---

[8] FEs are identified herein by number (FE-1, FE-2, etc.). All FEs are described in the masculine to protect their identities.

who reported to Pratt & Whitney's Vice President of Business Systems Transformation, who reported to Pratt & Whitney's President.

66.     FE-3 was formerly employed by Pratt & Whitney from March 2015 to September 2019 as Assembly & Test Mechanic at the Company's Jupiter, Florida location.  As an Assembly & Test Mechanic at Pratt & Whitney FE-3 worked on both the commercial GTF PW1100 engine as well as the military version for the F135, but spent most of his time working on the commercial version.  He was also formerly employed by Chromalloy in Fort Lauderdale, Florida as V2500 Product Line Manager and V2500 Product Line Representative from 2022 to 2023.  He advised that his responsibilities at both companies included testing and evaluating many different Pratt & Whitney parts, including the HPT and HPC disks used in the GTF PW1100 and V2500 engines.

67.     FE-4 joined Pratt & Whitney in September 2015 as an Inspector 1 and departed in March 2021 as an Inspector 3.  FE-4 advised that he worked in quality control during his first two years at Pratt & Whitney and in production for the remainder of his tenure.  FE-4 detailed that he worked with the Geared Turbofan (GTF) engine from 2018 to 2021, during which time he inspected engine parts.

68.     FE-5 was employed with Pratt & Whitney as a Mechanical Engineer from May 2017 to December 2022.  FE-5 detailed that he worked at Pratt & Whitney's HMI Metal Powders facility in Clayville, New York.  FE-5 noted that this facility mainly produced nickel alloy metal for Pratt & Whitney's fan blades and rotors.  FE-5 advised that he was responsible for making sure that no contaminants got into the powder metal.

69.     According to FE-6 he worked on Pratt & Whitney's defense side of the company's business, originally in the defense global supply chain and then transitioned to the New Product Introduction segment or department (also on the defense side) from January 2023 until he left the

Company in December 2023. FE-6 advised that New Product Introduction was also internally referred to as New Program Introduction.

70.     FE-7 joined Pratt & Whitney as a Manufacturing Engineer in July 2018 and was promoted to Operations Supervisor in January 2020. FE-7 later departed Pratt & Whitney in October 2022. FE-7 advised that as an Operations Supervisor, he worked on the Maintenance, Repair and Operations side and mainly on Pratt & Whitney Canada cases. FE-7 noted that he worked on Geared Turbofan (GTF) fan blades as a Manufacturing Engineer but not as an Operations Supervisor. FE-7 detailed that he worked at Pratt & Whitney's Plant 5 in Holt, Michigan.

71.     FE-8 was employed with Pratt & Whitney as a Manufacturing Engineering Manager from October 2021 to September 2023. FE-8 advised that he and his engineers developed the process to apply coating to engines, including the Geared Turbofan (GTF) engines. FE-8 detailed that he worked "a lot" on the GTF 30K engines and on the GTF Advantage engines.

72.     FE-9 initially worked at Pratt & Whitney as a Senior Analyst and later in management positions in the Quality department. FE-9 advised that from August 2016 to August 2023, he worked with multiple engines, including the Geared Turbofan (GTF) engine. FE-9 advised that he was responsible for mitigating risks for the GTF engine in this role.

73.     FE-10 was employed at Pratt & Whitney in a variety of roles from January 2006 through October 2022, including Manager, Quality Assurance Customer Support Team. His most recent and final position was Operations Manager, East Hartford Repair Operations, based in Connecticut. As Operations Manager, FE-10 reported to former Deputy General Manager and current Transformation Manager Alexandra Manzin; Manzin reported to General Manager Kevin Thomas.

**IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD**

**A.    RTX's Background & Business**

74.    RTX, an American multinational aerospace and defense corporation, is the product of a $121 billion Merger consummated on April 3, 2020 between military and aerospace behemoths Raytheon Corporation ("RTN") and United Technologies Corporation ("UTC"). RTN was a major United States defense contractor and industrial manufacturing corporation. UTC was an aerospace conglomerate specializing in commercial aircraft engine manufacturing and aerospace systems. Today, RTX operates through three business segments, Collins Aerospace, Raytheon, and Pratt & Whitney.

75.    Pratt & Whitney—previously a subsidiary of UTC—became a business segment of RTX via the Merger. Pratt & Whitney's business focuses on designing, manufacturing, and servicing its product lines of jet engines for commercial and military aircraft. Pratt & Whitney's commercial aircraft engine division is the second largest in the world, boasting a 35% market share as of 2020.

76.    Pratt & Whitney is an OEM that produces commercial jet engines and sells them to aircraft manufacturers.[9] These aircraft manufacturers, most prominently Airbus, deliver the aircraft—equipped with Pratt & Whitney engines—to commercial carriers such as Delta, Spirit, and JetBlue for operation.[10] Pratt & Whitney earns a significant portion of its revenue by providing Aftermarket MRO sales and services for its engines after they are in use by operators. Indeed, Pratt & Whitney derives most of its profit from these Aftermarket MRO sales and services because

---

[9] Pratt & Whitney occasionally sells its engines through partnership consortiums like IAE International Engines AG ("IAE").
[10] Pratt & Whitney's largest commercial customer by sales is Airbus, with sales of 33%, 31%, and 30% of total Pratt & Whitney's business segment sales in 2022, 2021, and 2020, respectively.

its development and manufacturing costs are high and often result in the engine being sold at an initial loss.

77.     Pratt & Whitney is critical to RTX's business.  In 2022, Pratt & Whitney accounted for approximately 30% of RTX's total net sales, bringing in $20.5 billion in revenue.  Of Pratt & Whitney's $20.5 billion in total net sales, roughly $11.5 billion came from its commercial engines business.  Accordingly, investors paid close attention to the success of Pratt & Whitney's key commercial engine product families.

**B.    RTX's Crown Jewel – Pratt & Whitney's GTF Family**

78.     In the years leading up to the Class Period, Pratt & Whitney's most significant product suite, by far, was its GTF engine family.  Pratt & Whitney launched the GTF program in 2008 after investing $10 billion to develop the engine.  The first GTF engine, the PW1100G (GTF 30k) variant, entered service in 2016.  PW1100G engines primarily power the Airbus A320neo aircraft family—which are among the most produced commercial jet airliners across the world. Pratt & Whitney's GTF engines also power the Airbus A220 aircraft family through the PW1500G (GTF 24k) models, and the Embraer E2 family through the PW1900G (GTF 24k) models.

79.     Leading up to and throughout the Class Period, the GTF engine was the centerpiece of Pratt & Whitney's growth strategy.  As a 2018 Forbes Magazine article explained, the GTF was seen as a "a watershed in the history of aircraft propulsion," and thus quickly became "the most important development shaping [Pratt & Whitney's] future success."  This was because, as Forbes explained, "Pratt & Whitney promised that jetliners equipped with the GTF would achieve a 16% reduction in fuel consumption, a 50% reduction in greenhouse gas emissions, and a 75% reduction in noise."  These were previously unheard-of improvements in the jet engine industry.

80.     Standard turbofan engines—predecessors to the GTF engines—have been on the market for many years.  These engines work through a series of air ingestion, compression,

combustion, and expulsion.  The engine's front fan draws in air and feeds it into the compressor.  There, a series of blades compress the air and channel it into the combustor, also called its burner.  In the combustor, injection nozzles create a mix of fuel and compressed air that burns at a temperature of approximately 1,700 degrees Celsius.  The ultra-hot combustion gases flow at a high pressure and temperature into the engine's turbine, where they are converted into mechanical energy.  The combusted gases are then accelerated in a thrust nozzle and expelled, which propel the aircraft.

81.    A turbofan engine's turbine is a critical part of the jet propulsion system because it drives the compressor and generates thrust.  The turbine contains many blades and disks that are connected through a shaft and rotate.  The turbine is divided into HPT and low-pressure turbine ("LPT") sections.  The HPT drives the high-pressure compressor, while the LPT drives the low-pressure combustor and the fan that generates the bulk of the engine's thrust.  Notably, the turbine is part of the engine's "hot section" and exposed to blistering temperatures by being situated near the engine's combustor.

82.    Pratt & Whitney's GTF engine represented an industry "breakthrough," because, unlike traditional turbofan engines, it had a gearbox between the fan and combustor that allowed the two sections of the engine to function at different, purportedly optimal, speeds.  Specifically, the front fan spins slower to maximize air intake, while the core compressor and turbine operate at a faster speed to improve thrust.  These design improvements were meant to enable the GTF engine to generate higher thrust while also burning less fuel. A diagram of the GTF engine follows:



Credit: Pratt & Whitney

83.    The industry quickly heralded Pratt & Whitney's innovation on the GTF engine. For example, Delta's CEO Richard Anderson touted that Pratt & Whitney's "geared turbofan is really the first true innovation since the Boeing 787 Dreamliner," which was introduced into commercial service nearly a decade earlier, in 2009.  Due to its revolutionary design and fuel efficiency, demand for the GTF engine was overwhelming.  By the end of 2018—just three years into its manufacture—Pratt & Whitney had already received more than 10,000 orders and commitments for its GTF engines.

84.    A slide from a Pratt & Whitney's March 2018 investor presentation illustrated the importance of the GTF engine to Pratt & Whitney's business model, and demonstrated that GTF engines were expected to soon dwarf all other Pratt & Whitney commercial engines in the market combined:



85.   Further emphasizing the point, the Company's SEC filings and investor communications repeatedly described the GTF engine as "the architecture of the future" and a "huge driver of growth," that would "get [RTX] back to [its] historic level of margins."  As the Company's 2019 annual report boasted:

> **Pratt & Whitney continues to set the industry standard for performance. Its GTF (geared turbofan) engine is the quietest, cleanest and most fuel-efficient engine in its class.  Demand for the GTF engine is strong with more than 10,000 firm and option orders at the end of 2019**.  Approximately 1,400 GTF engines are in service across six continents.  During the year 14 airlines took their first GTF-powered aircraft, including Wizz Air, Cebu Pacific and JetSMART. Current customers, such as GoAir and JetBlue, announced additional GTF orders.  GTF engines have saved operators more than $550 million in fuel and more than 2.5 million metric tons of carbon emissions since the engine's entry into service. The GTF engine's revolutionary geared turbofan architecture allows for further evolution and performance enhancements.

86.    Indeed, as Defendant Calio explained during a May 18, 2021 investor call, the GTF was soon expected to account for **60% of all of Pratt & Whitney's sales**.  Defendant Calio specifically remarked that the GTF engine "**is going to be the huge driver of growth in this business**," and stated that while, in 2019, the GTF was "15%, 20% - little north of 20% of our sales in the large commercial engine business," it would "**be close to 60% when we get to 2025**[.]"

87.    Notably, the way RTX generates revenue on its GTF engines is linked to their time "on wing" or in flight.  This is because RTX's GTF engines are initially sold at a loss, resulting from the high investment needed to design and build the engines.  RTX frequently acknowledged this point during the Class Period.  For example, during a February 23, 2022 investor conference, Defendant Hayes stated, with respect to the GTF program, "we still lose money on every single engine."

88.    Because initial sales of GTF engines are not profitable, RTX recoups its losses and generates this "cash flow" or profit through commercial Aftermarket MRO sales and services related to already-installed engines.  However, RTX can only begin charging for Aftermarket MRO once the GTF engine has been in service long enough for its initial warranty to expire—typically up to **five years**.  During the warranty period, Pratt & Whitney does not charge the operator for Aftermarket MRO services.

89.    Accordingly, RTX had a strong incentive to "ramp up" its production volume of GTF engines to get them to market as quickly as possible, in order to bring the fleet closer to generating cash flow from its Aftermarket MRO services.  Moreover, due to how important Aftermarket MRO profits were to the GTF program, Defendants emphasized to investors that they closely monitored the engine's performance—*i.e.*, its ability to stay in the air—"every single day, every single hour."  For example, on September 12, 2019, an analyst inquired, "on the GTF, what

do you think is the biggest risk in getting that aftermarket goodness over the next 10, 20, 30 years?" Defendant Hayes responded, "[w]e know, for instance, how long a turbine is going to last . . . we monitor these [engines] every single day, every single hour that they're operating. So we can see when they're going to come out of service."

90.    In sum, it was critical to RTX's profitability that it not only sell as many of the GTF engines into service as quickly as possible, but that the Company keep the engines in service until their warranty periods expired so that RTX could start earning profit through its Aftermarket MRO business. Nevertheless, in a frantic effort to get the GTF engines into commercial service, Pratt & Whitney cut corners in its manufacturing, which produced aircraft engines with a host of manufacturing defects.

### C.    RTX's Scramble to Meet Demand for GTFs Led to Rampant Quality Control Problems and Defects

91.    As Pratt & Whitney struggled to ramp up production of its GTF engines to meet increasing levels of demand, its quality control suffered. Consequently, in the years leading up to the Class Period, Pratt & Whitney's faulty quality control led to GTF engines being plagued by a series of defects. As part of its strategy to ramp up production volume and get the GTF engine to market quickly, numerous former employees of RTX detailed how the Company knowingly compromised manufacturing quality and, in turn, flight safety. The FEs highlight how RTX's push to get the GTF engines to market was tied to its need to begin logging flight hours on the engines to bring them closer to profitability.

92.    For example, according to FE-8, a Manufacturing Engineering Manager, Pratt & Whitney "pushed production over everything." FE-8 stated that Pratt & Whitney sent customers GTF 30K engine parts with known defects because the Company was behind on production and needed to get certain parts "out the door." FE-8 detailed that he was told by Elliott, Senior

Operations Manager Mark White, Associate Director Maribel Rodriguez, former Vice President Deb Chipperfield and others that Pratt & Whitney needed to produce GTF 30K engine parts to customers even if there were known defects. FE-8 added that he left Pratt & Whitney partially because the company targeted "minimal spec" (i.e. specifications) when conducting investigations on engine parts.

93.     Similarly, FE-4, who worked with the Geared Turbofan (GTF) engine from 2018 to 2021, recalled that after he was moved from quality control to production, he felt pressure from his supervisors to get the GTF engine to market, even though there were problems with the engine. FE-4 detailed that he and his colleagues were told to "hurry up" with the production of the GTF engine during this time. FE-4 noted that despite problems with the GTF engine, the engines were still delivered to Pratt & Whitney's customers. FE-4 stated Pratt & Whitney was not making any money on the GTF engine during his tenure. FE-4 explained that Pratt & Whitney's customers purchased the GTF aircraft from Airbus and that the GTF engine came with the Airbus aircraft. Therefore, according to FE-4, Pratt & Whitney made money by engine overhauls and servicing. However, FE-4 noted that all the GTF engine work that Pratt & Whitney did for its customers during his tenure was warranty work.

94.     Similarly, FE-3 described quality problems affecting Pratt & Whitney's GTF PW1100 engines, specifically the high-pressure turbine ("HPT") and high-pressure compressor ("HPC") disks, also referred to as hubs. He also described numerous other manufacturing quality issues impacting the GTF engine fleet, which were known by top management within the Company. He described the Company's strong push to avoid delays and deliver the GTF engines on time, so as not to negatively affect customer relationships, despite these many quality issues. Specifically, FE-3 recalled that there was a "big push to get the GTF out" to market, adding that

the priority and biggest push was getting the GTFs to Airbus. He also described how the Company was sensitive to these issues because they knew disclosing them would impact shareholders or investors.

95.     Other former employees described a change in procedure in order to get more GTF engines out the door. For example, according to FE-7, a former Manufacturing Engineer at Pratt & Whitney, engine fan blades are typically developed for two years and then manufactured. However, FE-7 stated that Pratt & Whitney developed the GTF engine fan blades at the same time they were manufacturing them because it wanted to get them out to its customers. FE-7 stated that the quality of these parts was "poor" compared to where it should be because Pratt & Whitney wanted to get the GTF engine to market.

96.     Former employees also explained that Pratt & Whitney tried to keep the manufacturing issues secret and, worse, that many of the engineering fixes were not working. For example, FE-10 recalled that employees were instructed not to divulge publicly any details about the engine's problems or efforts to fix them. Moreover, FE-10 elaborated that he knew that the Company's internal numbers regarding the number of affected engines were very high, and that the initial engineering "fixes" for the problem were not working, so the costs were much higher than initially anticipated.

97.     More egregious, FEs also recall that, as part and parcel of its push to get the GTF engine to market quickly, RTX implemented a policy from its highest level of cutting manufacturing costs at the expense of quality control and the safety of the GTF engine family. For example, FE-2 indicated that he was aware of the quality control issues at Pratt & Whitney which led to the recall of the GTF series of engines. FE-2 advised that the quality control problems were caused by changes in the Company's procurement process; specifically, the Company switched

from reliable suppliers to much less expensive suppliers to save money, but the materials sourced from the cheaper suppliers were much poorer in quality.

98.    FE-2 advised that the cost-cutting measures which forced Pratt & Whitney to switch to unqualified suppliers came from former RTX CEO Gregory Hayes. FE-2 noted that Hayes was recently replaced as CEO by Christopher Calio, and that Calio had also been responsible for creating the cost-cutting policies that led to the quality control problems.

99.    According to FE-2, Pratt & Whitney switched to less expensive suppliers shortly before the COVID pandemic; Company management forced the Sourcing Team to look for new, less expensive suppliers starting in 2018. FE-2 recalled that there was a directive from Pratt & Whitney's president to find cost savings of approximately $1 billion. FE-2 added that this directive was issued to Pratt & Whitney's president by the CEO of RTX, who instructed him to find cheaper suppliers "right now." FE-2 noted that the Sourcing Team earned bonuses for achieving certain levels of cost savings. FE-2 indicated that the cost savings directive was communicated to him during regular SIOP process meetings.

100.    FE-2 reiterated that, after the switch to the cheaper suppliers, quality control problems increased. FE-2 commented that some of the new suppliers, most of which were overseas, "don't even have a company" and were "building parts in their garage." According to FE-2, RTX fired him for raising concerns about these issues.

101.    Similarly, FE-3 recalled that Pratt & Whitney always internally pushed cost-cutting which he described as always a "priority." According to FE-3, with the internal concerns over cost-cutting, potential costs of recalls, threatened contract cancellations, and not letting bad news make it to press, that Pratt & Whitney was focused on containing issues, and not fixing them.

102.    Corroborating the FEs' accounts, contemporaneous news publications described early issues with the GTF engines attributable to Pratt & Whitney's shoddy manufacturing.  For example, throughout 2017 and 2018, dozens of Airbus A320neo planes with GTF engines experienced in-flight shutdowns or aborted takeoffs due to defects in a number of different components in the GTF engines, such as fan blades, turbine blades, and knife-edge seals.[11]   These component problems were so widespread that, in 2018, Airbus temporarily stopped taking delivery of new GTFs from Pratt & Whitney.  Indeed, FE-3 recalled that Pratt & Whitney's customers— most notably Airbus, the Company's key customer with the largest contract—were threatening to cancel their contracts if there were any more delays with the GTF engines.  He first recalled hearing

---

[11] Numerous FEs described manufacturing defects concerning parts of the GTF engines that were not the focus of RTX's 2023 product "recall," including turbine blade coatings and fan blades.  For example, FE-8 specified that there was "separation in certain areas" and that there was "thin coating" and chipping in the combustion panels and turbine blades of the GTF 30K engines.  FE-8 stated that the two main quality control issues that were identified with the coating of GTF 30K engines during his tenure were 1) ghosting, cracking and crazing, and 2) spallation.  FE-8 detailed that in April 2022, he and his engineers identified ghosting, cracking and crazing in the coating of the GTF 30K engines, including in the turbine vanes and turbine blades.  According to FE-8, if the engines got too hot the turbine blades could melt, break off and cause engine failure.  FE-8 stated that the turbine blades were supposed to last for between 20,000 and 25,000 hours but that some of the turbine blade parts did not last that long.  FE-8 recalled that he notified his superiors of this ghosting, cracking and crazing problem but that current Pratt & Whitney Associate Director of Operational Excellence Scott Elliott "forced" him to find a "deviation acceptance" to this problem, instead of stopping production and fixing the process.  FE-8 defined "deviation" as an acceptance outside of Pratt & Whitney's required quality control limits.  FE-8 added that Pratt & Whitney never fixed this ghosting, cracking and crazing issue during his tenure.  FE-8 noted that he was told by his General Manager and Director that Pratt & Whitney shipped GTF 30K engine parts to customers that later failed due to this ghosting, cracking and crazing problem.  FE-8 detailed that Chris P. in Quality Control told him that Pratt & Whitney was content with the fact that one out of every 10 GTF 30K turbine blade parts failed.  Likewise, FE-7, a former Manufacturing Engineer at Pratt & Whitney, recalled that between July 2018 and January 2020 there were "always" some quality control issues with the GTF engine fan blades.  FE-7 detailed that the cover of the GTF engine fan blades "liberated in flight" and was "ingested" into the engine twice during this period.  FE-7 described this issue as "catastrophic" and stated that "quality alerts" were sent to all Pratt & Whitney employees both times this occurred.  FE-7 explained that all Pratt & Whitney employees, including the C-suite, were on "high alert" about what had happened each time.

about these customers' threats to pull contracts at work sometime in 2018. FE-3 recalled that the issue with the HPT and HPC parts were not rectified when his tenure at Pratt & Whitney ended.

103.    Moreover, many of these news articles caused the market to become concerned about whether and when the GTF would finally become profitable. As a March 15, 2018 Business Insider article explained, despite the GTF's "game changer" technology, the engine's progress in the market had been stalled, as "the engines have been plagued by a series of **teething problems** that have slowed aircraft deliveries, increased maintenance costs, and forced the Indian government to ground a fleet of planes." As such, Business Insider opined that "it looks as if we'll have to wait a bit longer for this piece of newfangled equipment to hit its stride."

104.    Accordingly, leading up to the Class Period, analysts and investors were highly focused on the Company's efforts to address these defects and turn the GTF program into long-term profits from Aftermarket MRO services and gain market share. For example, in an April 8, 2020 report, RBC Capital Markets analysts took note of Pratt & Whitney's "spending to address **teething issues** associated with the entry into service for the GTF." While Pratt & Whitney was "still years away from positive FCF [free cash flow] on new GTF deliveries," analysts at RBC expressed hope that "aftermarket revenues associated with the program should gradually build as the fleet expands," such that "the GTF franchise will create value over decades." RBC further stated its belief that "Pratt has overcome most of the technical issues that affected the engine during its first few years," and noted that, now, "the key test for the GTF will be the share of new orders it is able to generate," estimating that, if the defects were resolved, "Pratt & Whitney will capture ~45-50% of the A320 engine market through 2030."

105.    Despite analysts and investors' belief that Pratt & Whitney had overcome its early manufacturing difficulties with respect to the GTF engine fleet, one far more severe and pervasive

problem—the Powdered Metal Defect—was poised to deal a major setback to RTX's plans to get the GTF program to profitability if it was revealed.

**D.      By No Later Than March 2020, Defendants Discovered that Pratt & Whitney Was Manufacturing GTF Engine Parts Using Contaminated Powdered Metal**

106.    Among the numerous defects resulting from Pratt & Whitney's desperate scramble to get the GTF engines to market was an even more severe and pervasive defect: contamination of its powdered metal used to manufacture critical GTF engine parts.  As Defendants would admit at the end of the Class Period in 2023, Pratt & Whitney's frantic efforts to "ramp up" production on the GTF engines in 2015 had caused the process to "g[e]t away" from the Company, and resulted in a catastrophic manufacturing error—the Powdered Metal Defect—that affected HPT disks installed on all 3,000 GTF engines in the existing fleet, which Defendants would later admit they discovered years earlier, by no later than 2020.  As explained herein, remedying the Powdered Metal Defect had such severe financial implications that Defendants were determined to keep it under wraps to avoid taking a hit to RTX's stock price.

107.    Manufacturing parts with powdered metal is a technique that the Company has employed to construct engine parts since the mid-1900s.  Powder metallurgy is a multi-step manufacturing process that turns raw materials into solid metal parts.  First, the manufacturer creates a powdered metal alloy by liquifying raw material and spraying the molten compound down a multi-story "tower" structure.  As the liquified raw materials free fall down the tower, they disperse and solidify into powdered particles.  Then, the manufacturer collects the powdered metal compound from the tower to undergo a forging process.  This involves compressing and heating the powdered metal to bond and then extruding it into solid pieces of metal called forgings.  Finally, the forgings undergo a machining process during which the manufacturer shapes them to their final part specifications.

108.    One of the main known risks of powdered metal manufacturing is contamination. Contamination can occur in several ways, such as through the incorporation of foreign particles, objects, or incorrect alloys into the powdered metal compound. Contaminants cause the powdered metal to bond improperly during the forging process—or not at all—and leave weak spots, or microcracks, in the formed part, thus significantly shortening the life of the part.

109.    Indeed, when this manufacturing error occurs and results in a defective metal part, the engine's extreme temperature and movement variations during flight cause the microcracks to "propagate," or grow and worsen. These fractures are often catastrophic, causing the release of high-energy debris to penetrate the engine, and can lead to engine failure. Further, once manufactured and installed in aircraft, the inspection of defective metal and cracking, along with replacement of any affected parts, cannot be done "on wing." This means that the aircraft must be taken out of service—referred to as time "off wing"—and certain forms of nondestructive testing ("NDT"), specifically an angled ultrasonic inspection ("AUSI"), must be performed in order to detect whether cracking has occurred, and the part must be replaced.

110.    Pratt & Whitney obtains powdered metal through RTX's wholly-owned subsidiary, HMI, based in Clayville, New York. Per RTX, HMI "has been the principal supplier of superalloy powder and billet to Pratt & Whitney" since 1966, and a wholly-owned subsidiary of Pratt & Whitney since 1975. In 2015—as Defendants would later admit— Pratt & Whitney "brought online additional capacity at HMI" by "adding an additional tower" in order to "ramp[] up production because of the additional capacity required for the GTF." It was "[d]uring that ramp-up process" that Pratt & Whitney "somehow or other introduced a contaminant into the powdered metal." As a result, for **six years—**between 2015 and 2021—Pratt & Whitney manufactured its prized GTF engines with the Powdered Metal Defect.

111.    Numerous FEs of RTX recounted Defendants' contemporaneous knowledge of manufacturing defects with respect to Pratt & Whitney's powdered metal manufacturing process for various aircraft engine families, including the GTF engine fleet. The FEs also recounted Defendants' push to get the GTF engines to market, despite the known Powdered Metal Defect.

112.    For example, FE-1 explained that the issue of contamination in the powdered metal used in Pratt & Whitney's engines was a problem for the entire time of his employment as a Validation Expert. Specifically, FE-1 advised that there was a "telcon" or conference call meeting in approximately August 2019 to discuss the powdered metal problems. FE-1 recalled that the person who called the meeting was Sarah Toomey, Chief Engineer. FE-1 recalled that the meeting was led by the Director of the GTF 1100 engine program, for the A321neo / A320neo aircraft. FE-1 indicated that this meeting was specifically about contamination in the powdered metal supplied by Pratt & Whitney's source, an entity called *HMI*, based in Clayville, New York. He noted that materials problems – such as contaminated components – are the "worst you can have" because they go to the life of the component, and therefore the life of the engine. FE-1 reiterated that these problems were common knowledge throughout the Company, but that Pratt & Whitney's culture made it so that employees were not allowed to speak to anyone outside the Company regarding problems. He indicated that there were no comments during this meeting about the financial impact of the materials problem, and that the meeting was not a discussion, it was simply informing the group to be aware of the contaminated powdered metal problem.

113.    FE-1 recalled speaking with his supervisor, Karnas, about the contamination problems shortly after the telcon meeting— within hours, or maybe a day, of the telcon. He advised that he told Karnas that they must address the contaminated powdered metal problem, or it will get worse. FE-1 noted that Karnas, as Designated Engineering Representative, was also the

Organizational Designation Authority ("ODA") for Pratt & Whitney, meaning that he was the Company's official representative with the FAA. FE-1 elaborated that, during his employment, he maintained a file in a Company group drive regarding powdered metal contamination issues. He recalled being told that there was a "high impact team" on it to correct the problem. FE-1 added that there was no further debrief after the telcon and no further information was forthcoming. FE-1 also noted that the telcon in approximately August 2019 was specifically regarding the GTF fleet.

114.    FE-1 articulated that the contaminated powdered metal problems were not limited to the GTF series of engines. As an example, he mentioned that the problem also affected the V2500 engines. FE-1 emphasized that the problem was also not limited to the compressors or fan blades; he explained that the problem was everywhere, because the powdered metal was used everywhere, for both civilian and military products, as there were limited sources of supply. FE-1 clarified that there are only three to four different alloys that could be used for various stages or different parts of engines. He analogized the powdered metal to flour used in baking. He described how, if flour is contaminated, then it does not affect only muffins made with that flour, but also cakes, bread, and anything else made with that flour. He advised that the powdered metal was like the flour and used throughout Pratt & Whitney's product lines.

115.    FE-1 advised that he wrote about the contamination problems in an email to Ruthanne Szumski, Repair Design Aftermarket and Sustainment Engineering Manager. Szumski is still employed in that role at Pratt & Whitney. FE-1 explained that Szumski worked in the Repair organization on air foils and bladed rotor turbo compressors.

116.    FE-1 explained that the Materials lab, which he had worked at previously, performed testing on materials and components. He further explained that, during his time as a

Validation Expert in the Repair organization, he would retrieve reports from the NTSB website and discuss the reports with his group. He commented that metallurgical issues – such as the contamination problem – were often not well understood by engineers, most of whom were not heavily trained in metallurgy, so he had to "translate" the reports for them.

117.    FE-1 described how Pratt & Whitney was no longer applying the same rigor in analyzing powders and related components as it had earlier in his career. FE-1 indicated that the decline in analytical rigor began in approximately 2015, as the Company could not hire people with the right experience and knowledge to perform the work at the same level. FE-1 advised that the Materials and Process lab focused primarily on producing new materials; it did not focus on developing expertise regarding processes – that is, testing and applying existing materials to product designs. He continued that the lab lacked expertise in that area. FE-1 confirmed that corners were cut to get the engines out faster.

118.    FE-1 elaborated that developing and applying standards for testing materials for engineering was called ESA, for Engineering Source Approval; similarly, for testing materials for repair purposes, the process was called RSA, for Repair Source Approval. He noted that, in this case, it was an OEM problem, not a repair issue. He reiterated that the Engineering Source Approval standard work for testing appeared to drop after approximately 2015, as the expertise in the lab required for testing and qualifying materials – such as powdered metal – were not as good. FE-1 added that there was a lot of pressure to get it done faster, creating a "no win situation," because the testing can never be done fast enough or inexpensively enough. He reiterated that the level of rigor degraded as more experienced people left.

119.    FE-1 noted that the qualifications for sourcing the powdered metal as well as for forging were often done together, because powdered metals and forging must be sourced together.

The reason for that, FE-1 continued, was because the Company could not "go anywhere" to get the powdered metal, as supply sources were limited. He noted further that every change in sourcing or qualification of sources must be approved using the ESA or RSA process, because the Company must be certain that any changes would not be "deleterious" to the end product.

120.    FE-1 advised that, in approximately 2015, the responsibility for ESA and RSA were taken out of the Materials and Process Engineering lab, which was a part of the Engineering lab responsible for design and moved to the Quality Control organization, which is part of the Manufacturing division of the Company. FE-1 described this move as like "the fox watching the henhouse." FE-1 explained that in an ideal world, the Company's number one priority is safety, quality is number two, and cost and delivery are number three. He added that the top priority of the Manufacturing department is cost and delivery. He further noted that the focus of the Company has become cost and delivery first, then safety, then quality. He added that the Company is "all about delivery," even if the quality is not "up to snuff."

121.    FE-1 confirmed that senior leadership at Pratt & Whitney were aware of the contaminated powdered metals and titanium problems. He indicated specifically that Frank (Francis) Preli, currently Vice President, Propulsion and Materials Technology and Chief Engineer, Materials and Processes Engineering at the Company, and Geoff Hunt, Senior Vice President, Engineering, were aware of the problems. He elaborated that if the Company did not meet the production numbers, or if the Company had to bring in engines earlier than promised for inspection and repairs, then the cost was on Pratt & Whitney.

122.    Certain FEs also discussed the manner in which the Powdered Metal Defect was known and discussed within the Company. Specifically, FE-1 explained that incidents would be known to the CIPT (Component Integrated Product Team), and inspections would be conducted

by the lab; there would be conversations between the CIPT and the lab. Those conversations would be reported up through Preli, as the Chief Engineer, and Hunt.

123.    FE-1 explained that the Reliability Group at Pratt & Whitney had a Statistics department which analyzed the probability and exposure of inspections, recalls, and related issues. He indicated that Reliability "just ran the numbers." FE-1 again used a baking analogy to explain how the Reliability Group performed its analysis: if you have a batch of 10 muffins, and one "breaks," then there is a 10% error rate, per statistical analysis. He noted that a problem with the Reliability Group's methodology was that it analyzed the engines according to the "ideal case" in the engine's design and inspection. FE-1 added that once an engine is used in the real world, the engine is affected by stresses and factors that are not present in the ideal. He further added that engines are interconnected systems, so they must be analyzed in that way; one can't view each piece in isolation. He advised that one must consider what assumptions were made in conducting the statistical analysis, and part of that process is determining when the problem started in order to set bounds for analysis and determining how to fix it. FE-1 commented that, "Parts don't fly. Systems do."

124.    Moreover, FE-5, who was employed with Pratt & Whitney as a Mechanical Engineer at Pratt & Whitney's HMI Metal Powders facility in Clayville, New York, recalled that in approximately 2020, foreign objects were occasionally identified in the powder metal as it was forming. FE-5 explained that ultrasonics at the HMI facility "found stuff" in the powder metal "that did not belong in there." FE-5 noted that this was a "big deal" and that when foreign objects were identified in powder metal, the manufacturing process stopped, the machines were cleaned, and an investigation was conducted. According to FE-5, Pratt & Whitney conducted tests on the material to determine what foreign objects were in the powder metal. FE-5 added that in one

instance, the foreign material was determined to be the seal from one of the powder metal machines.

125.    According to FE-5, the HMI facility subsequently sent the nickel alloy to Pratt & Whitney's Columbus, Georgia facility for forging and to Connecticut for machining.  FE-5 noted that the Columbus, Georgia facility's ultrasonics sometimes caught "abnormalities" with the metal that got through the inspection process at the HMI facility.  FE-5 stated that the Columbus, Georgia facility's ultrasonics were better than the ultrasonics at the HMI facility.

126.    FE-9 recalled that he first heard of the contaminated powdered metal quality control issue that affected 3,000 GTF 30K engines before he departed Pratt & Whitney in August 2023. FE-9, who worked with multiple engines, including the Geared Turbofan (GTF) engine, detailed how colleagues from Pratt & Whitney's metallurgical testing labs told him that there had been a problem with its powdered metal since approximately 2016 and that the Company was planning a recall because of this problem.

127.    Similarly, FE-3 recalled that when he was at Pratt & Whitney, there were problems with various metal parts breaking or fatiguing quickly.  He recalled that the source metal was a suspect for these recurring problems.  He described the metal problems as being expensive to fix and that it was "only a matter of time" before the Company had to address it.  FE-3 later recalled hearing from a friend, who started his own powdered metal company (and is an owner of a jet engine component repair MRO), that had looked into Pratt & Whitney's issues and told FE-3 that the problem with the Company's manufacturing of the powdered metal was due to Pratt & Whitney's "chaotic and dangerous process" in making it.

128.    FE-3 added that the issues with the HPT and HPC disks were not only a quality issue (insofar as they were not holding up as long as intended), but one of R&D (research and

development).  FE-3 detailed that the parts needed to be redesigned and redeveloped but that management would not allow for it.

129.    FE-3 recalled that, during his tenure at Pratt & Whitney, the HPT stage-1 disks on the GTF engines were failing after 1 year, when their lifespan was intended to be 6 to 8 years.  In recalling how these parts failed prematurely, he described the issues as the parts being compromised, cracking, or corroding.  He also recalled shutdown events at IndiGo airlines occurring because of similarly failing LPT blades on the GTF engines.  According to FE-3, testing revealed that what led to the failing HPT disks was stress on the part resulting from some combination of the engine's thrust and environmental factors.  He explained that the parts tested well when on stands in the shop but fatigued and corroded quickly when tested in a jet in the Florida humidity near sea level, when required to withstand the amount of thrust necessary.  He recalled that the same parts that were failing on the GTF PW1100 were the same parts failing on the V2500.

130.    FE-3 went on to explain that while he was employed by Chromalloy after leaving Pratt & Whitney, he worked on the V2500 engine and observed that the HPT disks had "0% serviceability," meaning that they could not be used at all and had to be thrown out.  According to FE-3, Chromalloy was a third-party company that repaired and tested the quality of Pratt & Whitney parts.

131.    FE-3 recalled numerous instances from the middle to the end of his Pratt & Whitney tenure, from approximately 2016-2019, when the issues affecting the HPT and HPC GTF engine parts were discussed.  According to FE-3, "senior management" was aware of the problem.  He recalled that this occurred both in all-hands department meetings and face to face with Senior Manager—Assembly Operations Steven Jocelyn.  Specifically, FE-3 recalled Jocelyn stating that

"top-level management" within the Company were aware of the issues affecting the HPT and HPC engine parts of the GTF fleet. He recalled that Jocelyn also told him that, despite these issues, those top-level people had decided it was "in the interest of shareholders, investors, and customers" to proceed with using the parts as-is. FE-3 further recalled Jocelyn explaining that remediating the problem would have involved redesign, and that the parts and engines would have to go through new testing and approval processes leading to delays in the certification process, which the "top-level people" did not want to go through.

132.   FE-3 also recalled it being specifically stated in all-hands meetings that Pratt & Whitney did not want the issues with the HPT and HPC disks "to go to press," meaning to go public. He recalled someone specifically saying, "we cannot afford every issue making it to the press." He estimated that, of the many issues that Pratt & Whitney experienced with its GTF engines, only around one-quarter to one-third of those problems made it to press.

133.   Due to the nature of the contaminant, the only remedy for the Powdered Metal Defect would be to take the airplanes out of service at great cost and expense to the Company. However, Defendants adopted a dangerous wait-and-see-approach by ignoring the known Powdered Metal Defect—as it had with many other problems—and assuring investors for as long as it could that its prized GTF fleet was safely accumulating flight hours and drawing closer to cashing in on lucrative Aftermarket MRO profits.

**E.    RTX's Dangerous Wait-and-See Approach to its Powdered Metal Defect Caused Engine Failures**

134.   Pratt & Whitney's Powdered Metal Defect soon caused a major flight safety event in the Company's older model V2500 turbofan engine family, essentially a GTF predecessor. On March 18, 2020, Vietnam Airlines Flight VN-920—equipped with a V2500 engine with HPT disks manufactured from the same plant and same powdered metal used to manufacture HPT disks

installed on GTF engines—departed from Ho Chi Minh City, Vietnam to Phnom Penh, Cambodia. While moving at a high speed on the runway toward takeoff, the flight crew aborted takeoff due to an indication of engine failure.  The flight crew brought the aircraft to an emergency stop and rescue services responded to a large smoke plume rising from the grass beside the runway.





135.    Examination of the aircraft showed that a HPT disk had cracked and failed during takeoff, resulting in "high-energy debris" penetrating the engine.  This caused the engine to ingest the broken fragments and rip apart as the aircraft prepared for takeoff. The event triggered a series of investigations by the FAA that forced Pratt & Whitney to determine the precise cause of the engine failure.

136.     Accordingly, on March 21, 2020 and April 13, 2020, the FAA issued an EAD and AD, which only pertained to the V2500 engine.  The FAA's March 21, 2020 EAD mandated that the V2500 HPT disks be removed within 30 days "[d]ue to the need to correct an urgent safety of flight situation," as the failure of an HPT disk "could result in release of high-energy debris, damage to the engine, damage to the airplane, and loss of the airplane."  The EAD applied to eleven V2500 engines.

137.     In connection with the March 18, 2020 event, Pratt & Whitney undertook, at the behest of the FAA, a manufacturer's investigation.  Upon receipt of Pratt & Whitney's root cause analysis—which was not made public—on January 6, 2021, the FAA issued another AD noting that Pratt & Whitney had identified an additional population of HPT disks in the V2500 engine family affected by an "unsafe condition," which "is likely to exist or develop in other products of the same type design."

138.     At the time, Pratt & Whitney and IAE issued SBs indicating that Pratt & Whitney's HPT disks were affected by "an anomaly in the material that can affect the part certified life" of disks "delivered starting early 2017."[12]  The ADs and SBs were specifically limited to the V2500 engine series, despite HPT disks being a part manufactured using the same raw materials for outfitting across multiple Pratt & Whitney engine families, including the GTF.  Put simply, Pratt & Whitney manufactured its HPT disks defectively, using contaminated metal, for use in its engines—including the GTF fleet—and did not disclose it to the public.

---

[12] Manufacturers issue aircraft Service Bulletins ("SBs") or Service Instructions ("SIs") to inform owners and operators about critical and useful information on aircraft safety, maintenance, or product improvement.  SBs or SIs are issued to operators on a strictly confidential basis.  Occasionally, the FAA will publish previously issued SBs or SIs to its docket in connection with ADs.

F.    **Defendants Discovered the Severe, Wide-Ranging Implications of the Powdered Metal Defect No Later Than 2020**

139.    As Defendant Hayes would admit at the end of the Class Period in 2023, Defendants' findings from Pratt & Whitney's investigation of the March 2020 engine failure had wide-ranging implications for RTX's entire engine fleet—and particularly the GTF engine. Most significantly, by 2020 Defendants knew that the issue had resulted not from any one-off technical failure, but from a **manufacturing defect** caused by Pratt & Whitney's own manufacturing process. Defendants further admitted that this was a well-understood issue—that the Company had "been making powdered metal parts for 50-some years," and had "always known that contaminated powder is a potential issue in terms of life of the part."

140.    Defendants also discovered that the Powdered Metal Defect had resulted from a "manufacturing escape" at Pratt & Whitney's own powdered metal facility in Clayville, New York—HMI Metal Powders—the plant that manufactured HPT disks "for the entire fleet of Pratt products," including the GTF engine family. Furthermore, this Powdered Metal Defect at HMI was prolonged and widespread, as Defendants determined that the contaminant was first introduced into the powdered metal **back in 2015**—and that the contaminant had continued to be present in the powdered metal manufacturing process ever since and over the prior five years, thus impacting thousands of Pratt & Whitney engines that had been produced during that period.

141.    Finally, Defendants determined that the only way to detect whether the Powdered Metal Defect had caused the HPT disks on existing engines to crack—such that the engine was at risk for catastrophic failure and the HPT disk had to be immediately removed—was to apply a specialized AUSI, requiring that the engine be fully removed from the aircraft, or taken "off wing," and completely disassembled due to the location of the HPT disks in the interior of the engine.

Significantly, this meant that the inspection process would ground the affected aircraft and take almost a year to complete.

142.    These discoveries had huge implications with respect to the GTF engine fleet. As set forth above and as Defendant Hayes would later admit in 2023, not only were HPT disks for the GTF engine manufactured using the exact same powdered metal process from the exact same plant, but in 2015—the year Pratt & Whitney's investigation determined the contamination had begun—RTX had aggressively expanded production capacity at HMI **specifically for the purpose of "ramping up" production for GTF engines**. Indeed, in 2023, Defendant Hayes admitted that the Company discovered that it was "during that ramp-up" process for the GTF in 2015—when the Company "brought online additional capacity at HMI" and "added an additional tower"—that "we somehow or other introduced a contaminant into the powder." As a result, Defendants knew that the GTF engines would "experience the most significant impact" due to the high "production volumes during this period." Indeed, Pratt & Whitney produced more GTF engines using the contaminated metal by far than any other engine type, including the V2500.

143.    As demonstrated by Defendants' July 25, 2023 admissions, as well as the accounts of numerous FEs set forth in Sections IV.C., IV.D., and IV.L, *supra*, by 2020, Defendants unequivocally knew that Pratt & Whitney used contaminated powdered metal to form critical engine parts across several of its engine fleets—including the GTF—that caused in-flight engine failure. Despite this, and unbeknownst to investors, Defendants spent the next **eighteen months** attempting to cure the Powdered Metal Defect from affecting future engine manufacturing. Defendants' attempts evidence not only that they understood the magnitude and urgency of the defect, but that they opted to prospectively cure the defect on newly manufactured GTF engines

without undertaking the costly effort of inspecting and removing the already-installed faulty turbine parts affected by the Powdered Metal Defect on existing GTF engines.

**G.  Prior To and During the Class Period, Defendants Spent Eighteen Months Attempting to Cure the Powdered Metal Defect Without Success**

144.  Rather than reveal in real-time that the known Powdered Metal Defect affected its prized GTF engine fleet, Defendants, over the next **eighteen months** (stretching well into the Class Period), secretly scrambled to find a way to fix the Powdered Metal Defect and eliminate the contaminant from the powdered metal.  Tellingly, Defendant Hayes admitted at the end of the Class Period in 2023 that after Defendants realized that the March 2020 incident had resulted from the Powdered Metal Defect, they began examining and making extensive changes to the powdered metal manufacturing process in a desperate effort to rectify the issue.  RTX ended up having to make a total of "nine changes to the [manufacturing] process to ensure the purity of the powder" that extended well into the Class Period in the fourth quarter of 2021.

145.  Significantly, during this prolonged period during which Defendants were attempting to fix the issue, at no time did Defendants ever disclose the Powdered Metal Defect to investors or their desperate attempts to fix it.  Nor did they ever once halt or even slow down GTF production—even though Defendants knew that contaminants were still in the powdered metal that was being used to make GTF engines.   To the contrary, Defendants continued to aggressively produce and deliver to customers GTF engines with HPT disks made from contaminated powdered metal and concealed this fact from investors.  Moreover, despite Defendants' hidden, internal fire-drill to rid the powdered metal of impurities prospectively, they did and said nothing to warn investors of the thousands of previously delivered GTF engines operating in commercial service with the known Powdered Metal Defect—which was not only dangerous but would require exorbitant cost to remedy.

146.    During the same period, as the FAA's investigation continued, Pratt & Whitney commenced subsequent manufacturer's investigations to purportedly determine whether all other engine parts that it manufactured contained the Powdered Metal Defect.  Notably, through documents later released by the FAA, Pratt & Whitney was forced in 2021 to perform an **expanded root cause analysis** to include a review of records for all other Pratt & Whitney engines that contain parts of similar material.  Put simply, regulators did not believe this was an isolated incident and tasked Pratt & Whitney with analyzing a root cause.[13]

147.    Accordingly, prior to the start of the Class Period, Defendants knew that, **for six years**, Pratt & Whitney used **the same contaminated powdered metal material** to create defective turbine disks that were installed on **both** its V2500 and GTF engines.  Throughout the Class Period, Defendants brazenly misled investors about the widespread reach of the Powdered Metal Defect.  Specifically, Defendants concealed the extent to which the issue rendered its prized GTF engine fleet un-airworthy and, therefore, less profitable.

148.    While Pratt & Whitney had publicly identified only a handful of V2500 engines to the FAA as being impacted by the defect, with the FAA now aware that the issue involved a manufacturing defect, this soon changed.  On January 26, 2021, less than one month before the start of the Class Period, Pratt & Whitney and IAE were forced to update their December 15, 2020 SB to list serial numbers of over 4,500 HPT disks installed on thousands of V2500 engines spanning several manufacturing years, which the Company now acknowledged needed to also be inspected for contaminants using an AUSI.

---

[13] According to a post-Class Period AD issued on June 11, 2024, Pratt & Whitney's analyses of the March 18, 2020 Vietnam Air engine failure (involving a V2500 engine), and the subsequent December 24, 2022 Viva Aerobus engine failure (involving a GTF engine) revealed that the failures were "caused by a nickel powdered metal anomaly" that were "similar in nature."

149.    Significantly, however, Pratt & Whitney and IAE's January 26, 2021 SB omitted an important factor that Defendants had discovered early on upon investigating the March 2020 incident: the higher the thrust rating of the engine, the more likely the HPT disks affected by the Powdered Metal Defect were to fail.   In other words, Defendants had discovered that the higher the engine's thrust, the hotter the engine burned, and the more stress was put on the HPT disk, which caused the defective disks to fatigue and crack much faster.   Indeed, as revealed in documents later released by the FAA, in December 2020, IAE held a Customer Council Call with operators of the V2500 engine about the March 2020 engine failure, during which IAE specifically identified the thrust rating of the engine as an important factor in terms of how soon HPT disks on other affected engines needed to be inspected and potentially replaced.   Critically, the GTF engine family has a significantly higher thrust rating than the V2500 engine family, making HPT disks contaminated by the Powdered Metal Defect on the GTF engines even more likely to catastrophically fail than those installed on the V2500.

150.    Tellingly, however, despite Pratt & Whitney and IAE having orally identified thrust ratings to customers as a significant factor from the outset, Pratt & Whitney and IAE "removed references to thrust ratings" from the revised January 26, 2021 SB that expanded the scope of the Powdered Metal Defect.  This in turn caused the FAA to conclude, in its later corresponding ADs following the revised January 26, 2021 SB, that it did not need to "distinguish inspection intervals based on thrust" (a crucial determination the FAA would later reverse).  Indeed, Defendants knew that if customers and the FAA were made aware of the significance of thrust rating in terms of how quickly the affected HPT disks would fatigue and crack, questions would automatically be raised regarding the degree to which GTF engines—the highest thrust commercial engines Pratt & Whitney had—were also impacted, a fact Defendants sought to keep hidden.

151.    In sum, leading into the Class Period, Defendants had identified the Powdered Metal Defect and undertaken extensive measures in an attempt to remove the contaminant with respect to new equipment production.  Defendants also knew, both by nature of the defect and through its root cause findings to the FAA, that the Powdered Metal Defect existed on nearly all of its in-service GTF engines.  Nevertheless, Defendants undertook a course of deception on investors designed to convey that the GTF engine fleet was airworthy and profitable.

**H.    The Class Period Began as Defendants Misled Investors as to the GTF Engine Fleet's Airworthiness and Profitability**

152.    At the outset of the Class Period—and in the wake of the repeated problems with the GTF engine that had raised investor concerns about its future profitability—Defendants sought to strongly reassure investors that the GTF engine was now performing in a way that would lead the Company to historic profit margins.

153.    Accordingly, Defendants touted the GTF fleet while concealing the known Powdered Metal Defect to keep the GTF engine fleet in flight service and closer to the expiration of their warranty periods.  Doing so allowed Defendants to delay the inevitable—great cost to replace the defective metal parts—at the expense of passenger safety and a dramatic hit to its stock price.  For example, on the first day of the Class Period, February 8, 2021, in its Annual Report on Form 10-K for the year ended December 31, 2020, RTX proclaimed "*[s]ince the PW1000G Geared Turbofan engine entered into service in 2016, technical issues have been identified and experienced with the engine, which is usual for new engines and new aerospace technologies. Pratt & Whitney has addressed these issues through various improvements and modifications*."

154.    To the extent RTX's unspecified "*technical issues*" were meant to encompass the Powdered Metal Defect, the statement was false and misleading because it led investors to falsely believe that the "*technical issues*" were already "*addressed . . . through various improvements*

*and modifications*."    However, unbeknownst to investors, Defendants had intentionally not "*addressed*" the Powdered Metal Defect.  The falsity of Defendants having "*addressed*" issues with the GTF engine fleet unfortunately became apparent as flight safety issues continued to occur.

155.    Moreover, to the extent RTX's disclosure included the Powdered Metal Defect in its reference to "*technical issues*," the statement gave investors the false impression that the issue was "*usual for new engines and new aerospace technologies*."    In reality, the known metal manufacturing defect involved metalworking processes that the Company had been using for half a century.  Put simply, the "*technical issues*" Defendants "*identified*" in the GTF engine fleet were the result of manufacturing errors having nothing to do with the novelty of the GTF engine itself— as evidenced by the fact that the same and similar defects occurred in Pratt & Whitney's seasoned V2500 engine fleet.

156.    To the extent RTX intended to limit the disclosure of "*technical issues*" to only those "*usual for new engines and new aerospace technologies*," Defendants knowingly omitted the pervasive problem that stood in the way of the GTF engine fleet's profitability from investors— the Powdered Metal Defect—which also renders the statement false and misleading.  Defendants made these statements knowing that, if discovered by the public or the FAA, RTX would have to ground its GTF engine fleet and perform costly inspections on them out of the Company's own pocket, since they were still under warranty.  By any measure, RTX's disclosure was false and misleading.

157.    Nevertheless, on February 17, 2021, Defendants Hayes spoke at the Barclays Industrial Select Conference, where he stated that RTX had "*upgraded about 96% of the* [GTF] *fleet during the past year such that all of those fixes that we talked about . . . 96% of those are now incorporated*."  This statement assuaged any concerns investors might have regarding

lingering problems in the GTF engine fleet, while omitting the large, looming, and undisclosed issue of the Powdered Metal Defect continuing to operate on in-service airplanes. Further, Defendant Hayes' representation that the Company "***got everything upgraded***" on its GTF engine fleet was an inaccurate portrayal of remaining issues standing in the way of the GTF engine fleet's airworthiness and profitability. As flight safety events occurred and regulatory agencies pressed RTX to expand its root cause findings, Defendants continued to mislead investors to keep RTX's stock price artificially inflated, by assuring them that the GTF engine fleet's problems were a thing of the past.

158.    In early 2021 and throughout the Class Period, Defendants continued to repeatedly and emphatically tout that the GTF was consistently "***performing very, very well***," and that Defendants were confident in the GTF's future profitability due to "***the robustness of the current engine***." These statements were false. Defendants were aware that the Powdered Metal Defect meant that contaminants were dispersed throughout the GTF engines' turbine parts like ticking time bombs. As those engine parts were subjected to the extreme temperature and movement variations of flight, they were liable to fracture at any moment.

**I.    As Pratt & Whitney Identified Additional "High-Risk" Parts in the V2500, the FAA Pressed Pratt & Whitney to Expand Its Root Cause Analysis**

159.    By mid-2021, the FAA slowly discovered that the Powdered Metal Defect was more urgent and widespread than what Defendants had let on with respect to the V2500s—and inevitably affected GTF engines as well. Nevertheless, Defendants continued to conceal the fact that Pratt & Whitney's data showed that the Powdered Metal Defect also severely impacted all GTF engines that had been produced since 2015 and that were still being produced—and likely worse than the V2500s—due to the higher production volume of GTF engines and their higher thrust and hotter temperatures.

160.   For example, on May 21, 2021, the FAA issued another EAD, for the V2500 engines, stating that based on its "review of [the Company's] investigative findings" from the March 2020 event, it had identified 15 additional V2500 engines that needed to have their HPT disks removed immediately, within 10 flight cycles.

161.   With FAA scrutiny increasing, three days later, on May 24, 2021, Pratt & Whitney was forced to issue a SI (*i.e.*, a follow-on to the Company's earlier SB) that identified an expanded group of "high risk" V2500s, approximately 490, that "require[ed] accelerated removal of certain suspect HPT hubs."   While Pratt & Whitney again did not reference or identify thrust as a significant factor in this SI, the SI nonetheless stated that HPT disks on certain V2500 engines— the ones that happened to have the highest thrust ratings—had to be removed before 100 additional flight cycles, meaning in less than 30 days, while those installed in lower-thrust models had to be removed before 220 flight cycles (*i.e.*, in less than 60 days).   The FAA issued an AD requiring the removal of the affected HPT disks from the 490 engines Pratt & Whitney had identified within the timelines specified in the Company's SI thereafter, which stated that the FAA considered "the risk of an uncontained HPT disk failure" on those engines "to be an urgent safety issue."

162.   Not long after Pratt & Whitney was forced to identify 490 additional "high risk" V2500 engines, on June 8, 2021, the FAA issued another AD for the V2500.   This AD was related to IAE's revised January 26, 2021 SB that had identified over 4,500 HPT disks installed on V2500 engines that were at risk for the same issue and needed AUSI inspection, and formally mandated that these AUSI inspections occur within the timelines specified.   The AD estimated that 1,100 engines installed on airplanes of United States registry would require inspection related to the unsafe manufacturing condition caused by a "material anomaly."   At that point, the FAA noted that it had "no way of determining the number of aircraft" in need of HPT disk replacements, as

61

that information was solely with the manufacturer. The AD required an AUSI to be performed "at the next engine shop visit or between 3,200-6,700 flight cycles (FCs) depending on the model turbofan engine . . . whichever occurs first," on the affected V2500 fleet.

163. The next month, on July 2, 2021 and July 21, 2021, the FAA issued additional ADs that addressed a "high-risk subpopulation of parts that require urgent inspection," which Pratt & Whitney and the FAA identified as an "urgent safety issue" on its V2500 engines. Indeed, the FAA's AD stated that "[t]his unsafe condition may result in loss of the airplane," and that correction of the at-risk disks was necessary "to maintain an acceptable level of safety." For this high-risk subpopulation, inspections needed to be performed between 100 and 620 flight cycles (with "flight cycle" meaning the number of take-offs and landings), or within approximately one to six months).

**J.    RTX Disclosed Its Expanded Root Cause Analysis to the FAA and Continued to Misleadingly Downplay the Extent of the Problem in the GTF Engines**

164. Significantly, even as Pratt & Whitney was forced to identify to the FAA more and more "high risk" V2500 engines that had defective HPT disks due to the Powdered Metal Defect that had to be urgently removed and inspected, the Company continued to conceal that GTF engines were also affected. In fact, the GTF engines were at greater risk than the V2500 due to the much higher volume of GTF engines produced since 2015, as well as the GTF engines' higher thrust ratings and hotter temperatures. However, by June 2021, and after realizing that, in truth, hundreds of V2500s were at high risk for catastrophic HPT disk failure, the FAA mandated that Pratt & Whitney expand its root cause analysis to evaluate the issue across all of its engine families, including the GTF.

165. Accordingly, on July 29, 2021, Pratt & Whitney provided its non-public, expanded root cause analysis results on the GTF engine series to the FAA. Through that analysis, Pratt &

Whitney finally specifically identified to the FAA that the Powdered Metal Defect clearly affected the GTF engine fleet as well. Indeed, Pratt & Whitney was forced to identify **59 GTF engines** to the FAA that Pratt & Whitney admitted "ha[d] the highest risk of failure" for the manufacturing defect.

166.     By this point in mid-2021, Defendants indisputably knew not only that the Powdered Metal Defect impacted the GTF fleet, but that the issue was urgent, as the risk of HPT disk failure grew the longer the affected engines remained in service. Indeed, by July 2021, Defendants had now been forced to identify **59 GTF engines** that they had determined had the "highest" risk of failure and could be on the brink of catastrophic failure. Moreover, Defendants had no basis to limit the Powdered Metal Defect to only those 59 GTF engines. As Defendants would later admit in 2023, they were fully aware by no later than March 2020 that the issue was pervasive and spanned no less than **six manufacturing years**. Indeed, Pratt & Whitney manufactured engine parts with the Powdered Metal Defect since before GTF first since it entered service in 2016 and throughout a period in which more GTFs were produced than any other engine. Moreover, it was impossible to detect contamination in the formed engine parts without use of the specialized AUSI, which no GTF engine had ever been subjected to. Defendants would also later admit in 2023, their **only** basis at this time in mid-2021 for understanding how the GTF engine might be affected by the Powdered Metal Defect was the data they had collected on the V2500s— a seasoned engine with lower thrust—and that data had so far shown that thousands of V2500s were at risk for the issue, with hundreds already having been identified as "high risk" and needing their HPT disks urgently removed from service and inspected.

167.     It was not until September 10, 2021, that the FAA referenced (without disclosing) Pratt & Whitney's expanded root cause findings in an AD. The FAA explained in its AD that Pratt

& Whitney undertook a root cause analysis in June 2021 to include "a review of records for all other IAE and PW engines that contain parts of similar material" to those involved in the March 18, 2020 aborted takeoff involving a V2500 engine. At the time, the FAA estimated that the Powdered Metal Defect on the GTF engine fleet was limited and affected only "3 engines installed on airplanes of U.S. registry" at a total cost of about $500,000 to aircraft operators. That Airworthiness Directive mandated that the affected disks be removed urgently, within 30 days of its effective date.

168.    With the FAA now clued into the fact that the same manufacturing defect that had plagued the V2500s also affected GTF engines, Pratt & Whitney was forced to release a Service Bulletin to its customers three days later, on September 13, 2021, which was later revised and reissued on July 8, 2022. This confidential SB remained non-public until the revised version was ultimately released by the FAA on October 3, 2022. Significantly, the SB listed serial numbers for **thousands** of GTF engines that could be impacted by the Powdered Metal Defect and thus needed AUSI inspection. The SB also acknowledged that the "source of the anomaly is thought to occur during part manufacture."

169.    However, despite Defendants being forced to finally acknowledge that the GTF fleet was impacted by the same manufacturing defect that plagued the V2500s, they continued to dramatically downplay the issue to the FAA and RTX's customers.

170.    First, the nonpublic September 13, 2021 SB stated that AUSI inspections of the expanded group of affected GTF engines could wait **years**, until the "next shop visit" when the engine was fully disassembled—despite the fact that Defendants in truth knew that every defective HPT disk installed on a GTF engine was essentially a ticking time bomb that could cause catastrophic engine failure at any time. Indeed, at this exact same time in September 2021 and

unbeknownst to investors and the FAA, Defendants were in the midst of completing the extensive manufacturing changes they had been desperately trying to implement over the prior year and a half to rectify what Defendants clearly knew was a severe, pervasive and urgent issue.  Second, and as the FAA would soon discover, Defendants were still misleadingly limiting the scope of the issue to only some GTF models—when Defendants knew that **every** GTF engine that had been produced from 2015 through the third quarter of 2021, *i.e.*, **the entire 3,000 GTF fleet**, had HPT disks installed that were potentially on the brink of catastrophic failure.

171.    By October 28, 2021, the FAA finally became aware that, despite Defendants' removal of the importance of thrust ratings from the Pratt & Whitney's prior SBs, the thrust rating of the engine was a key factor with respect to which engines with HPT disks were most subject to cracking from the Powdered Metal Defect and thus needed to be inspected immediately.  On that day, the FAA issued a proposed AD, as a Notice of Proposed Rulemaking ("NPRM") for the V2500 engine mandating that Pratt & Whitney's SBs be updated to clarify that if an HPT disk had *ever* been operated at any time on any "high-thrust" V2500 engine—as specified by the FAA itself—the affected HPT disk "must follow shortened compliance thresholds."

172.    On January 12, 2022, the FAA issued another AD, detailing how the Powdered Metal Defect's impact on the GTF engine was broader than previously reported, this time with respect to PW1500G and PW1900G engines, which were actually lower-thrust variants of GTF models than the PW1100G.  This AD mandated that HPT disks be removed from 21 of those engines within 30 days, based on the Company's root cause analysis submitted to the FAA back in July 2021, because they had the "highest risk of failure."

**K.    Despite Pratt & Whitney's Expanded Root Cause Findings, Defendants Hid the Impact of the Powdered Metal Defect on the GTF Engine Fleet**

173.    While Pratt & Whitney's expanded root cause analysis remained hidden from public view, Defendants continued to tout the GTF engine fleet's airworthiness and profitability. For example, on February 11, 2022, RTX's 10-K Annual Report for the year ended December 31, 2021 conveyed as a risk factor to investors that "***failures may occur from time to time, whether as a result of manufacturing or design defect, operational process or production issue attributable to us***," which "***could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity***."    In representing this as a risk factor, Defendants misled investors because the stated risk had already occurred.  Indeed, Defendants knew of the Powdered Metal Defect since 2020 and had already turned over a non-public root cause analysis to the FAA revealing the Powdered Metal Defect's impact on the GTF engine family in July 2021.  This statement was crafted to conceal that Defendants were already experiencing negative "***results of operations***" through engine failures and customer operations disruptions, that were undisclosed to the market because the Company knew that the problem was financially significant and, therefore, meaningful to investors.

174.    On March 24, 2022, the FAA issued another AD as an NPRM that set forth guidelines for the inspection and removal of contaminated metal parts from the GTF engine fleet based on Pratt & Whitney's September 13, 2021 SB.  However, notably, by this time the FAA had discovered that Defendants had improperly limited the breadth of engines that were affected. Specifically, the NPRM stated that while Defendants had limited the September 13, 2021 Service Bulletin to apply to only certain GTF models, "[t]he FAA determined" that three additional GTF models "are of the same type design and are subject to the same unsafe condition."  This expanded the reach of the inspections that would be required to now encompass 189 GTF engines of U.S.

registry and what the Company would soon be forced to acknowledge was over 2,000 GTF engines total. Notably, in response, RTX's airline operator customers questioned why the proposed inspection guidelines only covered a subset of the Company's GTF engines, given the nature of the Powdered Metal Defect. For example, on May 9, 2022, Delta submitted a comment letter to the FAA referencing Pratt & Whitney's confidential September 13, 2021 (reissued July 8, 2022) SB by recommending that the inspection instruction apply to "**ALL engine serial numbers**" rather than the subset listed by Pratt & Whitney (capitalization in original).

175.    By mid-2022, the Company had now removed and conducted an AUSI inspection of at least some HPT disks from a handful of GTF engines. However, rather than these inspections providing any comfort that the issue was in any way controlled or contained, the opposite was true. This was evidenced by the fact that, on July 8, 2022, the Company quietly revised its confidential September 13, 2021 SB to now clarify that **2,070 GTF engines** were impacted by the issue and needed an AUSI inspection of their HPT disks. Despite this, Defendants continued to downplay the issue to RTX's customers and the FAA by stating in this SB that the AUSIs could occur over an extended period of time—and specifically, that the inspection was again not urgent and could wait years to occur, until the next routine shop visit when the engines were fully disassembled as part of regular maintenance.

176.    As Defendants were assuring investors of the GTF engine fleet's profitability and airworthiness, the FAA pressed on with its investigation concerning the Powdered Metal Defect within the GTF engine fleet. On October 3, 2022, the FAA issued another AD, mirroring Defendants' earlier SB and requiring that a certain subset of GTF engines go through AUSI testing and replacement if any cracks were detected. The AD, which now impacted 189 in-service GTF engines registered in the United States, again **only required that such tests be performed as part**

**of scheduled inspection and maintenance**.  In this AD, the FAA continued to rely on the Company's assertion that, while it was clear numerous GTF engines were affected by the Powdered Metal Defect and would eventually need an AUSI inspection, the Company's root cause analysis had sufficiently shown that that HPT disks on GTF engines were not at high risk for failure.

177.    However, as Defendants would later admit in 2023, they had no basis whatsoever to support this conclusion.  In fact, Defendants had information that supported the opposite conclusion:  that, by way of being manufactured with the Powdered Metal Defect, the GTF engines' HPT disks were highly subject to premature fatigue and cracking and needed to be inspected urgently.  By this time, Defendants had applied AUSI inspections to, at most, 59 "high risk" engines that were identified as needing urgent HPT disk inspection within 30 days.  This limited subset of GTF engines—which was itself concerning considering that those 59 engines encompassed dozens of airplanes that had previously been in service—could not have given Defendants any meaningful data regarding the impact of what Defendants knew was a pervasive and potentially catastrophic Powdered Metal Defect spanning the entire GTF fleet.

178.    Thus, as Defendants would later admit on September 11, 2023, the **only** meaningful data they had regarding the impact of the powdered metal contaminant on GTF engines was from their AUSI inspections of V2500 engines—a far more seasoned engine with lower thrust. Moreover, the V2500 data, instead of providing any comfort, only confirmed the urgency of the issue.  Indeed, by as early as May 2021, Pratt & Whitney was forced to identify **over 500** of those engines as needing urgent HPT disk removal and inspection due to being at "high risk" for cracks, or **over** 17% of the 3,000 V2500 engines that were ultimately inspected.  Additionally, at the end of the Class Period, Defendants further admitted that these 3,000 V2500 inspections had yielded a

"fallout rate" of 1%—with "fallout rate" meaning the rate at which HPT disks were so damaged and cracked from the Powdered Metal Defect that they had to be immediately replaced or else they would cause catastrophic engine failure.  While Defendants later attempted to describe this 1% "fallout rate" at the end of the Class Period as "very, very low" and thus of little concern, this was not true.

179.    Under FAA regulations, and specifically 14 CFR 25.1309, manufacturers are required to ensure that "[t]he occurrence of any failure condition which would prevent the continued safe flight and landing of the airplane is extremely improbable."  In general, the FAA requires an "inverse relationship between the probability and the severity of each failure condition," with "catastrophic" failures—defined to be events such as engine failures that could cause "loss of the airplane"—being at the highest end of the improbability scale.  In fact, the FAA expressly states that "[c]atastrophic failure conditions must be shown to be extremely improbable," and specifically quantifies "extremely improbable" to mean that the probability must be one in one billion—meaning that even a 1% failure rate was ten million times higher than what FAA regulations would tolerate.  Indeed, for the 3,000 GTF fleet, even a 1% fallout rate would mean that no less than **30 GTF engines** were subject to imminent catastrophic failure.

180.    Shortly after the October 3, 2022 AD, however, a flight safety event took place on a flight involving a GTF engine that further revealed the gravity of the Powdered Metal Defect that Defendants concealed from investors.

L.    **The Class Period Continued as Defendants Downplayed the Extent of Problems in the GTF Fleet**

181.    On December 24, 2022, Viva Aerobus Flight VB2135 accelerated for takeoff when the flight crew "felt a strong thump on their controls" and received a fire warning for the aircraft's right engine.  The Airbus was equipped with a GTF engine and departing from Guadalajara,

Mexico to Cancun, Mexico.  According to the FAA ADs that followed this event, Pratt & Whitney conducted a "a records review of production and field-returned parts, and re-evaluated their engineering analysis methodology."

182.   Significantly, when Defendants investigated the incident, they determined that the engine had failed due to the exact same Powdered Metal Defect that had caused the March 2020 incident.  As Defendants later admitted in 2023, this was a contaminant in the powdered metal manufactured by HMI.  With respect to the December 24, 2022 incident, the Powdered Metal Defect had caused internal cracking, this time in multiple parts of the GTF engine's hot section— the HPT disks as well as parts of the engine's compressor.  Moreover, the cracking discovered in the GTF engine's HPT disks had occurred at a much more severe and faster rate than what Pratt & Whitney's analyses represented to the FAA.

183.   However, even in the wake of this incident—and with the FAA now pressing Defendants for answers—Defendants still did not come clean.  Instead, for the next **seven months**, Defendants strongly reassured the market that there were no significant issues with the engine. Defendants assured investors that the GTF remained a high-quality engine and that any outstanding issues had been addressed by "upgrades" and were being resolved.  Defendants gave these reassurances despite increasing investor concerns in light of recent complaints from GTF customers about the existing GTF fleet suddenly proving to be performing far worse than intended, with less "time on wing" due to GTFs suddenly having to be brought back in for maintenance more frequently.

184.   During a January 24, 2023 earnings call shortly after the December 24, 2022 engine fire, an analyst asked Defendant Calio about recent press articles describing customer dissatisfaction with the GTF engine because the "time on wing" had "been falling short of

expectations." In response, Defendant Calio strongly reassured investors that the Company had "***done a number of block upgrades***" that "***increase[d] time on wing***" with "***durability and reliability hardware and software fixes that we put in as well***," and that with respect to "***the existing fleet today, we've got upgrade plans to continue to push that time on wing higher and higher***." These statements left investors with the false impression that the Company had implemented upgrades and fixes that stood to keep the GTF engine fleet in service and profitable. In reality, the opposite was true as the unaddressed Powdered Metal Defect festered throughout in-service GTF engines due to the costly undertaking it would take to remedy.

185.    Also, by the start of 2023, numerous FEs detailed that Defendants were already planning for the sweeping financial impact of the Powdered Metal Defect on the GTF engine fleet. For example, according to FE-6, it was "well before July 2023" when he first learned about Pratt & Whitney's issues with cracked powdered metal on the commercial side's GTF engines. More specifically, FE-6 advised that he learned of Pratt & Whitney's issue with cracked powder metal after he joined New Product Introduction in January 2023 and no later than March or early April 2023, before the AEP (Advanced Engine Program) Conference on April 18, 2023, that he had to prepare for. FE-6 explained that he attended morning "Coffee Talks" twice a week where the buying side of the commercial business was discussed, and it was in these talks where the cracked powdered metal problem was discussed once or twice sometime between January and early April 2023. FE-6 advised that the Coffee Talks were always led by Director, New Product Introduction Global Supply Chain Jesse Bavaro, and were sometimes attended by Executive Director, New Product Introduction Sarah (surname not recalled).

186.    FE-6 also recalled that the cracked powdered metal issue was discussed in an Executive Committee Meeting that he attended in preparation for the April 18, 2023, AEP

Conference.  FE-6 could not recall who led and attended that specific Executive Committee Meeting, but advised that Vice President, Military Development Programs Chris Flynn and President, Military Engines Jill Albertelli attended these meetings "as needed."

187.    FE-6 recalled that the cracked powdered metal problem was the only instance of a problem on the commercial side being discussed in the defense-side Coffee Talks and Executive Committee Meetings.  FE-6 added that he did not recall another issue being treated this way.  FE-6 could not recall the level of detail discussed with respect to the powder metal problem but recalled that it was discussed in a manner that made it clear that the situation was a severe problem. FE-6 also recalled that the cracked powdered metal problem was discussed in one or two Coffee Talks, as well as one Executive Committee Meeting leading up to the April 18, 2023, AEP Conference, and he did not recall it being internally mentioned again until RTX's July 25, 2023, Q3 earnings call where the Company first publicly acknowledged the issue.

188.    Additionally, FE-2, was employed at Pratt & Whitney from early 2020 through mid-2023, confirmed that problems with the powdered metal used in the GTF engines were among the quality control issues, and that the defects in the powdered metal caused cracking in the engines, which led to the Company needing to recall engines and change the affected parts.  He recalled that the estimates for the cost to Pratt & Whitney for the recall of the affected GTF engines ranged from $3.4 billion, up to $5.1 billion, then down to $2.8 billion.  Due to the shifting estimates, he never knew the exact numbers for the costs.

189.    FE-2 explained that the quality control team at each Pratt & Whitney mod center had to identify the number of potentially affected engines originating in that facility and report those numbers up to the Senior VP in order to calculate the total costs for the recall.  He added that, as part of the SIOP process, those quality control teams reported which parts had to be used

to repair or retrofit the faulty engines instead of being used for new engines. FE-2 reiterated that the estimates of total costs changed a lot, and that the numbers were prepared initially at each mod center or repair facility, because not all repairs were conducted, or parts manufactured at all facilities. FE-2 added that the Directors of each mod center presented these numbers to the SIOP team, which then presented those numbers to senior leadership at the monthly meetings.

190. Despite Defendants' knowledge that a financially impactful recall of parts affected by the Powdered Metal Defect was imminent, on April 25, 2023, Defendant Mitchill spoke on the GTF engine's Aftermarket MRO profitability during a Company earnings call, remarking "***our estimates today contemplate everything that we know about the engine***," giving investors a falsely positive sentiment concerning the profitability of the GTF engine fleet. Defendant Calio also failed to disclose that Defendants had already known of the Powdered Metal Defect for years and now needed to ground airplanes for inspection and removal.

191. However, as Defendants would later admit at the end of the Class Period, as soon the Company actually began inspecting GTF engines, Defendants immediately "found cracks [in GTF HPT disks] were larger than we had anticipated" based on the V2500 data. Indeed, despite Defendants' later claim that they were able to rely on the V2500's purported 1% fallout rate, ultimately Defendants admitted that they could not rely on that data and would need to inspect and replace **every** contaminated HPT disk—because that was the only way to ensure that the HPT disks would "have full certified life" and not cause a catastrophic engine failure. Thus, while Defendants asserted at the end of the Class Period in 2023 that they had relied upon hypothetical "lifing models" to give them comfort that the HPT disks on GTF engines would not fail until several years later, Defendants also admitted that **they had no actual data** for the GTF relating to the Powdered Metal Defect at issue to plug into those models.

192.    In fact, Defendant Hayes also starkly admitted at the end of the Class Period that for 137 GTF engines, RTX was completely in the dark, as it had no "lifing" data at all.   As Defendant Hayes stated, for those 137 engines, "**we don't have a digital record to assure us in terms of what their life is**"—such that Defendants acknowledged that those 137 engines would have to be inspected first.  This meant that, from day one, Defendants unquestionably knew that there was a group of 137 GTF engines that were in active use on commercial airliners for which they had no data at all to support any conclusion that the HPT disks on those engines would not crack.  Tellingly,  and despite this stark reality, Defendants had **never** identified those 137 GTF engines to the FAA as "high risk" or otherwise, and those engines did not number among the 59 engines Defendants had previously identified to the FAA as needing urgent inspection.

**M.    Defendants Falsely Touted the Viability and Profitability of the GTF Engine Fleet at the Paris Air Show's Investor Meeting**

193.    On June 19, 2023, RTX held its Investor Meeting at the Paris Air Show, a critical event for its stakeholders.  During this event, Defendants made numerous representations leaving investors with the impression  that there were no lingering issues affecting the airworthiness and profitability of the GTF engine fleet.  For example, Defendant Eddy stated that the GTF engine fleet had "***significant life remaining, and that enables us to address these technical issues early in the program.  And we've assumed all of these activities and the related costs in our contract modeling and of course, in our financial guidance***."   By representing that the Company's "***contract modeling***" already "***assumed all of these activities***" and fixes on "***technical issues***," Defendant Eddy lulled investors into believing  that the GTF fleet was safe and profitable.  This false and misleading  statement was central to Defendants' fraud because it misled investors to believe that RTX's "***financial guidance***" encompassed and "***assumed all of these activities***" or technical fixes on the GTF engine fleet.  In reality, and unbeknownst to investors, Defendants had

not included in its financial guidance the massive, looming liability of its Powdered Metal Defect, which was systemic throughout the entire GTF engine fleet that had not been cured or disclosed.

194.    Moreover, Defendants emphasized that the recent GTF issues were decidedly "***not tied to the performance of the engine***," which was "***delivering on the commitments***," had consistently maintained "***[d]ispatch reliability of 99.96%***," and now had "time on wing" that was supposedly "better than the V2500 was at this point in the program."    Remarkably, Defendants further specifically proclaimed that they had successfully "***improved hot section durability***"— with the "hot section" directly referring to the combustor, compressor and HPT disks—and had purportedly also successfully "***extended the life on life-limited parts***."

195.    Even when Defendant Eddy was directly asked by an analyst about "a number of customers who've been pretty vocal about their concerns over the engine"—and whether Defendants saw "any financial exposure" to issues involving the engine causing "grounded airplanes" and costs to customers—Eddy unequivocally asserted that all costs associated with any issues with the engine were "***expected costs for us going forward to upgrade the fleet over time,***" and that "***there's not a surprise here coming***."

196.    In reality, and unbeknownst to investors, a major technical issue—the Powdered Metal Defect—was both known to Defendants since 2020 and went undisclosed by the Company to keep its stock price artificially inflated.    By representing to investors that the Company had implemented fixes to improve the life of the engine while concealing this known defect, Defendants falsely led investors to believe that the GTF engine fleet was airworthy and profitable when neither was true.

### N.    The Truth Began to Emerge on July 25, 2023

197.    On July 25, 2023, Defendants shocked investors when RTX issued a Press Release and Form 8-K disclosing a "***rare condition***" of contaminated powder metal introduced through

Pratt & Whitney's manufacturing process that would "require Pratt & Whitney to remove some engines from service for inspection earlier than expected." RTX reduced its 2023 cash flow expectations by **$500 million**, to $4.3 billion, "primarily to reflect the developments at Pratt & Whitney" involving its Powdered Metal Defect affecting the GTF engine fleet.

198.    The same day, RTX held its earnings conference call for 2Q 2023. During the call, Defendants provided additional details on the previously undisclosed Powdered Metal Defect, and the enormous "impact on Pratt & Whitney and our customers" this would have. As Defendant Hayes explained, RTX had identified "an issue resulting from a rare condition in powdered metal that will require Pratt & Whitney to **remove some engines from service for inspection earlier than expected**."

199.    Defendant Calio elaborated that this "condition in powdered metal used to manufacture certain engine parts **may reduce the life of those parts.**" Defendant Calio explained that not only would this serious defect require "that approximately 200 PW1100 engines [] be removed for enhanced inspection," but that even more engines would have to be inspected over the following year, explaining that "[b]eyond the initial 200 engines, **Pratt also anticipates that approximately 1,000 additional PW1100 engines will need to be removed from the operating fleet for this inspection within the next 9 to 12 months**." Defendant Calio further admitted that the manufacturing defect spanned **six years**—"**from approximately Q4 2015 into Q3 2021**"— and that the GTF would "**experience the most significant impact**" due to the its large "production volumes during this period."

200.    Strikingly, Defendants now admitted that they had **known of this issue as early as March 2020**, and that they had specifically traced the Powdered Metal Defect to Pratt $ Whitney's

own powdered metal manufacturing process from their investigation of the March 2020 Vietnam Airlines V2500 incident.  As Hayes admitted:

> **This is an issue that we first uncovered back in 2020 when we had an incident with the V2500 turbine disc**. As a result of that investigation, **we determined at that point that we had some contamination in this powdered metal that we make**. It occurred very, very rarely, but it did happen, **and it actually resulted in the turbine disc failure on an airline** . . . At the same time, we knew that this contamination had occurred between late 2015 and late 2020, early 2021. **So we knew we had a suspect population in the fleet**.

201.    Defendant Hayes further explained that all of the affected turbine disks across all of Pratt & Whitney's engine families, including the GTF, were "**all internally manufactured with a proprietary powder [metal]**."  That powdered metal was made by HMI, Pratt & Whitney's own powdered metal facility located in Clayville, New York.  This meant that, once Defendants knew they had defective HPT disks made with contaminated powdered metal in their V2500 engines, they clearly understood that they had also installed defective HPT disks in their GTF engines, since they were all made from the same powdered metal alloy produced at the same plant during the same time period.  As Hayes explained, Pratt & Whitney realized that they had to perform inspections "**not just for the V[2500] but for the whole GTF fleet, in fact, the entire fleet of Pratt products that were manufactured during this timeframe**" using the powdered metal.

202.    Defendant Hayes also revealed for the first time that due to the Powdered Metal Defect, in "mid to late 2021," RTX "changed all the processes in terms of the screening of the powdered metal to identify the contamina[nt], to eliminate the contaminant."  Defendants stated that it was only after these "extensive improvements" had been made to "remove possible contamination sources," along with the "deployment of enhanced inspections for improved detection," that the problem was rectified.  Hayes further acknowledged that the Powdered Metal Defect had resulted from Pratt & Whitney's quality control lapses in its scramble to meet demand

for the GTF, stating that as the Company had "**scaled up production for GTF, it got away from us a little bit**."

203.    As a result of Defendants' disclosures, RTX's share price fell $9.91 per share, or 10.2%—from a close of $97.01 on July 24, 2023, to a close of $87.10 on July 25, 2023, on extraordinarily high volume.

204.    Analysts expressed shock and dismay at the disclosure and the Company's prior lack of candor.  For example, a Bank of America analyst highlighted that as recently as a few weeks earlier, Defendants had spoken positively of the GTF engine and made no mention of the defect:

> When you look at the **litany of issues that have happened here with this engine**, everything from section issues, manufacturing issues, do you have a cultural issue in your engineering workforce?  Are people not talking to each other?  And I mean, it also begs the question, **how could you guys possibly not know about this at Paris when you did this major investor event**?

Similarly, a Vertical Research Partners analyst noted that "[b]y my count, this is the third [quality] issue you're dealing with at the moment [on the GTF]," and asked whether "there [is] a root problem or cause that's linking these issues?"

205.    Analysts continued to excoriate the Company following the call, uniformly expressing disbelief that the Company had not disclosed the issue earlier.  An RBC analyst report complained that "[t]he company has identified **another issue with the GTF engine**," and noted that "the initial reaction will be a headwind for the stock, **especially since the company sounded incrementally bullish on the GTF just a month ago at the Paris airshow**," noting that the GTF issue was "**not fully disclosed**" at that time.  Similarly, a Barclays report noted that the newly disclosed defect would not only create significant costs for the Company but could have a "longer-term impact to market share relative to" the GTF's main competitor engine, and further explained that the "**reaction partially reflects the company making no mention nor contingency for this**

issue a month ago at its **Paris Airshow briefing (at that point a known potential issue, per company commentary**."  RBC further remarked that "the $500M reduction in 2023 FCF [free cash flow] as a result of the **urgent need to inspect the 200 GTF engines was a negative surprise**.  Compounding the negative reaction was the fact that this issue is **coming to light now, just after the investor event at the Paris airshow**."

206.    The fallout for RTX's customers—commercial airline operators—was also immense, with Reuters reporting that "**[A]irline executives are fuming about the prospect of grounding planes and trimming flight capacity** amid a busy summer travel season after fresh problems arose with some of RTX's Pratt & Whitney engines," and quoting an unnamed airline executive referring to the disclosure as a "**nasty surprise**."  Carriers including Delta, United Airlines, JetBlue, Spirit, Frontier Airlines, and Hawaiian Airlines, as well as numerous foreign airlines, had all taken delivery of planes with impacted GTF engines and were forced to weigh service cuts as they would have to ground hundreds of planes for the inspections.

207.    However, Defendants' false impression of candor continued to mislead investors. For example, according to Defendant Hayes, the Company's "***inspections, yielded a very, very small fallout rate, less than 1%***."  That statement, however, was false and misleading because in reality, there was no basis to extrapolate that data to all of Pratt & Whitney's engines, and particularly the GTF, a much newer engine with significantly higher thrust that Defendants knew would cause the HPT disks to fatigue and fracture much faster.  Moreover, while Defendants downplayed the 1% rate as being of little concern, as set forth above, a "fallout rate" of 1% was ***ten million times higher*** than the 0.000000001% failure rate FAA regulations required for potentially catastrophic engine failures—equating to ***30 engines*** out of the 3,000 GTF fleet.  Thus, while Defendants claimed that this 1% fallout rate for a different and far more durable engine was

the key piece of data that informed their "belie[f] that the life of the turbine disc was such that we would see these discs in the shop and be able to inspect them before we ever had an issue," in truth that data point was unreliable and far too high for what the FAA would tolerate with respect to airline safety.

208.    Moreover, Defendants' disclosure entirely omitted reference to the December 2022 Viva Aerobus engine failure, or of the fact that Pratt & Whitney already knew that the December 2022 engine failure was directly linked to the exact same Powdered Metal Defect as its V2500 engine series.   Additionally, while Defendants claimed that the "accelerated" inspections of the 200 engines that had been identified could be performed within a mere 90 days, in reality—and as Defendants would soon be forced to admit—the full disassembly of the engine and specialized inspection process the AUSIs required would in fact take upwards of ten months.   Finally, while powdered metal contamination could be described as a "***rare condition***" for powder metallurgy at-large, the Powdered Metal Defect was certainly not a rarity within Pratt & Whitney, whose entire production line was tainted by the contamination for six years.   Defendants' statements were demonstrably false and misleading in light of Defendants' admissions concerning Powdered Metal Defect, including that it was "**first uncovered back in 2020**," as well as the allegations of numerous RTX FEs indicating that Defendants were aware of the widespread Powdered Metal Defect in the GTF engine fleet even prior to 2020 (*see* Sections IV.C., IV.D., and IV.L, *supra*).

209.    Following Defendants' July 25, 2023 disclosures, some analysts took some comfort in RTX's reassurances, with RBC stating "[t]he recent powder metal quality issue is stressing near-term GTF FCF [free cash flow] generation, **but we do not anticipate that this issue will impact the long-term economics of the program**."   Analysts at Morgan Stanley similarly took comfort that "[c]onsidering that the issue is finite in nature (1,200 total engines affected) with the majority

of the cash outflow likely completed by 2024, this pullback seems overdone. On a 4-5 year long-term view, we recognize that RTX's growth and cash thesis remains intact."

210.    Despite Defendants' reassurances, further impacts of the GTF defect continued to surface. First, on August 4, 2023, Pratt & Whitney was forced to issue an SI to operators of the GTF engine-powered A320neo aircraft, requiring accelerated inspections and engine removals covering an initial tranche of operational engines no later than September 15, 2023—i.e. within a mere five weeks. Then, on August 22, 2023, the FAA adopted a new AD mandating the removal of HPT disks from GTF engines by September 15, 2023, which the FAA directly linked to RTX's "updated analysis" of GTF engines' HPT disks, purportedly conducted after the December 2022 Viva Aerobus incident, which investors learned of for the first time from the FAA's AD and not from Defendants. The FAA warned that the GTF engines' HPT disks were "susceptible to failure much earlier than previously determined," and that these defects "could lead to premature fracture and uncontained failure, which indicates an immediate safety of flight problem." The FAA stressed that these AUSI inspections needed to occur as soon as possible, as "the longer these parts remain in service, without the inspections required by this AD, the higher the probability of failure."

### O.    On September 11, 2023, Defendants Disclosed the Full Impact of Manufacturing Defect on the GTF Engine Fleet

211.    On September 11, 2023, RTX issued a Press Release and Form 8-K providing an update on Pratt & Whitney's Powdered Metal Defect. RTX now revealed a dramatically worsened impact of the Powdered Metal Defect versus its disclosure less than two months earlier. First, an additional "600 to 700 engines [would] be removed for shop visits between 2023 and 2026 beyond Pratt & Whitney's shop visit forecast entering 2023," the majority of which would "occur in 2023 and early 2024." These "accelerated removals" would "**result in higher aircraft on the ground**,"

which, Defendant Hayes acknowledged, would "**create an extremely difficult situation for our customers**." Second, the expected financial impact of these removals would be enormous, with a hit to operating profit of "**between $3 billion and $3.5 billion over the next several years**," and a gross financial impact of as much as **$6-7 billion**. Significantly, an estimated 20% of these staggering costs would go to inspecting and repairing the engines, while **80%** would go to compensating airlines because RTX had sold them dangerously defective engines that could not remain in service.

212.    During a "Special Call" held that same day to address the GTF issues, Defendants finally revealed the massive impact of the Powdered Metal Defect on the GTF engine fleet. Far beyond even the 1,000 engines announced to have been impacted in the July 2023 earnings call, Defendants now revealed that the issue would "**touch roughly 3,000 engines**,"—**essentially every single GTF engine produced and sold over a six-year period**—including the 600-700 engines that needed to be removed and disassembled in the near term. Each of these engines, Defendant Calio now admitted, would have to undergo an extensive remediation process, and would accordingly be out of service "**between roughly 250 and 300 days on average for when these engines are removed from wing until they are returned to an operator**." Defendant Calio further stated that hundreds of GTF-powered aircraft would be grounded for months at a time as a result, stating that "we now forecast an average of 350 aircraft on the ground for the GTF-powered fleet from 2024 through 2026, **with a peak of 600 to 650 aircraft on the ground in the first half of 2024.**"

213.    Moreover, while Defendants had only weeks earlier claimed that Pratt & Whitney would only need to replace the HPT disks in fewer than 1% of its GTF engines based on the V2500 data, Defendant Calio now revealed that Pratt & Whitney would have to **replace as many of the**

**contaminated HPT disks as it possibly could** with non-defective parts, in order to avoid future engine failures. Indeed, Defendant Calio stated that Pratt & Whitney now "plan[ned] to replace as many HPT disks as possible"—because otherwise the disks would not "have full certified life."

214. Defendant Calio also acknowledged, for the first time, that the December 24, 2022 Viva Aerobus engine failure was directly linked to the Powdered Metal Defect—and further admitted that the Company's "inspections and destructive testing" of GTF engines in the wake of that incident had immediately revealed "cracks that were larger than we had anticipated" versus the V2500 data the Company had previously claimed it relied on, "which required us to also increase our assumption on the rate at which a crack would grow." Defendant Calio also made clear for the first time that the life of the HPT disk was directly linked to the "thrust rating of the engine"—such that the part life of contaminated HPT disks for high-thrust engines was reduced by as much as **2,000 flight cycles**, or approximately **one and a half years**, as compared to engines with lower thrust.

215. During the same Special Call, Defendant Hayes similarly clarified that while Defendants had previously stated they were able to rely on "lifing models" that purportedly gave them comfort that the HPT disks on GTF engines would not crack and could last for years, those models were in fact extremely ill-informed—to the extent that for no less than **137 GTF engines,** the Company in fact had no "lifing" data at all. Specifically, Hayes admitted that the first group of GTF engines that would be urgently inspected would be a group of 137 engines for which "**we don't have a digital record to assure us in terms of what their life is**."

216. During the call, analysts again expressed shock at the Company's disclosure and prior lack of candor. For example, a Bank of America analyst asked "**Ultimately, how did this happen? I mean, a quality escape of kind of this magnitude**." In response to analysts,

Defendant Hayes again admitted that it was "back in late 2015"—when the Company had "brought online additional capacity at HMI" and "added an additional tower" in order to aggressively "ramp up" production for the GTF engine—that "we somehow [or other] introduced a contaminant into the powdered metal." Hayes further explained that because Pratt & Whitney had "been making powdered metal for 50-some years," Defendants were very familiar with the type of severe risk a contaminant in the powdered metal could cause—as Hayes stated, "we have always known that contaminated powder is a potential issue in terms of life of the part."

217.    Defendant Hayes also again explained that, following the V2500 aborted takeoff on March 18, 2020, the Company had engaged in intensive "root cause analysis" investigations of the source of the Powdered Metal Defect. Hayes now further detailed that, in RTX's attempts to remedy the problem after the March 2020 incident, Pratt & Whitney had made at least "**nine changes to the process to ensure the purity of the powder**" which did not result in contaminant-free powdered metal until the **fourth quarter of 2021.** As a result, during that eighteen-month period and through the end of the Class Period, **Defendants had been knowingly producing and delivering contaminated GTF engines to RTX's customers.**

218.    Notably, certain airline operators were disproportionately affected by Defendants' recall, including InterGlobe Aviation Limited ("IndiGo"), Go Airlines, Limited ("Go First"), Wizz Air Hungary Ltd. ("Wizz"), and Aeroenlaces Nacionales, S.A. de C.V. ("Viva Aerobus"). Viva Aerobus, for example, estimated that 20% of its fleet would be impacted.



*Data via ch-aviation.com*

219.    On this news, RTX's share price fell $6.58 per share, or 7.9%, to close at $76.90 on September 11, 2023.

220.    Analysts expressed shock at the sudden disclosure of an even worse GTF situation than revealed a mere six weeks earlier.  A September 11, 2023, RBC Capital Markets report noted the Company's dramatic shift in tone from just two months earlier, stating that "[c]oming out of the 2Q23 results call, when the company initially identified the powder metal issue with the GTF engine, we had confidence that the issue, based on the data provided, was relatively well contained.  However, the financial and operational impact identified today is more substantial than we had expected.  We see incremental risk to the ~$3B of cumulative FCF [free cashflow] impact, and we believe investor confidence in RTX and the GTF will take time to be restored."  The RBC report further expressed surprise that while the Company's announcement less than two months earlier had "initially estimated that the inspections would cover ~200 engines in 2023 (by mid-September) and an incremental 1,000 engines in 2024," the Company had now more than doubled its public estimate of total engines impacted, i.e., that "today, the company indicated that **the number of**

**engines that will need inspection is ~3,000**, and an incremental 600-700 engines will require heavy shop visits in the 2023-25 period."   The RBC report thus downgraded RTX stock from Outperform to Sector Perform and lowered its price target from $105 to $82 per share, citing the fact that "RTX now anticipates a ~$3B FCF impact from 2023 through 2025" from the GTF issue "with ~80% of this going toward customer concessions," and noting "continued risks to the FCF outlook from both execution on the engine repairs and the customer concessions."

221.    Additionally, on September 13, 2023, analysts at Bernstein Research specifically attributed RTX's drop in stock price to its disclosures concerning the GTF engine recall, "[w]e attribute the drop to investor concerns we have heard that Pratt may not yet fully have its arms around the problem, that the GTF may have broader issues which could put its long-term future at risk, and questions about management, given the time it took Pratt to fully raise the issue."

## V.    POST CLASS PERIOD EVENTS

### A.    Additional FAA Airworthiness Directives

222.    Following Defendants' final disclosure on September 11, 2023, the FAA issued numerous additional ADs, which shed further light on the magnitude and severity of the problems that were concealed from the investors during the Class Period.  For example, on December 28, 2023, the FAA proposed an AD that would supersede those issued previously relating to the GTF engine fleet.  The proposed AD would significantly expand the scope of AUSI to additional parts on the PW1100G and PW1400G engines to include additional HPT hubs and bladed rotors. Notably, the FAA received fifteen industry comments, including a comment dated January 16, 2024 from airline operator Lufthansa Technik AG, describing how the thrust ratings of the GTF engines (for example, 27k, 29k, or 33k), informs the threshold for inspection and removal of the contaminated parts.

223.    The additional ADs also shed light on the connection between the March 2020 V2500 engine failure and the December 2022 GTF engine failure.  For example, on March 27, 2024, the FAA issued two ADs applicable to the GTF engines that revealed that the FAA became aware of these problems after Pratt & Whitney's updated analysis of the December 24, 2022 Viva Aerobus incident revealed that the engine failure was caused by the same metal powder anomaly as the V2500 engine series.  In response to the expanded group of affected engines, the AD required performing an inspection and potential removal of additional engine parts, including HPT hubs and high-pressure compressor ("HPC") disks.  The AD specifically defined the Powdered Metal Defect reducing the life of the specified engine parts in the GTF engine fleet as "a nickel powdered metal anomaly, similar in nature to an anomaly previously observed" on the V2500 engine.  The analysis also concluded that "there is an increased risk of failure for additional powdered metal parts in certain nickel powdered metal production campaigns, and these parts are susceptible to failure much earlier than previously determined."

224.    Finally, on June 11, 2024, the FAA published an additional AD concerning the V2500 engine family, which also referenced the GTF engine family.  In that AD, the FAA "clarifie[d] that the affected population [of contaminated metal parts] was manufactured from the **same production campaign** (a batch of nickel powdered metal) as the HPT 1st stage hub that failed on March 18, 2020."  The AD noted that "these parts have a higher likelihood of containing the nickel powdered metal anomaly and are susceptible to failure much earlier than previously determined."  In sum, under these post-Class Period ADs, every single HPT disk produced over a six-year period at Pratt & Whitney and then used in the V2500s and the entire GTF engine family had to undergo an AUSI.

### B.    SEC Investigation

225.    In the aftermath of the Company's stunning disclosures, the SEC launched an ongoing investigation into the Powdered Metal Defect with the GTF engines.  Defendants' 2023 10-K, filed with the SEC on February 5, 2024, revealed that on November 7, 2023 and January 30, 2024, Defendants received two subpoenas from the SEC.  Specifically, RTX divulged that the SEC's subpoenas seek "engineering, operational, organizational, accounting, and financial documents in connection with an investigation relating to the Company's disclosures in 2023 of issues arising from Pratt & Whitney's use of powder metal in manufacturing various engine parts, its identification of certain risks associated with those manufacturing processes, and corrective actions identified by Pratt & Whitney to mitigate those risks."  As of this filing, Defendants had not provided further updates about the investigation.

### C.    CEO Hayes Resigns

226.    Amid the SEC investigation regarding the Powdered Metal Defect, on December 14, 2023, Defendant Hayes announced that he would step down as the CEO of RTX in May 2024 and then remain as the executive chairman of the Board.  Defendant Calio was appointed as CEO of RTX following Defendant Hayes's departure.

### D.    RTX's Fleet Management Plan & Company Layoffs

227.    Following the Class Period, on September 11, 2024, during a business update call, Defendants announced that the Company had developed a fleet management plan to remedy the Powdered Metal Defect on approximately 3,000 GTF engines.  The plan would require the HPT disks to be inspected roughly every 2,800 to 3,800 cycles, require additional inspections on the HPC, and reduce the part life of HPT and HPC disks to 5,000 to 7,000 cycles.  As result of the foregoing problems, the Company announced that employees would be laid off to save cost.

E.    **Impacts to Airlines and to RTX Continue to Worsen**

228.    Fallout from the impact of the Powdered Metal Defect on the GTF engine fleet have continued to severely disrupt numerous airlines' businesses, which in turn has contributed to mounting costs for RTX to compensate airlines for these disruptions.  A November 27, 2023 article on the airline news website SimpleFlying.com reported that more than 40 airlines globally had been seriously impacted by the GTF issues, and that "[a]irlines like Air New Zealand, JetBlue, Cebu Pacific, Viva Aerobus, Volaris, IndiGo, and All Nippon Airways have experienced significant disruptions and have had to ground or inspect their aircraft due to the engine issues."

229.    During a mid-January 2024 investor call, Delta CEO Ed Bastian lamented that, with respect to "the engine side of the business . . . there's a lot of work on Pratt.  We have a lot of reliance on Pratt, and the challenges that they're facing have been well-chronicled."

230.    Spirit stressed in early 2024 that the situation already had a material impact on its network and "estimate[ed] the impact will continue through 2026[.]"  For example, Spirit noted "that **as a result of the Pratt & Whitney engine issues, in November 2023, we announced that we will discontinue service at Denver International, effective January 9, 2024**[.]"  Spirit also emphasized the lengthiness of the disruptions caused by the inspection and replacement processes, with President and CEO, Ted Christine explaining, "[w]e used to see the engine manufacturers get wing-to-wing turn time somewhere in the 90- to 120-day range. Unfortunately, we're seeing Pratt numbers that are in the 300-plus range.  And we're not sure whether or not that is stable, whether or not it will continue to increase or decrease."

231.    In March 2024, Jozsef Varadi, CEO of Hungarian airline Wizz, announced that he expected the number of aircraft grounded due to flaws with Pratt & Whitney's GTF engines would take another six to 12 months to reach their peak, later than what RTX had claimed in 2023.  Varadi noted that Pratt had been overwhelmed by the volume of engines coming in for repairs, and

**roughly 20% of Wizz's fleet remained grounded as the turbines undergo inspections and fixes**—a process that had been taking about 300 days to be reinstalled on an aircraft. Shortly after the September 11, 2023 corrective disclosure, Wizz was forced to begin extending the life of its older A320neos, and began swapping its flying patterns and reducing thrust take-off and longer take-off distances to help reduce strain on the engines as it worked through the travel season.

232. Mexican low-cost carrier Volaris announced that it expected **to reduce its full-year capacity in terms of available seat miles (ASM) by between 16-18% in 2024** as it contends with increased inspections of some of the Pratt & Whitney PW1100G geared turbofans (GTFs) powering its Airbus A320neo-family jets.

233. Air New Zealand Limited ("Air New Zealand") CEO, Greg Foran, noted in November 2023, that "[w]hile this maintenance issue does not present a safety issue, it has caused Air New Zealand to revise its flight schedule due to adjustments made to the engine maintenance plan." Foran noted that this issue could impact services **for up to two years**, and that due to engine availability due to the Pratt & Whitney maintenance issues, the airline will have up to four aircraft grounded at any one time.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS[14]

### A.     February 8, 2021 Annual 10-K Report

234.     On February 8, 2021, RTX filed its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"). Defendants Hayes and O'Brien[15] signed the 2020 10-K, containing SOX Certifications.

#### 1.     Management's Discussion and Analysis of Financial Condition and Results of Operations – Contingent Liabilities

235.     RTX's 2020 10-K contained the following language related to commitments and contingencies:

> Of note, the design, development, production and support of new aerospace technologies is inherently complex and subject to risk. **Since the PW1000G Geared TurboFan engine entered into service in 2016, technical issues have been identified and experienced with the engine, which is usual for new engines and new aerospace technologies. Pratt & Whitney has addressed these issues through various improvements and modifications.** These issues have resulted in financial impacts, including increased warranty provisions, customer contract settlements, and reductions in contract performance estimates. Additional technical issues, either related to this program or other programs, **may also arise in the normal course**, which may result in financial impacts that could be material to the Company's financial position, results of operations and cash flows.[16]

---

[14] Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of RTX's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

[15] On April 9, 2021, Defendant Anthony O'Brien unexpectedly resigned from his role as CFO of RTX. News outlets widely reported his departure as "abrupt." O'Brien had been in his role as CFO since 2015 and had worked at Raytheon for 34 years at the time of his resignation. CEO Hayes remarked on O'Brien's departure, noting that he "has played a pivotal role in the establishment of Raytheon Technologies" and stating "[w]e thank him for his many contributions and wish him well in the future." O'Brien was replaced by Defendant Neil Mitchill.

[16] This disclosure did not appear in RTX's 10-K Annual Report for fiscal years 2021 and 2022.

236.    Defendants' statements in Paragraph 235 were false and misleading by any measure.  To the extent RTX's unspecified "*technical issues*" were meant to encompass the Powdered Metal Defect, the statement was false and misleading because it led investors to falsely believe that the "*technical issues*" were already "*addressed . . . through various improvements and modifications*."    However, unbeknownst to investors, Defendants had intentionally not "*addressed*" the Powdered Metal Defect.  The falsity of Defendants having "*addressed*" issues with the GTF engine fleet unfortunately became apparent as flight safety issues continued to occur.

237.    Moreover, to the extent RTX's disclosure included the Powdered Metal Defect in its reference to "*technical issues*," the statement gave investors the false impression that the issue was "*usual for new engines and new aerospace technologies*."   In reality, the known Powdered Metal Defect occurred during metalworking processes that the Company had been using for half a century.  Put simply, the "*technical issues*" Defendants "*identified*" in the GTF engine fleet were the result of manufacturing errors having nothing to do with the novelty of the GTF engine itself— as evidenced by the fact that the same and similar defects occurred in Pratt & Whitney's seasoned V2500 engine fleet.

238.    To the extent RTX intended to limit the disclosure of "*technical issues*" to only those "*usual for new engines and new aerospace technologies*," Defendants knowingly omitted the pervasive problem that stood in the way of the GTF engine fleet's profitability from investors— the Powdered Metal Defect—which also renders the statement false and misleading.  Defendants made these statements knowing that, if discovered by the public or the FAA, RTX would have to ground its GTF engine fleet and perform costly inspections on them out of the Company's own pocket, since they were still under warranty.  By any measure, RTX's disclosure was false and misleading.

239.    Bolstering the falsity of this statement, as alleged in Sections IV.C, IV.D, and IV.L, *supra*, numerous RTX FEs detailed that Defendants knew that Pratt & Whitney's GTF engines contained parts affected by the Powdered Metal Defect by no later than 2020.  Specifically, FE-1 advised that there was a "telcon" or conference call meeting in approximately August 2019 to discuss the powdered metal problems.  FE-1 recalled that the person who called the meeting was Sarah Toomey, Chief Engineer.  FE-1 recalled that the meeting was led by the Director of the GTF 1100 engine program, for the A321neo / A320neo aircraft.  FE-1 indicated that this meeting was specifically about contamination in the powdered metal supplied by Pratt & Whitney's source, an entity called *HMI*, based in Clayville, New York.  He noted that materials problems – such as contaminated components – are the "worst you can have" because they go to the life of the component, and therefore the life of the engine.  FE-1 reiterated that these problems were common knowledge throughout the Company, but that Pratt & Whitney's culture made it so that employees were not allowed to speak to anyone outside the Company regarding problems.

240.    FE-1 recalled speaking with his supervisor, Karnas, about the contamination problems shortly after the telcon meeting—within hours, or maybe a day, of the telcon.  He advised that he told Karnas that they must address the contaminated powdered metal problem, or it will get worse.  FE-1 noted that Karnas, as Designated Engineering Representative, was also the Organizational Designation Authority ("ODA") for Pratt & Whitney, meaning that he was the Company's official representative with the FAA.  FE-1 elaborated that, during his employment, he maintained a file in a Company group drive regarding powdered metal contamination issues.  He recalled being told that there was a "high impact team" on it to correct the problem.  FE-1 added that there was no further debrief after the telcon and no further information was forthcoming.  FE-1 also noted that the telcon in approximately August 2019 was specifically regarding the GTF

fleet. FE-1 articulated that the contaminated powdered metal problems were not limited to the GTF series of engines. As an example, he mentioned that the problem also affected the V2500 engines.

241.    FE-1 confirmed that senior leadership at Pratt & Whitney were aware of the contaminated powdered metals and titanium problems. He indicated specifically that Frank (Francis) Preli, currently Vice President, Propulsion and Materials Technology and Chief Engineer, Materials and Processes Engineering at the Company, and Geoff Hunt, Senior Vice President, Engineering, were aware of the problems. He elaborated that if the Company did not meet the production numbers, or if the Company had to bring in engines earlier than promised for inspection and repairs, then the cost was on Pratt & Whitney.

242.    Relatedly, FE-5, who was employed with Pratt & Whitney as a Mechanical Engineer at Pratt & Whitney's HMI Metal Powders facility in Clayville, New York, recalled that in approximately 2020, foreign objects were occasionally identified in the powder metal as it was forming. Similarly, FE-9 who worked with multiple engines, including the Geared Turbofan (GTF) engine, detailed how colleagues from Pratt & Whitney's metallurgical testing labs told him that there had been a problem with its powdered metal since approximately 2016 and that the Company was planning a recall because of this problem.

### 2.    Risk Factors – Operational Risks

243.    Further, the 2020 10-K contained the following risk factor:

Our Products Must Meet or Exceed Stringent Performance and Reliability Standards.

Our products and services involve advanced technologies in highly sophisticated products. The impact of a catastrophic product failure or similar event, particularly in our commercial aerospace business, could be significant. Actual or perceived design or production issues can result in significant reputational harm to our business, in addition to direct warranty, maintenance and other costs that may arise. A significant product issue resulting in injuries or death, aircraft grounding or similar systemic consequences could have a material adverse

effect on our business, reputation, financial position and results of operations. We may also incur increased costs, delayed payments or lost equipment or services revenue in connection with a significant issue with a third party's product with which our products are integrated. ***There can be no assurance that we or our customers or other third parties will not experience operational process or product failures and other problems, including through manufacturing or design defects, process or other failures of contractors or third-party suppliers, cyber-attacks or other intentional acts, any of which could result in potential product, safety, quality, regulatory or environmental risks. If our products do not perform as intended, including with respect to safety or reliability, the possible consequences include product recalls and product liability claims, significant financial losses, including fines, as well as a diversion of management attention and reputational damage that could reduce demand for our products and services.*** Further, our insurance coverage may not be adequate to cover all related costs and we may not otherwise be fully indemnified for them.

244.    Defendants' statements in Paragraph 243 were false and misleading because, at the time they were published on February 8, 2021 (for the year ended December 31, 2020), the very risk set forth as a mere hypothetical had already occurred and continued to exist. Specifically, Defendants' risk disclosures addressed, in a merely hypothetical manner, that RTX cannot provide "***assurance that we . . . will not experience operational process or product failures and other problems, including through manufacturing . . . or other failures . . . any of which could result in potential*** *product, safety, quality, regulatory or environmental risks*." The disclosure also discusses "***possible consequences***" that could arise "***[i]f our products do not perform as intended.***" This statement was false and misleading because, in reality, Defendants later admitted that nearly a full year earlier, by no later than 2020, they knew that their entire fleet of GTF engines manufactured and sold since 2015 suffered from a Powdered Metal Defect—a "***manufacturing,***" "***safety,***" and "***quality***" failure—that could lead to catastrophic engine fires and shutdown. Accordingly, by the time Defendants made these statements, the Powdered Metal Defect had already caused Pratt & Whitney's products to "***not perform as intended.***" Indeed, underscoring Defendants' knowledge of the falsity of this statement, Defendants admitted in 2023 that RTX had

been scrambling for a year by this point to make numerous changes to the Company's powdered metal manufacturing process in order to remove the contaminant, all of which at this point had been unsuccessful.

245.    Additionally, Defendants' risk disclosures were false and misleading because, by February 8, 2021, when the disclosures were released to investors, Defendants were already under intense pressure from regulators since March 18, 2020, to determine the root cause of its engine shutdown involving the V2500 engine.  By the time Defendants published this statement, RTX was already on the receiving end of numerous FAA Airworthiness Directives related to the Powdered Metal Defect's effect on its engine products.  Indeed, the FAA had already directed Pratt & Whitney to engage in root cause analyses to remedy the "unsafe" condition, while investors remained unaware that it extended to the Company's prized GTF engine family.  Accordingly, the "*regulatory*" risk arising from its Powdered Metal Defect had already occurred.

246.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

### 3.    Risk Factors – Industry Risks

247.    Finally, the 2020 10-K contained the following risk factor:

We Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.

We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies.  The product, program and service needs of our customers change

and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services.

Of particular note, Pratt & Whitney is currently producing and delivering the PW1000G Geared Turbofan engine to power various aircraft, including the A320neo family of aircraft. The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or *if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts*.[17]

248.    Defendants' statements in Paragraph 247 were false and misleading because, at the time they were published, the very risks that were set forth as merely hypothetical had, in fact (unbeknownst to investors), already occurred. Specifically, these "risk factor" statements gave the impression that it was a mere future possibility that "*if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs . . . or other liabilities*." However, as Defendants ultimately and explicitly admitted in 2023, by the end of 2020, Defendants knew that their prized GTF engine fleet suffered from the Powdered Metal Defect. Indeed, by the time Defendants published this statement on February 8, 2021, Defendants had already undertaken a root cause analysis concerning its HPT disk fractures following the March 18, 2020 Vietnam Airlines engine fire and aborted takeoff in its V2500 series engine. Thus, Defendants knew full well that its GTF fleet was made using the same exact contaminated powdered metal, from the same exact manufacturing process, and at the same exact manufacturing facility in Clayville, New York. Yet, the fact that Defendants had connected the Vietnam Airlines engine fire to a Powdered Metal Defect that impacted the GTFs remained concealed from both investors and customers.

---

[17] This language is reproduced in RTX's Annual Reports for fiscal years 2021 and 2022.

249.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

**B.    February 17, 2021 Barclays Industrial Select Conference**

250.    On February 17, 2021, Defendant Hayes spoke at the Barclays Industrial Select Conference.    An analyst posed a question to Defendant Hayes concerning the GTF engine program, specifically asking how much of the fleet is currently up to specifications.    Defendant Hayes responded:

> So, let's just level set everybody in terms of where we are with GTF.  So, we've delivered roughly 1,800 engines out there that are in service today.  As you mentioned, the GTF powered A320 fleet, the utilization has been remarkably good during the pandemic.  About 85%, we believe, of the fleet is flying on a regular basis, and that's pretty good.  That's only about 2% lower than it was a year ago.  So, utilization is good.  ***Dispatch reliability for the last 12 months has been 99.97%.***[18]
>
> ***So, all those teething problems that we talked about for the last several years seem to be behind us.  We have upgraded about 96% of the fleet during the past year such that all of those fixes that we talked about, all of the reliability upgrades, 96% of those are now incorporated.***    And so, all that bodes pretty well in terms of starting to see kind of a return to normalcy.
>
> Now, the problem, of course, is that those 1,800 engines, the average age is about two years.  And we typically don't see aftermarket until you get to about year five.  So, I wouldn't expect that we're going to see a significant bump from GTF aftermarket until we get into the late 2023, 2024, 2025. And the program, again, should be breakeven by 2025 given the given the progression of the aftermarket and as we continue to drive costs down on the OE.  So, I think that's all very positive.  I think the Pratt team did a really good job last year.  ***We didn't stop any of the overhaul activity, even though people weren't sending***

---

[18] Dispatch reliability is an aviation industry term that reflects the percentage of scheduled flights that depart without making a mechanical delay of more than fifteen minutes or cancellation.  It is a significant metric because it is meant to reflect customer satisfaction and the aircraft's operational efficiency.

*as many engines and we got everything upgraded for the most part. So, I think, at least, knock on wood, all the GTF issues that we've been talking about seem to be behind us and the engine's performing really well.*

251.    Defendants' statements in Paragraph 250 were false and misleading. Defendants' representations that problems with the GTF engine were "*behind us*" were materially false and misleading. As Defendants themselves admitted at the end of the Class Period, Defendants knew that its problems with the GTF engine were not "*behind*" them. To the contrary, Defendants admitted that, by no later than 2020, they were well aware of a pervasive manufacturing defect due to contaminated powdered metal that affected thousands of critical GTF engine parts over six years, which were forming catastrophic cracks as the engines racked up flight hours. Moreover, the Powdered Metal Defect that was so severe that at this time in February 2021, Defendants were scrambling (unsuccessfully) to fix the issue by making no less than nine separate changes to RTX's powdered metal manufacturing process.

252.    Defendants' materially misleading statement spoke directly to "fixes" necessary on the GTF engines, while deliberately concealing the large, looming, and undisclosed issue of metal parts with the Powdered Metal Defect continuing to operate on in-service airplanes. Defendants' statements thus gave investors the false impression that any lingering problems in the GTF fleet were already addressed by "*fixes*" that were "*now incorporated*." However, as evidenced by Defendants' admissions on July 25, 2023 and September 11, 2023, Defendants knew by 2020 that Pratt & Whitney had manufactured parts for its entire fleet of GTF engines from contaminated powder metal since 2015, and despite frantically attempting to find a fix for the issue, Defendants at this point had been unsuccessful, and thus they were knowingly manufacturing and selling GTF engines that suffered from a potential catastrophic material defect.

253.    Similarly, Defendants' representations that it "**got everything upgraded**" on its GTF engine fleet were false and misleading.  Indeed, as flight safety events occurred and regulatory agencies pressed RTX to identify a root cause, Defendants did not "**upgrade**" the GTF to cure the known defect—HPT disks and other parts that were prone to cracking due to the Powdered Metal Defect—but continued to mislead investors to keep RTX's stock price artificially inflated, by assuring them that the GTF engine fleet's problems were a thing of the past.

254.    Finally, by touting a "**99.97% dispatch reliability rate**" to investors, Defendants misleadingly failed to disclose that, among the percentage of GTF engines that are not reliably dispatched, were those resulting in aborted takeoffs and engine shutdown warnings that were caused by the undisclosed Powdered Metal Defect.  Put simply, the statement left investors with the false impression that any technical issues preventing the GTF engine fleet from dispatch were not meaningful to RTX's commercial profitability.  When, in reality, those exact issues necessitated grounding Pratt & Whitney's engines for critical inspections and servicing.

255.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

**C.    June 8, 2021 UBS Global Industrials and Transportation Virtual Conference**

256.    On June 8, 2021, Defendant Mitchill fielded analysts' inquiries at the UBS Global Industrials and Transportation Virtual Conference.

257.    There, an analyst remarked on the GTF engine, stating:

At this point, the crisis for all the bad actually allowed you to resolve a lot of the in-flight issues and reliability and durability issues, at least to a point where it's really cured, I think, some of the customer relationships.  And given how active it's been in the fleet, it does

seem like, at a minimum it's been an opportunity for Pratt to resolve some of those items that are outstanding.

258.    Defendant Mitchill responded by stating:

*Yeah, you're right.  We were really able to take advantage of shop visit activity that was down last year to bring in GTFs and overhaul.  I might say, we're nearly 99% complete with retrofitting a couple of the issues that we were facing.*  We still have an option to upgrade the combustor.  We'll do that over the next several years.  That'll improve time on the wing as well.

259.    Defendant Mitchill's statements in Paragraph 258 were false and misleading because they gave investors the incorrect impression that RTX had taken "*advantage of shop visit activity that was down*" to "*overhaul*" the GTF engines to a point where the Company was "*99% complete with retrofitting a couple of the issues*" facing the fleet.  In reality, Defendants were avoiding retrofitting the HPT disks that the Company knew were formed using contaminated powder metal.  This was done to keep the airplanes in service long enough to outlive their warranty period and generate aftermarket profits.  Like other statements made during the Class Period, this statement falsely gave investors the impression that the GTF engine fleet was "cured" of its problems, airworthy, and poised to become profitable.  Especially given that this statement was made in direct response to an analyst asking whether the GTF engines were free of problems and doing well from a financial or "customer relationship" standpoint, this statement gave the false and misleading impression that RTX's diligence rendered the fleet problem-free.

260.    However, Defendants' own admission on July 25, 2023 that, since 2020, the Company had known that it manufactured engine parts using defective powdered metal renders this statement materially false and misleading.  Indeed, as noted above, at this point Defendants were in the midst of making multiple (and unsuccessful) changes to RTX's manufacturing process in order to remove the contaminant from the powdered metal.  Thus, Defendants had not come close to achieving any successful "*retrofitting*" of the materially defective parts that had been

installed in thousands of GTF engines made over a six-year period. This became apparent as flight safety incidents occurred and the Company was ultimately forced to ground hundreds of aircraft and recall parts created from the contaminated material.

261.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

**D.    October 26, 2021 3Q 2021 Earnings Call**

262.    On October 26, 2021, Defendants held an earnings call discussing RTX's performance for 3Q21 for the period ended September 30, 2021, ("3Q21 Earnings Call"). During the call, an analyst inquired as to the "big ramp-up" and ratings related to engines for Airbus, specifically the A320 aircraft equipped with GTF engines.

263.    In response Defendant Hayes stated:

[W]e see demand strengthening for the A320. It's a great aircraft and it's got great performance characteristics. Now, keep in mind, so the GTF, today, *we've just got over 900 aircraft delivered. We've flown about 9.5 million hours. We've got a 99.9% dispatch reliability rate. The engine is great*, and we continue to see opportunities to grow our market position on the A320. But we don't see any shortage of demand in the near term on the A320.

264.    Defendants' statements in Paragraph 263 were false and misleading Defendant Hayes' statements were false and misleading because they gave investors the false impression that the GTF "*engine is great*," when, in reality, the opposite was true: the entire GTF engine fleet was plagued by the Powdered Metal Defect. When spoken in tandem with statements touting Pratt & Whitney's GTF fleet achieving "*900 aircraft delivered*," and "*about 9.5 million hours*" flown, and a "*99.9% dispatch reliability rate*," Defendants gave investors the false impression that the GTF engine fleet was robust, performing well on-wing and were not plagued by any service-

threatening issues. However, what Defendants failed to disclose was that—as they admitted at the end of the Class Period in 2023—by no later than 2020, they knew that virtually every single GTF engine the Company manufactured during the preceding six-year period contained the Powdered Metal Defect that could lead to a catastrophic engine fire. Not only did Defendants conceal this extraordinarily material information, but they allowed these defective engines to remain in service and continued to manufacture and sell additional defective engines to unsuspecting customers. Unbeknownst to investors—but known to Defendants—the entire GTF fleet was in need of removal from service to perform critical inspections and removals to render the aircraft airworthy in the wake of Defendants' grave Powdered Metal Defect. Furthermore, at the same time that they made these statements, Defendants were still in the midst of an eighteen-month remedial exercise in which they changed the Company's manufacturing process no less than nine times before finally producing engines that were free of the contaminant.

265.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

### E.    November 9, 2021 Baird Global Industrial Conference

266.    On November 9, 2021, RTX's management team, including Defendant Mitchill, spoke at the Baird Global Industrial Conference. A moderator asked Defendant Mitchill to comment on the commercial side of RTX's business and provide some "key pieces" on the Company's performance in the commercial sector.

267.    Defendant Mitchill spoke specifically on the GTF engine fleet, stating, "just a comment or two, Peter, on the GTF. *The engine is performing very, very well. The platform of*

***engines have flown nearly 11 million hours with a dispatch reliability, well over 99%.*** The fleet remained highly utilized even through the pandemic.  So we're talking 87%, 88% utilization."

268.    Defendant Mitchill's statements in Paragraph 267 were materially false and misleading because it gave investors the incorrect impression that the "***11 million hours***" that the GTF engine fleet had flown, coupled with its "***dispatch reliability, well over 99%***," meant that the "***engine is performing very, very well***."  In reality, and as Defendants admitted at the end of the Class Period, Defendants knew that the GTF engine suffered from a systemic and potentially catastrophic Powdered Metal Defect.  Put simply, every hour that the GTF engines remained in flight with the known Powdered Metal Defect brought them closer to catastrophic cracking. Moreover, by touting that the GTF engine had "***11 million hours***" in-flight service, Defendants deceived investors into believing that more hours in the air were bringing the fleet closer to profitability.  In reality, Defendants knew that, because of the Powdered Metal Defect, the hours of service were simply a stop-gap to squeeze life out of the engines, and that the engines would need to be grounded for nearly a full year to allow for inspection and removal of the faulty parts.

269.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

### F.    January 25, 2022 4Q 2022 Earnings Call

270.    On January 25, 2022, Defendants held an earnings call discussing RTX's performance for 4Q21 for the period ended December 31, 2021 ("4Q21 Earnings Call").  During the call, Defendants Hayes and Mitchill both spoke on the GTF engine fleet.

271.    Defendant Hayes stated:

Maybe just to put it in perspective, to date, on the GTF program, *we have had more than 12 million flight hours* on that. *In the last 12 months, dispatch reliability has been 99.96%.* So I know that we had a lot of teething problems back in '16 and '17, and we talked ad nauseam about all of those teething problems. And obviously, it impacted some of our time on wing, impacted some of those maintenance support contracts. But given where we are from a reliability standpoint today, those programs will start to generate positive cash flow coming up as the first full shop visits happen in the next year forward and beyond. And I actually feel pretty good about where we are on those contracts *given the robustness of the current engine*.

272.    Defendant Hayes' statements in Paragraph 271 were false and misleading because they falsely led investors to believe that a "*dispatch reliability rate of 99.96%*" reflected the GTF's airworthiness and safety. In reality, Defendants' quantification left investors with the mistaken impression that the remaining 0.04% of failed departures were immaterial. However, as explained herein, several aborted takeoffs (a failure to reliably dispatch the aircraft) were the consequence of Pratt & Whitney's pervasive manufacturing defect that Defendants hid from investors. Rather than replace this known, pervasive, and dangerous manufacturing defect, Defendants adopted a wait-and-see approach to inch closer to profitability at the expense of passenger safety, to avoid damaging demand for the GTF and to keep the engines in service long enough to receive profitable aftermarket service revenue. At the core of its decision was Defendants' knowledge that the aircraft would need to be taken out of service or "off wing" to inspect and replace the defective metal parts, a huge financial hit for RTX. Moreover, investors understood "dispatch reliability" to be a metric closely associated with customer satisfaction and, therefore, profitability of the GTF engine fleet. By touting a near-perfect dispatch reliability despite ongoing customer disputes concerning the performance of the engines—specifically premature cracking—Defendants falsely led investors to believe that the GTF engine fleet was profitable and airworthy.

273.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that

Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

274.    Similarly, during the earnings call, Defendant Mitchill stated:

"*We've made significant improvements. You mentioned the durability improvements, and we are factoring that in, obviously, as we look at those contracts.* And I would tell you that as we perform warranty-type work under these contracts today, *we've been reasonably conservative in our outlook and our bookings on that.* So we are confident that we're able to see the improvement fall through the bottom line as those major overhauls begin. And we're also confident that we're able to demonstrate significant efficiencies and fuel savings that come from that engine . . . So we feel well-positioned with the product . . ."

275.    Defendants' statements in Paragraph 274 were false and misleading. By conveying to investors that RTX "*made significant improvements*," to the GTF engine fleet, which the Company was "*factoring*" into its "*reasonably conservative*" financial outlook, Defendant Mitchill's statements led investors to falsely believe that the Company had implemented fixes to the GTF engines that drove a conservative financial picture with respect to the fleet. In reality, and as Defendants explicitly admitted at the end of the Class Period, Defendants had deliberately concealed from investors, customers and the flying public a material known manufacturing defect—contaminated powder metal—that sat like a ticking timebomb in GTF engines powering commercial flights. Indeed, this defect was so severe, pervasive and entrenched that Defendants frantically attempted nine separate changes to the manufacturing process before they could produce engines that were contaminant-free. Despite the obvious magnitude of this material defect, Defendants did not breathe a word of this to investors. Far from cautious, Defendants' wait-and-see approach to the known Powdered Metal Defect was a dangerous and reckless gamble on the profitability of the GTF fleet. Defendants made a near-term decision to keep the GTF engines in flight to purposefully give the false impression of profitability, knowing that the engines needed to be grounded for critical inspection and removal of their defective parts.

276.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

**G.    February 11, 2022 Annual 10-K Report**

277.    On February 11, 2021, RTX filed its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"). Defendants Hayes and Mitchill signed the 2020 10-K, containing SOX Certifications.

278.    The 2021 10-K included the following language concerning the GTF engines:

Our products and services are highly sophisticated and specialized, involve complex advanced technologies, are often integrated with third-party products and services and are utilized for specific purposes that require precision, reliability and durability. Many of our products and services include both hardware and software that involve industrial machinery and intricate aviation and defense systems, including commercial and military jet engines, power and control systems and other aircraft parts, air and missile defense systems, and military sensors and command and control systems. ***Technical, mechanical and other failures may occur from time to time, whether as a result of manufacturing or design defect, operational process or production issue attributable to us, our customers, suppliers, third party integrators or others.*** In addition, our products could fail as a result of cyber-attacks, such as those that seize control and result in misuse or unintended use of our products, or other intentional acts. The impact of a catastrophic product or system failure or similar event affecting our or our customers' or suppliers' products or services could be significant, and could result in injuries or death, property damage, loss of strategic capabilities, loss of intellectual property, loss of reputation, and other significant negative effects.

A product or system failure could lead to negative publicity, a diversion of management attention and damage to our reputation that could reduce demand for our products and services. It could also result in product recalls and product liability and warranty claims (including claims related to the safety or reliability of our products) and related expenses, other service, repair and maintenance costs, significant damages and other costs, including fines and other remedies and regulatory and environmental liabilities. We may also incur increased costs, delayed payments, reputational harm or lost equipment or services revenue in connection with a significant issue with a third party's product with which our products

are integrated.  Further, our insurance coverage may not be adequate to cover all related costs and we may not otherwise be fully indemnified for them.  ***Any of the foregoing could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity.***[19]

279.    Defendants' statements in Paragraph 278 were false and misleading because such "***technical, mechanical, and other failures***" had already occurred.  Indeed, these statements were crafted to conceal that Defendants were already experiencing negative "***results of operations***" through engine failures and customer disputes.  As Defendants explicitly admitted at the end of the Class Period, Defendants well, long before this statement was made, that the Powdered Metal Defect affected the entirety of the Company's prized GTF engine fleet, since Defendants knew that the same contaminated powdered metal used to manufacture the V2500 components was also used in the same types of components on the GTF engines.  Furthermore, the fact that the GTF engine components used the same defective materials was of even greater concern because the higher-thrust GTF engine placed those components under even higher stress and temperatures than the V2500 engine.

280.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

**H.    January 24, 2023 4Q 2023 Earnings Call**

281.    On January 24, 2023, Defendants held an earnings call discussing RTX's performance for 4Q22 for the period ended December 31, 2022 ("4Q22 Earnings Call").  During the call, an analyst posed the following question to Defendant Calio:

---

[19] This language is reproduced in RTX's Annual Reports for fiscal year 2022.

If you can just give a little color on where GTF is in the aftermarket composition, where legacy higher-margin aftermarket is in that composition? How those 2 play out over the next several years? And also how the GTF aftermarket trending versus your sort of assumptions of profitability on those long-term contracts?

282.    Defendant Calio responded:

Demand remains really, really strong. As you know, *we continue to do the block upgrades to drive improved time on wing, obviously improved time on wing helps with their contract profitability.* We continue to incorporate upgrades to sort of improve the customer experience. On the aftermarket side, in 2022 turned slightly positive. *And so from this point, it's about accelerating those margins*. You're going to see that through some better contract mix as we talked about back in Investor Day in '21. *You're going to see that through increased time on wing through some of these upgrades.* And so *the GTF aftermarket profitability is something that is of high focus given the growing installed based, gets above 2,500 engines out there* and a very large backlog. So *GTF aftermarket is a huge driver.*

283.    Defendant Calio's statements in Paragraph 282 were false and misleading because they gave investors the impression that RTX had already performed "*upgrades to drive improved time on wing*" in a conscious attempt to improve "*time on wing*" and "*contract profitability*" of the GTF engines, when, in reality, Defendants had *not* performed the "upgrades" needed to address the most serious and pervasive defect impacting the GTF engines—the Powdered Metal Defect— and had instead continued to deliberately conceal that defect. Defendant Calio further gave investors the false impression that these improvements were already completed by saying that "*from this point, it's about accelerating those margins*" to grow the GTF engine fleet's profitability. By touting that the GTF's "*aftermarket profitability . . . is of high focus*" and a "*huge driver*," investors were falsely led to believe that Defendants had implemented upgrades that were achieving this ultimate goal of profitability. In reality, by January 24, 2023, the HPT disks in its GTF fleet had recently caused an aborted takeoff in December 2022, which further confirmed what Defendants had known and concealed for years—the GTF fleet needed to be grounded for inspection and removal of its contaminated metal parts. Through Defendant Calio's statements, investors were under the false and misleading impression that the Company had

109

improved time on wing through already-performed upgrades that were increasing contract and aftermarket profitability of the GTF engine fleet.

284.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

285.    During the same call, an analyst also asked Defendant Calio to "dig in a little bit more on the GTF." The analyst posited:

> What we've been reading lately from comments from some of the leasing companies and comments in the press is the time on wing on new generation engines has been falling short of expectations. And so: (a), kind of to what degree do you share that perception and kind of where does it need to get; (b), what specifically in the engine, do you need to kind of improve to get it there; and then the last part is, I think you mentioned the GTF aftermarket profits were positive for the first time. And just with a relatively young pool of engines and maybe some time on wing challenges, how did profits get to positive?

286.    In response to the analyst, Defendant Calio stated:

> So I would say that I generally agree with the sentiment that you're hearing, time on wing, and we've been pretty open about this. And very open dialogue with our customers about time on wing, on newer platforms, not necessarily being where we wanted them to be when we launched the program. We have done a number of block upgrades. As I said, ***we've got a block upgrade going on now through MRO that increases time on wing . . . And we've got some other, I'd say durability and reliability hardware and software fixes that we put in as well.*** So we want to—we obviously want to get to the contractual levels that we promised, and we've got a plan to do that with these upgrades . . . But even on the— ***what I'll call the existing fleet today, we've got upgrade plans to continue to push that time on wing higher and higher.*** Our customers are demanding it, and our contracts are dependent on it. So we're aligned there.

287.    Defendant Calio's statements in Paragraph 286 were false and misleading because his references to an "***upgrade going on now through MRO that increases time on wing***" and "***other . . . durability and reliability hardware and software fixes that we put in***" deliberately

concealed the severe Powdered Metal Defect that Defendants had knowingly left to fester on in-service commercial airplanes. Defendant Calio's statements led investors to falsely believe that Defendants had implemented certain "**upgrade plans to continue to push that time on wing higher and higher**." In reality, just months later, the GTF engine fleet's time on wing was about to grind to a halt, as mandatory off-wing time was necessary to implement inspections and removals to redress the Powdered Metal Defect, which Defendants would soon admit that they knew about since 2020, at the latest.

288.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

I.    **April 25, 2023 1Q 2023 Earnings Call**

289.    On April 25, 2023, Defendants held an earnings call discussing RTX's performance for 1Q23, for the period ended March 31, 2023 ("1Q23 Earnings Call"). During the call, when asked to comment on the GTF engine's aftermarket, Defendant Mitchill answered:

> We clearly will see the aftermarket continue to grow in the remainder of the year . . . . The other piece of that, in terms of thinking about the GTF and time on wing, basically, what I can say is **our estimates today contemplate everything that we know about the engine**. We feel very comfortable with where we are with our contract accounting. **And any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole. So I don't see that as being a headwind against our expectations for the year.**

290.    Defendant Mitchill's statements in Paragraph 289 that the Company's financial "**estimates today contemplate everything that we know about the engine**" were materially false and misleading. Indeed, long before this statement was made—and even before the start of the Class Period—the Company knew that it needed to remove and inspect virtually its entire 3,000+ GTF engine fleet, which would result in enormous amounts of time off wing, totaling as much as

300 days per engine.  Similarly, Defendants' statement that "***any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole***" was false and misleading because the immense costs and additional resources that the Company would need to invest in fixing the dangerous defect in its GTF fleet clearly were not "***already contemplated in the outlook***" for the Company.  Indeed, as the Company disclosed only a few months later (in July and September 2023), inspecting and repairing the GTF fleet and compensating customers for time off wing would reduce the Company's financial outlook by billions of dollars.

291.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

292.    During the same April 25, 2023 call, Defendant Calio stated:

I do want to provide a brief update on the GTF program.  As you know, ***since the GTF program went into service in 2015, we have continued to introduce upgrades and improvements to increase reliability and durability***.  With respect to reliability, ***we have met the target level for dispatch reliability***.  This is now at mature engine levels.  With respect to durability, ***we have improved time on wing since program inception***.  Again, time on wing, meaning how long engines can be operated before needing to be removed for maintenance.  But we are not yet at the level we and our customers expect.  This has put stress on the operations of the fleet. ***We continue to develop upgrades from the current GTF configuration to improve durability***.

293.    Defendant Calio's statements in Paragraph 292 were false and misleading because, yet again, investors were mistakenly led to believe that "***upgrades and improvements***" made since the GTF engine program's debut into service, had led to RTX achieving "***the target level for dispatch reliability***."  Defendant Calio purposefully concealed that the paramount fix needed to render the GTF engines airworthy and moving toward profitability was the inspection and removal

of defective parts made from contaminated powdered metal. As noted herein, Defendants admitted that they knew of this Powdered Metal Defect by no later than 2020, and they had spent eighteen months trying to cure the issue, which was about to take nearly the entire GTF engine fleet off wing. Nevertheless, Defendant Calio assured investors that the Company had "***improved time on wing since program inception***," giving investors the misimpression that airplanes equipped with GTF engines would remain in flight, thanks to the Company's touted "***upgrades***." Indeed, these statements were revealed to be false and misleading mere months later, when the Company admitted that the systemic Powdered Metal Defect, which was discovered in 2020 and affected its powder metal manufacturing for six years, required nearly the entire GTF engine fleet—over 3,000 engines in total—to be taken out of service for upwards of ten months to allow for inspection and removal of defective parts.

294.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

### J.    June 19, 2023 Investor Meeting at the Paris Air Show

295.    On June 19, 2023, at the Paris Air Show, Defendant Eddy (president of Pratt & Whitney since March 1, 2022) was asked by an analyst, "we've heard a number of customers who have been pretty vocal about their concerns over the engine . . . do you have any financial exposure to the kinds of issues that they're seeing, the grounded airplanes and the costs that they're incurring?"

296.    Defendant Eddy responded by saying:

So if you think about this, as we have designed the improvements that go into the fleet, we've rolled those costs into the cost basis for the portfolio. ***So this is expected costs for***

*us going forward to upgrade the fleet over time, so I think there's not a surprise here coming.*  When it comes to how we support our customers in terms of the AOG situation, I wouldn't get into specific terms, but clearly, when we're running at this level, 10% of our fleet out of service, we are working very closely with our customers on that to get through this.  And we want to get the fleet healthy again.  And again *all of those costs would be programmed into the portfolio and into our calculation as well.*

297.    Defendant Eddy's statements in Paragraph 296 were false and misleading because, while he assured investors that there was "***not a surprise coming***" in the way that the Company's "***costs would be programmed into the portfolio and into our calculation***" in terms of grounded aircraft.  In reality, Defendants were mere weeks away from disclosing a massive "surprise" insofar as the Powdered Metal Defect—which Defendants admit was discovered in 2020—required nearly the entire GTF fleet to be grounded and would cost the Company billions of dollars to remedy.

298.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

299.    During the same meeting, Defendant Eddy spoke on a separate "quality escape" unrelated to the powdered metal contaminant with respect to Pratt & Whitney's manufacturing.[20] Defendant Eddy stated:

> When you think about what we're doing here, block upgrades, the time on wing, the high capture of LTAs, our team is constantly analyzing every visit, and optimizing the fly forward for the customers, but also optimizing the fly forward to maximize our contract margins.  ***Our contract portfolio today on GTF is less than 5% complete, so we have significant life remaining, and that enables us to address these technical issues early in the program.  And we've assumed all of these activities and the related costs in our contract modeling and of course, in our financial guidance.***

---

[20] The aviation industry often refers to manufacturing quality defects as "escapes," signaling that the manufactured part does not conform to its specifications.

300.    Defendants' statements in Paragraph 299 were false and misleading for several reasons.    First, Defendant Eddy's representations that the GTF fleet had "**significant life remaining, and that enables us to address these technical issues early in the program**" omitted the fact that the Company had failed to address the most severe "technical issue" facing the GTF—namely, the Powdered Metal Defect—instead allowing airplanes with catastrophically defective parts to remain in commercial flight service so that Defendants could bring the program closer to profitability.

301.    Second, by representing that the Company's "**contract modeling**" already "**assumed all of these activities**" and "**technical issues**," Defendant Eddy misled investors to believe that the GTF fleet was safe and moving toward profitability.    In reality, and unbeknownst to investors, a major technical issue—defective powdered metal—was both known to Defendants since 2020 and went unaddressed by the Company.    By representing to investors that "**all of these activities**" or technical fixes were accounted for in the financial picture of the Company communicated to investors, Defendants falsely led investors to believe that the GTF engine fleet was airworthy and poised to become massively profitable when neither was true.

302.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

303.    During the same investor meeting, Defendant Calio stated:

Before I get into that, maybe just a minute on fleet health.    To be clear:    The fleet is not where it needs to be, period, full stop.    It's not where we need it to be, but more importantly, it's not where our customers need it to be.    And we are working tirelessly day and night to get that fleet into a better position . . . if you step back and you kind of look at what the causes are here, ***this is not a technical issue.    This is an industrial issue.***    Again, when we came into the year, ***we laid out a removal forecast with our customers, so they know how***

*many removals we're going to have in a year, when those are going to come off.* If you look at the actuals at this point in the year, *we are virtually within a few percentage points of how we communicated that to our customers. The issue, unfortunately, as I said, an industrial one, it's the MRO lag.*

304. Defendants' statements in Paragraph 303 were false and misleading. Yet again, Defendant Calio gave a false impression of openness with respect to the status and health of the GTF engine fleet, while concealing a known and catastrophic manufacturing defect that gutted the profitability of the program shortly thereafter. Moreover, Defendants knew this was coming, as they later admitted that the defect was known since 2020 and they had also turned over root cause findings to the FAA in mid-2021 revealing that the contaminant affected the heralded GTF fleet. Nevertheless, Defendant Calio assured investors that the issues facing the fleet were "*not a technical issue*" but was an "*industrial issue*," which used aviation industry hair-splitting to avoid calling a spade a spade—Defendants manufacturing process was defective, and the repercussions of the Powdered Metal Defect caused GTF engines to rip apart during commercial flight service. Instead of revealing the truth, Defendant Calio falsely led investors to believe that the Company was "*virtually within a few percentage points of how we communicated that to our customers*," and that the only issue standing in the way of the GTF fleet's profitability was "*an industrial one, it's the MRO lag.*" Defendants' lies became unavoidable as they were forced to reveal the truth of their deception to investors concerning the GTF engine fleet's airworthiness and profitability.

305. In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

**K.**     **July 25, 2023 – Partial Corrective Disclosure/Materialization of Risk**

306.     On July 25, 2023, RTX issued a Press Release (which it also filed with the SEC on a Form 8-K signed by Defendant Mitchill), disclosing a "***rare condition***" in its powdered metal that "will require Pratt & Whitney to remove some engines from service for inspection earlier than expected." In connection with that disclosure, RTX reduced its 2023 cash flow expectations by $500 million, to $4.3 billion, "primarily to reflect the developments at Pratt & Whitney" involving the Powdered Metal Defect affecting the GTF engine fleet. As Defendants explained on the Company's July 25, 2023 2Q23 Earnings Call, the newly disclosed "***rare condition*** in powdered metal used to manufacture certain engine parts may reduce the life of those parts."

307.     Defendants' statements in Paragraph 306 were false and misleading because, although powdered metal contamination could potentially be a "*rare*" occurrence in manufacturing generally, it was a systematic and regular occurrence throughout Pratt & Whitney's manufacturing process. Defendants' statements were meant to give the impression that the Powdered Metal Defect was sporadic and limited, when in fact, it affected nearly all of Pratt & Whitney's engines, including the GTF fleet.

308.     In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

309.     Defendant Mitchill commented on the financial impact of the disclosure, stating that:

> Given Pratt's results to date and aftermarket strength, the impact for the first 200 engines is contemplated within the range we just provided. Keep in mind, ***given the percentage of completion accounting for the aftermarket contracts and the relatively early life of the programs, the P&L impact will be less significant today***. However, for the reasons Chris

[Calio] described, the impact of any further engine removals from service for inspection is not currently assumed in our outlook.

310.    Defendant Hayes further explained:

At the same time, we knew that this contamination had occurred between late 2015 and late 2020, early 2021. So we knew we had a suspect population in the fleet. And we went out and look – and so we started inspecting. We inspected the turbine disc as they were manufactured. We inspected turbine discs as they came back in, not just for the V, but for the whole GTF fleet, in fact, the entire fleet of Pratt products that were manufactured during this timeframe.

Those inspections, and *there were over 3,000 of those inspections, yielded a very, very small fallout rate, less than 1%. So as Chris [Calio] said, all of this data goes into our model for the turbine disc. And based upon everything that we knew until very recently, we believe that the life of the turbine disc was such that we would see these discs in the shop and be able to inspect them before we ever had an issue*.

311.    Defendants' July 25, 2023 statements in Paragraphs 309 and 310 were false and misleading because, as they admit, Pratt & Whitney had determined a root cause of contaminated powdered metal in July 2021. At that point, Defendants were aware that its entire fleet was contaminated and subject to inspection and replacement. This is evidenced by Defendants' reports and Service Bulletins mandated by the FAA, as well as its customer Delta's May 9, 2022 request that Pratt & Whitney inspect "ALL" affected airplanes in the GTF fleet. Additionally, Defendants misleadingly touted a "*fallout rate [of] less than 1%*" with respect to the metal manufacturing defect. This gave investors the materially false impression that the defect was not statistically significant—in terms of both human life and financial impact. However, a statistic of "*less than 1%*" in this context can equate to thousands of lives or billions of dollars. Additionally, the nature of the contaminant, which required prompt inspection and removal, meant that once that action occurred, "*fallout rate*" was not nearly as relevant of a statistic to investors as the time off wing to complete the procedures. Accordingly, Defendants' representation that "*the P&L impact will be*

*less significant today*" was false and misleading because defendants knew the catastrophic financial impact at the time the statement was spoken.

312.    In addition, Defendants' statements are false for the reasons set forth in Paragraphs 236-242, *supra*, as corroborated by Defendants' admissions and numerous FEs who detailed that Defendants knew by no later than 2020 that the Powdered Metal Defect was present throughout Pratt & Whitney's GTF engine fleet.

## VII.    ADDITIONAL INDICIA OF SCIENTER

313.    As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning RTX's defective GTF engine fleet were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following.

### A.    The Company Has Admitted Scienter

314.    Defendants admitted on July 25, 2023 that they were aware that the Company manufactured thousands of critical engine components using contaminated powdered metal when they "**first uncovered [the issue] back in 2020 when we had an incident with the V2500 turbine disc**" and that, as a result, they had "**determined at that point that we had some contamination in this powdered metal that we make.**"  Moreover, Defendants knew full well that the same contaminated powdered metal, using the same manufacturing process, at the exact same HMI facility, was also used to make the HPT Disks for the Company's flagship GTF engines. Defendants' admissions thus make clear that they knew, by no later than 2020—a full year prior to the start of the Class Period—that the contaminated powdered metal was a serious issue that affected nearly the entire GTF engine fleet.  Indeed, as Defendants admitted, they had become fully aware that the contaminated powdered metal created problems "**not just for the V[2500] but for the whole GTF fleet, in fact, the entire fleet of Pratt products that were manufactured**

during this time,"—i.e., "**from approximately Q4 2014 into Q3 2021**." Furthermore, Defendant Hayes admitted that this defect occurred as a direct result of the Company's own scramble to meet overwhelming demand for the GTF engine, explaining that "as we scaled up production for GTF, **it got away from us a little bit**."

315.    Significantly, Defendant Hayes also admitted that the problem had been so severe that the Company had been forced to undertake extensive remedial actions over the course of eighteen months following the March 2020 incident. Indeed, by "**mid to late 2021 . . . we changed all the processes in terms of the screening of the powdered metal to identify the contamina[nt], to eliminate the contaminant**." Defendants admitted that they had been forced to make "**nine changes to the process to ensure the purity of the powder**" metal. The fact that Defendants admitted they were forced to make nine separate changes to the manufacturing process over a period of eighteen months demonstrates that they understood this was a severe and pervasive issue that needed to be fixed at all costs. Moreover, the fact that the senior most officers of the Company were involved in and responsible for making these changes—and that Defendants continued to sell these engines even after they indisputably knew that these engines suffered from a material defect that could lead to catastrophic engine fires—is overwhelmingly powerful evidence of scienter.

316.    Furthermore, Defendant Calio admitted to having understood that the GTF would "experience the most significant impact" due to its large "production volumes during this period." Notably, these remedial measures were never disclosed to investors, despite the fact the Defendants knew full well that such a significant overhaul in the Company's powdered metal manufacturing processes was extraordinarily material information, particularly given the central importance of the GTF fleet to the Company's financial performance and growth.

317.    Additionally, during the September 11, 2023 "Special Call," Defendant Hayes admitted that "**we have always known that contaminated powder is a potential issue in terms of life of the part**," meaning that, once Defendants discovered the contamination, they knew it would impact the durability of the GTF's critical turbine discs, given that the GTF is even higher thrust than the V2500, and thus burns at a hotter temperature and places more strain on the components.

318.    Finally, Defendants admitted that the so-called "lifing models" they had purportedly used to (incorrectly) determine that the defective GTF turbine discs could remain in service had no basis in reality whatsoever.  For example, Defendants admitted that for 137 GTF engines, RTX had no "lifing" data at all, i.e. that "we don't have a digital record to assure us in terms of what their life is"—such that Defendants acknowledged that those 137 engines would have to be inspected first.  Tellingly, despite this reality, Defendants had never identified those 137 GTF engines to the FAA as "high risk" or otherwise, and those engines did not number among the 59 engines Defendants had previously identified to the FAA as needing urgent inspection. Moreover, the so-called "lifing models" Defendants used were not even based on data from the GTF engine (which they did not have), but from the V2500 engine—a lower thrust engine that did not put as much stress on the turbine disks as the GTF.  Indeed, the very nature of the defect—a "manufacturing process defect" that caused contaminated powdered metal to be distributed in unpredictable ways throughout thousands of parts made for an entire six-year period—meant that there was no conceivable way that Defendants could avoid mass inspection and repair of the engines using a theoretical "model," since there was no possible way to model when and where the defect would lead to catastrophic cracking.

**B.    The Sale of GTF Engines Is Critical to RTX's Core Operations**

319.    For RTX, Pratt & Whitney's commercial engine sales were a core operation, and the GTF engine fleet was the crown jewel of those commercial engine sales.  Indeed, the successful sale of GTF engines were critical to the long-term financial prospect of Pratt & Whitney, which during the Class Period, generated more than 50% of its total net sales from the Large Commercial Engine business and accounted for roughly 30% of RTX's total revenue.  Accordingly, the senior most officers of the Company paid close attention to the success of the GTF engine program and had knowledge of the manufacturing defect and its impact on the GTF engine fleet's airworthiness and profitability.

320.    RTX touted the GTF engine family is a "huge driver of growth in [Pratt & Whitney]."  Specifically, as explained by Defendant Calio, in 2025, the GTF engines will be close to 60% of Pratt & Whitney's Large Commercial Engine business.  Similarly, in the beginning of the Class Period, analysts from Berstein Research recognized: "Almost all LCE OE [large commercial engine original equipment] revenue at Pratt & Whitney is now tied to the Geared Turbofan (GTF) program, which is on the A320neo Family . . . A320neo production rates will be most important going forward."

321.    Additionally, to evaluate the financial performance of the GTF engines, Defendants were required to consider the safety and quality problems in their accounting assumptions.  Specifically, on the 2Q22 Earnings Call, Defendant Hayes asserted that problems with the GTF engines, such as disclosed durability issues, factor "into the calculus of the full year guidance."  Further, on the June 19, 2023 Investor Day, in response to an analyst's question about the financial impact of those same durability problems with the GTF engine, Defendant Eddy explained, "[w]hen it comes to how we support our customers in terms of [an out of service aircraft] situation, . . . we want to get the fleet healthy again and again all of those costs would be

122

programmed into the portfolio and into our calculation as well." Analysts at Barclays Research and Morgan Stanley similarly noted that "Pratt maintained its view of strong GTF aftermarket improvement with current in service issues seen captured within Pratt's GTF accounting assumptions" and "[f]rom our meeting with RTX management, this durability issue with the GTF is already factored into the company's outlook . . . ."

322.    Further, safety and quality management with the GTF engines were also critical to the commercial success of the engines and were the highest priority for the Company, as Defendants repeatedly emphasized. Indeed, in RTX's April 25, 2022 ESG Report, Defendants stressed that "[t]he quality and safety of our products are essential to our business – and a focus for all Raytheon Technologies activities." Defendants further promised that "[w]e prioritize product safety and quality across the organization with a comprehensive oversight process as well as robust programs and practices to reduce product safety and quality risk" and that they "have built a proactive culture that prioritizes product safety and quality across the organization, starting with our CEO and Board of Directors."

323.    Critically, Defendants Calio and Eddy, former and current presidents of Pratt & Whitney, are responsible for the "overall safety of products designed, produced or maintained by" Pratt & Whitney. To ensure strong oversight on product within Pratt & Whitney, Defendants Calio and Eddy personally appointed a product safety officer to monitor and execute Pratt & Whitney's product safety management system. Likewise, Defendant Hayes, during the February 23, 2022 Barclays Industrial Select Conference, stated that "focus[ing] on meeting our customer commitments [and] . . . making sure we deliver on time with a 100% perfect quality."

324.    In sum, because (1) the GTF engines were critical to the financial success of Pratt & Whitney and RTX; (2) Defendants incorporated the safety and quality problems into their

accounting assumptions; and (3) safety and quality problems were critical to the success of the GTF engines, Defendants were keenly aware of the quality and safety problems with the GTF engines, including the Powdered Metal Defect.

## C.    The Magnitude and Duration of The Powdered Metal Defect Supports Scienter

325.    The Powdered Metal Defect at issue in this litigation was not some isolated and trivial matter affecting a small subset of the Company's operations. To the contrary, the material defect in RTX's powdered metal was severe and pervasive, lasting for six full years, from 2015 to 2021, and potentially causing catastrophic harm to airplanes and passengers.

326.    Furthermore, the Powdered Metal Defect contaminated virtually every single one of RTX's prized GTF engines that the Company manufactured and sold during this time period— over 3,000 engines in total, resulting in massive costs to the Company amounting to billions of dollars in inspection and repair costs as well as compensation to airlines for lost flight time.

327.    Accordingly, the magnitude and duration of this critical issue affecting the Company's flagship product is compelling evidence of scienter.

## D.    Defendants' Business Motives to Conceal the Defect Support Scienter

328.    In light of the paramount importance of the GTF program to Pratt & Whitney's profitability, Defendants had multiple business-related motives to conceal the Powdered Metal Defect as long as possible. These motives further support scienter.

329.    *First*, throughout the Class Period, Defendants were still in the phase of actively marketing and selling the GTF engine. For example, even at the June 2023 Paris Airshow—just one month before the truth would begin to be disclosed—Defendants announced that they had only recently received an additional 800 orders for GTF engines, and had received a total of 10,000 orders or commitments up to that point, many of which had yet to be fulfilled. The announcement

of a pervasive, catastrophic Powdered Metal Defect in the existing GTF fleet would clearly have damaged customer demand and led to postponed and canceled orders. Thus, Defendants had a motive to avoid disclosure of the Powdered Metal Defect for as long as possible to protect the market for their engines.

330.    *Second*, Pratt & Whitney's GTF program was primarily dependent on Aftermarket MRO revenue for profitability, as the engines were sold at an initial loss. In order to achieve that aftermarket revenue, Pratt & Whitney needed to keep the GTF engines in service past their warranty period—which typically lasted five years. Thus, Defendants had a strong incentive to avoid or at a minimum postpone disclosure, hoping to deal with the defects quietly as the engines came in for regular service rather than on a fleet-wide basis.

331.    *Third*, as detailed in Section IV.C and IV.D., *supra*, the Powdered Metal Defect's introduction into the GTF fleet came at a time when (i) RTX was eager to convince customers and investors that the GTF's history of defects was "behind us"; (ii) RTX was facing increased industry competition; and (iii) there was growing customer demand for cutting-edge engine technology.

332.    And *finally*, as events have borne out, Defendants knew that full disclosure of the Powdered Metal Defect in the GTF fleet would be immensely more costly than merely dealing with the defective engines one at a time, escaping public notice. Defendants' disclosures have not only led to enormous inspection, repair, and customer compensation costs, but have also forced them to add Aftermarket MRO capacity and facilities and scramble to source additional components as their systems have been overwhelmed by the number of GTF engines that have needed to come off wing at the same time. Thus, Defendants had an additional motive to avoid disclosing the Powdered Metal Defect in the GTF fleet to avoid the costly situation they now face.

**E.    Additional Flight Safety Incidents Identified Quality Failures in Pratt & Whitney's Metal Manufacturing Process**

333.    Even prior to the March 18, 2020 aborted takeoff in Vietnam, numerous flight safety incidents prompted Pratt & Whitney to investigate and generate cause findings that revealed contaminated metal parts.  While this sometimes occurred in other aircraft parts involving different engines or metal alloys, Defendants were aware of failings in its manufacturing processes that led to metal contamination and jeopardized its engines.

334.    For example, on December 26, 2018, Korean Air Flight 0753—equipped with a Pratt & Whitney GTF engine—similarly experienced loud banging and aircraft vibrations while flying from Korea to Japan and made an emergency landing due to engine failure.  At the time of its failure, the engine had only accumulated 417 flight hours since entering service.  Again, authorities shipped the engine to Pratt & Whitney for disassembly and examination.  On March 2, 2022, after three years, the NTSB published its Final Report on the December 26, 2018 engine shutdown in Korea involving a GTF engine.  The Final Report detailed Pratt & Whitney's internal examination of the engine, which determined that a turbine blade cracked because it was contaminated by "**a few crystals**" of a material that should not have been used during manufacturing.  The NTSB issued a probable cause finding that Pratt & Whitney's "**inadequate cleaning**" of its metalworking equipment caused the contamination that led to the crack.

335.    Additionally, on February 20, 2021, United Airlines Flight 328 departed from Colorado and a fan blade broke off the PW4000 engine shortly after takeoff.  Debris from the engine was sucked inward and caused a fire.  The flight crew was forced to perform an emergency landing.  When the NTSB issued a report years later on September 7, 2023, it revealed that the blade fracture was yet another result of Pratt & Whitney introducing contaminants into its metal manufacturing process.

336.    Aside from the specified incidents detailed herein, between 2019 and 2022, the NTSB alone logged **fourteen flight safety incidents** involving the GTF engine family specifically. Ten of these reports occurred in India and lack readily available public information beyond a log of the event itself.   Another of the reports occurred in Mexico and similarly lacks a robust description of the event.

337.    As described herein, Defendants attempted to use the lack of public information to their advantage by engaging in a course of conduct designed to conceal the widespread defect in its metal manufacturing and, specifically, the extent to which the defect affected its prized GTF engine fleet's safety and airworthiness.   However, the available records of flight safety documentation and associated investigations shows that the Company had clear knowledge of its failing metal manufacturing processes and the extent to which that impacted regulators and investors' perceptions.

**F.    RTX Was Embroiled in Client Disputes Concerning the GTF Engines**

338.    The GTF engine fleet's technical problems caused major disruptions in RTX's customer relationships during the Class Period.   Disputes of this nature provided Defendants with significant knowledge of the problems and financial impact flowing from its defective engine parts.   For example, on May 3, 2023 Reuters published an article entitled, *The engine dispute at the heart of Go First's bankruptcy filing*.   The article reported that "[c]ash-strapped Indian airline Go Airlines (India) Ltd., recently rebranded as Go First and previously as Go Air, filed for bankruptcy . . . blaming 'faulty' Pratt & Whitney engines for the grounding of about half its fleet.

339.    Go Airlines, Limited ("Go First") received its first A320neo aircraft powered by GTF engines in 2016.   In India alone, IndiGo and Go First are among the biggest customers for the A320neo planes.   Go First claimed that it grounded as many as twelve planes at one point, and that Pratt & Whitney agreed in 2017 to compensate the airline for engine "support" for days when

planes were grounded with engines that needed to be changed or serviced. In 2020, Go First began to experience "more severe" engine failures, and in 2022 financial disputes occurred between the two companies over engine replacement and maintenance arrangements.

340.    The parties submitted to private arbitration in March 2023 in Singapore, where Defendants presented significant testimony and documents—on an emergency basis—concerning Go First's claims that the GTF engines were "degrad[ing] prematurely, causing engine shutdowns and premature failure." In an arbitration award issued on March 30, 2023 in Singapore, the arbitrator details how, in "Q2 2020" Pratt & Whitney attempted to implement a "major hardware update, including to the combustor . . . HTP [sic] Stages 1 & 2, and HPC stages of the GTF Engines" that failed to resolve the problem. The arbitration award also references a "Pratt & Whitney technical presentation dated 14 October 2022 that shows global fleet data reflects that eight GF Engines with Block D modification have been removed due to combustor distress and 15 removed due to HT Stage 1 erosion." The award further describes the October 2022 presentation as noting "cracking in the HPT blades, resulting in 'increased UEKs [Urgent Engine removals] starting June 2022." According to the arbitration award, the October 2022 Presentation listed "manufacturing process" factors as "potential contributors" to the repeated cracking and engine failure. Based on the award's reference to a substantial record of Pratt & Whitney documents and testimony concerning cracking in turbine parts of the GTF engine, Defendants had clear knowledge during the Class Period of the Powdered Metal Defect's impact on the GTF engine fleet.

### G.    Analyst Reaction to Defendants' Non-Disclosure of the GTF Defect Supports Scienter

341.    After Defendants' July and September 2023 disclosures, numerous analysts specifically commented that Defendants had clearly known of the GTF Powdered Metal Defect

earlier and failed to disclose it. For example, in July 2023, RBC expressed shock at the disclosure "since the company sounded incrementally bullish on the GTF just a month ago at the Paris airshow," at which time the issue was "not fully disclosed." Barclays similarly noted "the company making no mention nor contingency for this issue a month ago at its Paris Airshow briefing (at that point a known potential issue, per company commentary."

342.    Multiple analysts noted a loss of "investor confidence" in management from the July and September disclosures, and J.P. Morgan noted "it's hard to have full confidence given how this issue has emerged and worsened." And Bernstein Research noted "investor concerns we have heard that Pratt may not yet fully have its arms around the problem, that the GTF may have broader issues which could put its long-term future at risk, and questions about management, given the time it took Pratt to fully raise the issue." Analysts' assessment that management had not been fully candid in previous public statements further supports scienter.

**H.    The Mandate to Cut Corners in Manufacturing Was Directed by Defendants**

343.    As detailed herein, numerous RTX FEs noted that, through a formalized, top-down directive to find cost savings in any way possible with respect to manufacturing, RTX pushed production of the GTF engine fleet despite known manufacturing defects, including powdered metal contamination. For example, according to FE-8, a Manufacturing Engineering Manager, Pratt & Whitney "pushed production over everything." FE-8 stated that Pratt & Whitney sent customers GTF 30K engine parts with known defects because the Company was behind on production and needed to get certain parts "out the door." Similarly, FE-4 who worked with the Geared Turbofan (GTF) engine from 2018 to 2021, during which time he inspected engine parts, recalled that after he was moved from quality control to production, he felt pressure from his supervisors to get the GTF engine to market, even though there were problems with the engine.

FE-4 noted that despite problems with the GTF engine, the engines were still delivered to Pratt & Whitney's customers.

344.    More egregious, RTX formalized this incentive through a top-down directive to find cost savings in any way possible with respect to manufacturing.  For example, FE-2, who oversaw Pratt & Whitney's Sales, Inventory, and Operations Planning ("SIOP") process, indicated that he was aware of the quality control issues at Pratt & Whitney which led to the recall of the GTF series of engines.  FE-2 advised that the quality control problems were caused by changes in the Company's procurement process; specifically, the Company switched from reliable suppliers to much less expensive suppliers to save money, but the materials sourced from the cheaper suppliers were much poorer in quality.  FE-2 advised that the cost-cutting measures which forced Pratt & Whitney to switch to unqualified suppliers came from former RTX CEO Gregory Hayes. FE-2 noted that Hayes was recently replaced as CEO by Christopher Calio, and that Calio had also been responsible for creating the cost-cutting policies that led to the quality control problems.[21] FE-2 noted that the Sourcing Team earned bonuses for achieving certain levels of cost savings.

345.    Similarly, FE-7, a Manufacturing Engineer, recalled that between July 2018 and January 2020 there were "always" some quality control issues with the GTF engine fan blades. FE-7 described this issue as "catastrophic" and stated that "quality alerts" were sent to all Pratt & Whitney employees both times this occurred.  FE-7 explained that all Pratt & Whitney employees, including the C-suite, were on "high alert" about what had happened each time.

346.    The Individual Defendants' Direct Involvement In The GTF Program Supports Their Scienter

---

[21] As noted throughout, Defendants Hayes and Calio were senior leaders of Pratt & Whitney prior to the Merger, when it was a subsidiary of UTC.

347.    The Individual Defendants' history of direct involvement in the GTF program further supports their scienter.  Defendant Calio directly oversaw the GTF program during the years in which the Powdered Metal Defect occurred and was discovered and remediated – including as Pratt & Whitney's President, Commercial Engines from 2017-2019, and as its overall President from January 2020 through February 2022, before becoming COO of RTX.  Calio was also thus president of Pratt when the March 2020 AirVietnam engine fire occurred.  And Defendant Hayes served as Chairman and CEO of Pratt & Whitney parent UTC from 2014 through the 2020 merger that formed RTX, at which point he became CEO of RTX.  And Defendant Eddy has been a Pratt & Whitney executive since 2016—first as SVP of Operations, then also as COO, and finally as President beginning in March 2022, and thus has similarly had direct oversight over the GTF program.

## I.    The Individual Defendants' Direct Involvement in The GTF Program Supports Their Scienter

348.    The Individual Defendants' history of direct involvement in the GTF engine program further supports their scienter.  In particular, Defendant Calio directly oversaw the GTF engine program during the years in which the Powdered Metal Defect occurred and was discovered and remediated—including as Pratt & Whitney's President, Commercial Engines from 2017 to 2019, and as its overall President from January 2020 through February 2022—before becoming COO of RTX.  Defendant Calio was also thus president of Pratt & Whitney when the March 2020 Vietnam Airlines engine fire occurred.  Moreover, Defendant Hayes served as Chairman and CEO of Pratt & Whitney's parent UTC from 2014 through the 2020 merger that formed RTX, at which point he became CEO of RTX.  Finally, Defendant Eddy has been a Pratt & Whitney executive since 2016—first as SVP of Operations, then also as COO, and finally as President beginning in March 2022, and thus has similarly had direct oversight over the GTF program.

**J.     Prior to the Class Period, Defendants Minimized Known Quality Defects**

349.    On June 19, 2017, Defendant Hayes spoke at the Paris Air Show and downplayed manufacturing defects with respect to the GTF engine family, because such disclosures clearly affected investors' perception of the engines' airworthiness and profitability.   Defendant Hayes curtly stated:

> I know Bob talked about **a little quality escape** from one of our suppliers, and **I know everyone was, oh, my god there's another god damn problems – no.** Look, the point of the matter is, we always try and be transparent with our investors.   **So, with those issues, we know this** [sic] **escapes impact our customers and that's why we mentioned it here today**.   We've got a solution.   **It's not a big deal, but it causes disruption with our customers and that is something we should never let happen whether it's a CL issue, whether it's the combustor, whether there's a quality escape, we've got to get on top of it**.
>
> So, we'll give you guys something to write about. We've got some quality issues. It's not a big deal, right?  Last year, it was motor to start and oh my God, it's going to take 60 extra second[s] to start the engine.  **I just would ask you guys to maybe think about another word, which is relax**.

350.    Similarly, on May 22, 2018, Defendant Hayes specifically spoke about quality control issues with respect to the A320neo turbine disk automation, and the remediation efforts the Company had put into the program.   Defendant Hayes stated, "[s]ame is true on the A320neo turbine disk automation.  You can see the statistics, a 50% reduction in lead time, a 40% reduction in quality escapes and a 16% reduction in cost. . . . We went from having 12 people working in nacelle to 1, completely automated 24/7/365 manufacturing of turbine disks for the A320, a huge productivity investment, but a huge return as well."

351.    In doing so, Defendant Hayes spoke to investors concerning the exact engine parts (turbine disks) that were subject to the hidden manufacturing defect.  Accordingly, Defendant Hayes had knowledge of the significance that the integrity of that part had to investors, citing the "huge return" flowing from its success.  Throughout the Class Period, Defendants' false and

misleading statements concealed the impact of the manufacturing defect in the turbine disks because they knew it would be meaningful to investors.

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

352.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated and/or maintained the price of RTX common stock and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired RTX common stock during the Class Period.  As alleged above, Defendants failed to disclose and misrepresented the existence of a Powdered Metal Defect affecting the GTF engine family.  Rather than reveal the truth about the Powdered Metal Defect and disclose its impact on RTX's GTF engine family, Defendants made a series of misrepresentations and omissions throughout the Class Period that provided investors with a false impression of the GTF engine family's airworthiness and profitability.

353.    Lead Plaintiffs and Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and omissions purchased RTX common stock at artificially inflated prices.  But for Defendants' misrepresentations and omissions, Lead Plaintiffs and other Class members would not have purchased RTX common stock at the artificially inflated prices at which it traded during the Class Period.

354.    The relevant truth regarding Defendants' fraud was revealed in two corrective disclosures and/or materialization of concealed risks that occurred on July 25, 2023 and September 8, 2023 after the market closed.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of RTX common stock declined significantly as the prior artificial inflation and/or artificial maintenance exited the Company's stock price.

355.    As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the two disclosures described below, investors incurred billions of dollars in losses.

356.    The declines in the price of RTX common stock during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

357.    As a result of their purchases of RTX common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements and omissions had the intended effect and caused RTX common stock to trade at artificially inflated and/or artificially maintained levels throughout the Class Period, reaching as high as $104.97 per share on April 20, 2022.

358.    Specifically, Defendants made false and misleading statements and omissions about a Powdered Metal Defect affecting its GTF engine family, which presented a misleading picture of RTX's business and prospects.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of RTX's common stock dropped significantly.  These declines removed the artificial inflation and/or artificial maintenance from the price of RTX common stock, causing real economic loss to investors who had purchased RTX common stock during the Class Period.

359.    Each decline in the price of RTX common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

360.    The market for RTX common stock was open, well-developed, and efficient at all relevant times, with an average daily trading volume of approximately 5,329,857 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, RTX common stock traded at artificially inflated and/or artificially maintained prices.  Lead Plaintiffs and the other Class members purchased RTX common stock relying upon the integrity of the market relating to RTX common stock and suffered economic losses as a result thereof.

361.    The declines in the price of RTX common stock on July 25, 2023 and September 8, 2023 were the direct and foreseeable result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors before the market opened on July 25, 2023 and after the market closed on September 8, 2023.  The timing and magnitude of the declines in RTX common stock evidence the impact that Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**A.    July 25, 2023 – Initial Partial Corrective Disclosure**

362.    On July 25, 2023, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were partially revealed and/or materialized in connection with the Company's announcement in a Press Release and Form 8-K that "Pratt & Whitney has determined that a rare condition in powdered metal used to manufacture certain engine parts will require accelerated fleet inspection."  RTX described that, "[a]s a result, the business anticipates that a significant portion of the PW1100G-JM [the GTF] engine fleet . . . will require accelerated removals and inspection within the next nine to twelve months, including approximately 200 accelerated removals by mid-September of this year [2023]."

363.    During RTX's earning call on July 25, 2023, Defendant Hayes described the Company as "working through an issue resulting from a rare condition in powdered metal that will require Pratt & Whitney to remove some engines from service earlier than expected." Defendant Calio spoke more specifically on the issue, describing how the "rare condition in powdered metal used to manufacture certain engine parts may reduce the life of those parts." Defendant Calio emphasized that Pratt & Whitney's "current production of powdered metal parts is not impacted" by the condition. Defendant Calio noted that "[a]s a result of this rare condition in powdered metal, Pratt instituted enhanced inspections to be performed at scheduled shop visits." Defendant Calio stated that RTX's announcement was "based on very recent learnings from these inspections," and that "this condition was present in rare instances in powdered metal produced from approximately Q4 2015 into Q3 2021."

364.    With respect to the inspections, Defendant Calio noted that the "next step is for Pratt to publish a service bulletin describing the inspections, and the FAA will likely follow up with an airworthiness directive." With respect to the financial impact associated with the removal and inspections, Defendant Calio stated that the "financial impact associated with these removals is still being analyzed and will depend on a number of factors, including the result of the inspections, the amount of work needed to be done in our network shops, and of course, the impact on our customers." Defendant Calio assured investors that, for RTX, "[s]afety always has been and always will be our number one priority, and we will never compromise on ensuring the safe operation of our fleet."

365.    In connection with this corrective disclosure, RTX reduced its 2023 cash flow expectations by $500 million, to $4.3 billion, "primarily to reflect the developments at Pratt & Whitney" involving the Powdered Metal Defect affecting the GTF engine fleet.

366.    In response to analyst questions about the cause and extent of the Powdered Metal Defect, Defendant Hayes stated "[t]his is simply a quality issue from a manufacturing problem." Defendant Hayes anticipated the market's reaction, stating "I know this GTF issue, this quality issue is a bit of a surprise" while assuring investors that the Powdered Metal Defect "is a small piece of what is a great franchise across RTX."

367.    News outlets quickly picked up on the story, echoing the Company's statements that the removal and inspection of "about 1,200 engines overall" were attributable to a "rare flaw in powdered metal used in some parts" and noting "that the cost has not yet been determined."

368.    This disclosure and the news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the GTF fleet, the Powdered Metal Defect and the financial impact the defect would have on the RTX's profitability and financial health generally.

369.    Moreover, this disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the GTF fleet and the metal defect. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions—namely that the Defendants knew about the material defect since at least 2020 and concealed from the market the extent of the issue as well as the financial impact it would have on the GTF fleets' profitability. Investors finally understood the significance of the defect and the steps RTX would have to take to fix the issue.

370.    As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, RTX's share price fell $9.91 per share, or 10.2%, to close at $87.10 on July 25, 2023.

371.    As Defendant Hayes acknowledged, investors were indeed surprised by the disclosure and attributed the stock decline to the announcement.  That day, analysts from Barclays remarked that "the $500M reduction in 2023 [free cash flow] FCF as a result of the urgent need to inspect the 200 GTF engines was a negative surprise.  Compounding the negative reaction was the fact that this issue is coming to light now, just after the investor event at the Paris airshow."  Nevertheless, Barclays' analysts continued to "believe" that the resulting stock decline was "overdone" based on the Company's assurances to investors.

372.    Similarly, on July 25, 2023, analysts at RBC Capital Market Research expressed overt frustration, stating "[p]erhaps most frustrating for investors is the fact that the company was not aware of this issue at its June investor day at the Paris airshow."  RBC's analysts also expressed dismay at RTX remaining "reluctant to provide any insight on how this issue may impact the 2024-2025 financials, considering it is very early in the discovery process, which further weighed on sentiment.  Despite the initial surprise, RBC's analysts heeded RTX's reassurances, stating "[t]he recent powder metal quality issue is stressing near-term GTF FCF generation, but we do not anticipate that this issue will impact the long-term economics of the program."

373.    Analysts at Morgan Stanley similarly heeded the Company's assurances.  "Considering that the issue is finite in nature (1,200 total engines affected) with the majority of the cash outflow likely completed by 2024, this pullback seems overdone. On a 4-5 year long-term view, we recognize that RTX's growth and cash thesis remains intact."

374.    Analysts at Bernstein Research, however, believed RTX's assurances that this was a new issue, stating "[t]hree weeks ago, the HPT disc problem, related to impurities in metal powder for discs produced before Q3 2021, was found to be of sufficient risk to act on it now. ~1,200 engines need to be removed and inspected over the next 9-12 months, with 200 to be

removed by mid-September . . . .  Because it has only been 3 weeks, there is not even a service bulletin out, so thinking on this is very preliminary."

375.    However, despite this disclosure, which removed some of the artificial inflation from RTX's stock price, its stock remained artificially inflated as Defendants knew but failed to disclose, or deliberately disregarded, that the extent of the recall was in fact far greater than Defendants claimed.  Despite revealing some of the truth about the Powdered Metal Defect, Defendants concealed the extent of the issue and the financial impact the recall would have on RTX's finances.

**B.**    **September 11, 2023 – Final Corrective Disclosure**

376.    On September 11, 2023, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were fully revealed and/or fully materialized.  On that day, RTX issued a Press Release (which it also filed with the SEC on a Form 8-K signed by Defendant Mitchill) providing an update on Pratt & Whitney's Powdered Metal Defect.  RTX expanded the financial impact of the earlier Powdered Metal Defect in the Press Release, estimating that it would cost between $3 billion and $3.5 billion to remove and inspect 600 to 700 engines in the GTF fleet.

377.    Also on September 11, 2023, RTX held a "Special Call" to discuss the Powdered Metal Defect's impact on the GTF fleet.  Defendant Hayes began the call by stating "[t]here is no question that the GTF has faced challenges since its entry into service.  To be clear, this latest disruption from the powdered metal contamination is frustrating and will have a significant impact on our customers, on our partners, and on RTX."

378.    Defendant Calio provided an operational update on the previously disclosed removal and inspections of GTF engines, which "were necessary to address the possibility that a rare condition in powdered metal could result in the formation of a crack during manufacturing."

Defendant Calio referenced how the Company "took several actions" in response to the March 2020 V2500 HPT disc failure, including "improvements to the powdered metal production process," a "new angle ultrasonic inspection," and an "inspection plan . . . in both production and MRO."

379.    According to Calio, RTX's new "fleet management plan will touch roughly 3,000 engines, but as I said before, it results in approximately 600 to 700 incremental removals in the 2023 to 2026 timeframe, with the majority of these occurring in 2023 and early 2024."

380.    Defendant Mitchill stated that "[b]ased on the impact to our customers, as well as the fleet planning that Chris just discussed, the estimated gross financial impact of this fleet inspection and management plan is expected to be in the range of between $6 billion and $7 billion."  Mitchill continued by explaining that "Pratt & Whitney's net partner share is 51% of the PW1100 program.  When taking that into account, we currently estimate the net pre-tax operating profit impact to be between $3 billion and $3.5 billion over the next several years. This cost includes estimated customer support, as well as the EAC impact for incremental costs to long-term maintenance contracts."

381.    Defendant Mitchill confirmed that "the time between taking an engine off the wing and inducting it into our shop and then, of course, the time in our shops is the principal driver of the disruption that we're going to cause to our customers and really forms the basis of our estimate. So ultimately, that's going to drive the number of aircraft on the ground, the duration of the aircraft – the aircraft that are on the ground for. And as Chris said, we project that to be about 350 AOGs on average over the next three years through 2026."

382.    This disclosure and the news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning

the GTF fleet, the Powdered Metal Defect and the financial impact the defect would have on the RTX's profitability and financial health generally.

383.   Moreover, this disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the GTF fleet and the Powdered Metal Defect. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions—namely the full extent of the issue and the financial impact it would have on the GTF fleets' profitability.

384.   As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, RTX's share price fell $6.58 per share, or 7.9%, to close at $76.90 on September 11, 2023.

385.   Analysts attributed the decline to the announcement and expressed a sentiment of having been misled. For example, on September 11, 2023, analysts at Bank of America stated, "[w]e find it interesting that while RTX urged the investor community not to extrapolate the $2.5mn per engine cash impact to arrive at $3bn in total impact, this ended up being the expected total cash impact."

386.   Analysts at RBC Capital Market Research noted the swing that investors felt by the Company's disclosures, "[c]oming out of the 2Q23 results call, when the company initially identified the powder metal issue with the GTF engine, we had confidence that the issue, based on the data provided, was relatively well contained. However, the financial and operational impact identified today is more substantial than we had expected. We see incremental risk to the ~$3B of cumulative FCF [free cash flow] impact, and we believe investor confidence in RTX and the GTF will take time to be restored."

387.    Similarly, on September 12, 2023, analysts at J.P. Morgan responded with surprise, noting that RTX's "GTF update that the market had been waiting for since the Q2 earnings report yielded an impact from metal contamination that was worse than the company indicated in July, triggering 10% under-performance the past two days.  Hopefully, RTX has now accounted for these costs but it's hard to have full confidence given how this issue emerged and has worsened, along with the fact that there is plenty of hard work ahead to return the fleet to an acceptable level of utilization."

388.    On September 13, 2023, analysts at Bernstein Research specifically attributed RTX's drop in stock price to its disclosures concerning the GTF engine recall, "[w]e attribute the drop to investor concerns we have heard that Pratt may not yet fully have its arms around the problem, that the GTF may have broader issues which could put its long-term future at risk, and questions about management, given the time it took Pratt to fully raise the issue.  The Sunday Air China GTF engine fire exacerbated these concerns."

## IX.    PRESUMPTION OF RELIANCE

389.    At all relevant times, the market for RTX's common stock was efficient for the following reasons, among others:

(a)    RTX's stock met the requirements for listing, and was listed and actively traded on the NASDAQ stock exchange, a highly efficient and automated market;

(b)    As a regulated issuer, RTX filed periodic reports with the SEC and NASDAQ;

(c)    RTX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    RTX was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports were publicly available and entered the public market place.

390.    As a result of the foregoing, the market for RTX stock reasonably promptly digested current information regarding RTX from all publicly available sources and reflected such information in RTX's stock price. Under these circumstances, all purchasers of RTX common stock during the Class Period suffered similar injury through their purchase of RTX common stock at artificially inflated prices, and a presumption of reliance applies.

391.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## X.    NO SAFE HARBOR; BESPEAKS CAUTION IS NOT APPLICABLE

392.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Amended Consolidated Class Action Complaint.

393.    Defendants acted with scienter because at the time they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

143

394.    As set forth in detail throughout this Amended Consolidated Class Action Complaint, Defendants, by virtue of their control over, and/or receipt of, the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

395.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.    CLASS ACTION ALLEGATIONS

396.    Lead Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of RTX Corporation f/k/a Raytheon Technologies Corporation ("RTX" or

the "Company") during the period from February 8, 2021 through September 8, 2023, inclusive (the "Class Period") and who were damaged thereby, subject to certain exclusions (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of RTX during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) RTX's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

397.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, RTX had between approximately 1.455 billion and 1.515 billion shares of common stock outstanding and actively trading on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

398.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

399.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

400.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    whether and to what extent the market price of RTX's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    whether Defendants acted with the requisite level of scienter;

(e)    whether the Individual Defendants were controlling persons of the Company;

(f)    whether reliance may be presumed; and

(g)    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

401.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members

of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND SEC RULE 10b-5 PROMULGATED THEREUNDER**
**(Against Defendant RTX and the Individual Defendants)**

402.    Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

403.    This Count is asserted on behalf of all members of the Class against Defendant RTX and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

404.    During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were materially misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

405.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of RTX common stock during the Class Period.

406.    As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a)    Defendants repeatedly assured the market that RTX's GTF engine fleet was airworthy and moving toward profitability but failed to disclose that Pratt & Whitney's Powdered Metal Defect posed grave flight safety risks and required the entire GTF engine fleet to be removed from service for costly inspection and removal of the defective parts.

407.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of RTX common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, that RTX's GTF engine fleet was airworthy and moving toward profitability without issue despite the known Powdered Metal Defect requiring costly inspection and removal; (b) artificially inflate and maintain the market price of RTX's common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase RTX common stock at artificially inflated prices and suffer losses when the true facts become known.

408.    Defendant RTX is liable for all materially false and misleading statements made during the Class Period, as alleged above.

409.    The Individual Defendants are liable for the false and misleading statements they made and for which they were responsible, as alleged above.

410.    As described above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of RTX stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

411.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at RTX, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

412.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for RTX common stock, which inflation was removed from the price when the true facts became known.  Lead Plaintiffs and the Class would not have purchased RTX common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the Defendants' misleading statements.

413.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of RTX common stock during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Hayes, O'Brien, Mitchill, Calio, and Eddy)

414.    Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

415.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

416.    During their tenures as officers and/or directors of RTX, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of RTX, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by RTX during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

417.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Hayes, Mitchill, and O'Brien signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by RTX during the Class Period. Defendant Calio participated in conference calls with securities analysts, during which RTX'S false and misleading statements filed with the SEC and included in press releases were presented and discussed. As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of RTX within the meaning of Section 20(a) of the Exchange Act.

418.    As set forth above, RTX violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of RTX and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired RTX common stock.  Moreover, during the respective times these Defendants served as officers and/or directors of RTX, each of these Defendants was culpable for the material misstatements and omissions made by RTX, as set forth above.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XIV.  DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 23, 2024

Respectfully submitted,

*/s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
James T. Christie (*pro hac vice*)
Jacqueline R. Meyers (*pro hac vice*)
Kaicheng Yu (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
jmeyers@labaton.com
nyu@labaton.com

*Counsel for New England Teamsters*
*and Co-Lead Counsel for the Class*

Steven B. Singer (*pro hac vice forthcoming*)
Kyla Grant (*pro hac vice*)
Joshua H. Saltzman (*pro hac vice*)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com
kgrant@saxenawhite.com
jsaltzman@saxenawhite.com

- and –

Lester R. Hooker (*pro hac vice forthcoming*)
Scott Koren (*pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382

lhooker@saxenawhite.com
skoren@saxenawhite.com

Ian W. Sloss (ct31244)
Johnathan Seredynski (ct30412)
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, Floor 15
Stamford, CT 06901
Tel: (203) 425-4491
isloss@sgtlaw.com
jseredynski@sgtlaw.com

*Local Counsel for Lead Plaintiffs and for the Class*