## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSHUA PENEYCAD, Individually and on behalf of all others similarly situated, *Plaintiffs*, <br><br> v. <br><br> RTX CORPORATION F/K/A RAYTHEON TECHNOLOGIES CORPORATION, GREGORY HAYES, NEIL MITCHILL, ANTHONY F. O'BRIEN, CHRISTOPHER T. CALIO, SHANE EDDY, *Defendants*. | No. 3:23-cv-1035 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

On July 23, 2024, the New England Teamsters Pension Fund, Westchester Putnam

Counties Heavy & Highway Laborers Local 60 Benefits Fund, and United Union of Roofers, and

Waterproofers & Allied Workers Local Union No. 8 WBPA Fund (collectively "Lead Plaintiffs"

or "Plaintiffs") filed an Amended Class Action Complaint on behalf of themselves and all other

similarly situated purchasers or acquirers of publicly traded common stock of RTX Corporation

("RTX") during the period from February 8, 2021 through September 8, 2023, inclusive ("Class

period"). Am. Consol. Class Action Compl., ECF No, 95 (July 23, 2024) ("Am. Compl.").

Along with RTX, Lead Plaintiffs sued Gregory Hayes ("Mr. Hayes"), Neil Mitchill ("Mr.

Mitchill"), Anthony F. O'Brien ("Mr. O'Brien"), Christopher T. Calio ("Mr. Calio"), and Shane

Eddy ("Mr. Eddy") (collectivity "Individual Defendants," and, with RTX "Defendants").

Lead Plaintiffs allege numerous violations of Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants and numerous

violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual

Defendants.

According to the Lead Plaintiffs, "[t]his case presents a classic example of a Company concealing from the market a known defect in its flagship product line in order to maintain its stock price and profitability. . . . [A]nd unbeknownst to investors, Defendants knew that virtually every single [Geared Turbofan] engine Pratt & Whitney sold from 2015 to 2021 contained defective parts manufactured from contaminated powdered metal (the "powdered metal defect") that could cause a catastrophic engine failure mid-flight. Critically, the powdered metal defect could only be fixed by grounding the [Geared Turbofan] fleet for a lengthy, costly inspection and removal process that would gut the engine program's profitability. In 2023, after concealing the powdered metal defect by no later than 2020 and knowing that remediating the defect would cost the Company billions of dollars." Am. Compl. ¶ 1-2

Defendants move to dismiss the Securities Class Action in its entirety and with prejudice because, they argue, Plaintiffs have failed to adequately plead falsity or scienter under Section 10(b) of the Exchange Act. Mot. to Dismiss, ECF No. 111 (Sept. 23, 2024) ("Mot.").

For the following reasons, the motion to dismiss is **GRANTED**, and all claims are dismissed with prejudice.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Factual Allegations[1]

RTX is an American, multinational aerospace and defense corporation that was founded through a merger between United Technologies Corporation ("UTC") and Raytheon Corporation ("RTN"). Pratt & Whitney ("Pratt") is an industry-leading airplane industry manufacturer and former subsidiary of UTC, and is now a subsidiary of RTX. Am. Compl. at 11. Pratt's

---

[1] The following facts are drawn from the Amended Complaint and statements or documents incorporated by reference. *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 146 (2d Cir. 2013) (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002)).

commercial engine sales are allegedly a critical driver of RTX's success, and allegedly accounted for 30 percent of RTX's net sales in 2022. *Id.* Pratt is allegedly an original equipment manufacturer ("OEM") and allegedly generates the majority of its profits through commercial aircraft engine sales and aftermarket maintenance, repair, and overhaul ("Aftermarket MRO") sales and services on its in-service engines. *Id.*

Pratt's most significant product is allegedly the Geared Turbofan engine family, which allegedly skyrocketed in popularity among commercial airlines after the product was launched in 2016. *Id.* ¶ 12. RTX initially sold the GTF engines at an alleged $1 million loss because of the engine's expensive design and construction. *Id.* ¶ 13. The alleged plan was to breakeven and recoup the losses through Aftermarket MRO of the initial sales. *Id.* RTX could allegedly only charge for Aftermarket MRO sales and services, however, after the warranties expired on engines, which is typically up to five years from the time the aircraft enters flight service. *Id.* This business model allegedly gave Defendants a strong incentive to increase GTF production and get the engines into service as soon as possible, but those engines would need to be in service long enough for the warranties to expire in order for RTX to profit from Aftermarket MRO services. *Id.* ¶ 14. "However, following the GTF Engine's commercial release in 2016, Pratt & Whitney struggled to increase capacity and thus began cutting corners in quality control for its GTF production." *Id.*

Pratt allegedly manufactured its engine parts using powdered metal. *Id.* This process allegedly involves creating a powdered metal alloy from raw materials, bonding the powder through compression and heat into a solid metal "forging," and machining the metal forging to a part specification. *Id.* ¶ 20. Contamination is allegedly a significant risk when manufacturing parts from powered metal because contaminants allegedly cause the powdered metal to bond

improperly. When such contaminated powdered metal is subject to extreme temperature and movement "that occur during typical flight conditions," the contaminated metal can allegedly crack. *Id.* The crack can allegedly lead to "catastrophic fractures, engine fires and [allegedly] ultimately the loss of the airplane." *Id.*

In 2015, Pratt allegedly built a new multi-story structure at its powdered metal manufacturing facility in Clayville, New York, to allegedly increase its powdered metal manufacturing capacity as part of an alleged effort to scale-up production on the GTF engine. *Id.* ¶ 21. During the alleged scale-up process, there was some introduction of contaminants to Pratt's powdered metal. *Id.* The company was allegedly aware of the powdered metal defect by 2020. *Id.* According to a former employee ("FE-1"), there was an alleged conference call in approximately August 2019 to discuss alleged powdered metal problems. *Id.* ¶ 22.

Sarah Toomey, Chief Engineer, allegedly convened the call, a call allegedly led by "the Director of the GTF 1100 engine program, for the A321neo/A320neo aircraft." *Id.* According to FE-1, there was allegedly concern about the facility in Clayville, New York. *Id.* Another former employee ("FE-5") alleged that, in approximately 2020, "foreign objects were occasionally identified in powder as it was forming," *Id.* ¶ 24, and FE-9 alleged that "colleagues from Pratt & Whitney's metallurgical testing labs told him" that there had been issues with powdered metal since approximately 2016 "and that the Company was planning a recall because of this problem."

On March 18, 2020, Vietnam Airlines Flight VN-920 allegedly experienced an HPT disk fracture, allegedly leading its V2500 series Pratt & Whitney engine to rip apart, which allegedly forced the crew to abort a high-speed takeoff. *Id.* ¶ 26. The V2500 engine allegedly was manufactured using the same powdered metal process that GTF engine and at the same

processing facility. *Id.* Pratt's alleged analysis of the aircraft allegedly showed that the fractured disk was "attributable to 'a material anomaly,' or contamination resulting from 'deficiencies in the manufacturing process.'" *Id.* By this point in 2020, Defendants allegedly "knew that the powdered metal defect was a systemic, serious problem afflicting all Pratt & Whitney engines equipped with parts constructed from the faulty, contaminated material," and Defendants allegedly made this discovery in 2020, and were allegedly aware that "revealing the pervasive and costly powdered metal defect to investors would have a cataclysmic impact on RTX's stock price." *Id.* ¶ 27.

Immediately after the alleged March 2020 incident, the Federal Aviation Administration ("FAA") issued Emergency Airworthiness Directives and Airworthiness Directives allegedly requiring Pratt to remove all affected HPT disks in the V2500 engine family from service. *Id.* ¶ 28. These directives also allegedly required Pratt to investigate the "root cause" of the incident. *Id.* Based on that root cause analysis, Pratt later determined that the HPT disks "were defective due to contamination of the powdered metal from which they were made." *Id.* Defendants later allegedly admitted that this defective powdered metal was used to manufacture HPT disks across Pratt engines from approximately the end of 2015 through the middle of 2021. *Id.* ¶ 29. Because HPT disks for both the V2500 and the GTF engine families were allegedly manufactured using the same process and using the same allegedly contaminated material, Defendants were allegedly aware that the same powdered metal defect present in the V2500 was also present in the GTF engine family. *Id.*

Remedying a powdered metal defect would allegedly require RTX to take affected engines out of service for months prior to their warranty period, which would allegedly cost RTX

"billions of dollars in emergency inspections and repairs, as well as compensation to airlines for prolonged grounding of planes" that suffered from the defect. *Id.* ¶ 30.

Defendants are alleged to have committed numerous representations[2] related to the scope of the powdered metal defect starting on February 8, 2021, when Defendants allegedly falsely assured investors that any early mechanical problems with the GTF engine had been addressed. *Id.* ¶ 6. Defendants allegedly were aware as early as March 2020 of the extent to which the powdered metal defect affected the in-service GTF engines, *id.* ¶¶ 3–4, and that the defect could cause critical engine parts to crack and fail during flight. *Id.* ¶ 34.

Pratt allegedly provided the FAA with an "'expanded' non-public root cause analysis" of the Vietnam Airlines incident on July 29, 2021, that allegedly identified the same powdered metal defect within the GTF engine fleet that had allegedly caused the engine failure in Vietnam. *Id.* ¶ 37. The FAA allegedly released an Airworthiness Directive based on that "expanded" analysis on September 10, 2021, that related to three GTF engines. *Id.*

On December 24, 2022, a Viva Aerobus flight equipped with a GTF engine allegedly caught fire and aborted takeoff in Mexico. *Id.* ¶ 39. Defendants continued to make statements about the GTF's airworthiness and profitability. *Id.* ¶¶ 39–40.

On July 25, 2023, Defendants issued an 8-K Press Release disclosing a "rare condition" in its powdered metal that would require Pratt to "to remove some [GTF] engines from service for inspection earlier than expected." *Id.* ¶ 41. During the subsequent earnings call, Defendants disclosed that RTX would immediately recall approximately 200 GTF engines for "emergency 'enhanced inspection,' with approximately 1,000 more [allegedly] needing to be removed and inspected within the next 9 to 12 months, [allegedly] causing a $500 million hit to RTX's free

---

[2] Specific alleged misstatements will be described in greater detail *infra.*

cashflow." *Id.* Defendants also allegedly revealed during the call that there were contaminates introduced into "powdered metal produced from approximately Q4 2015 into Q3 2021." *Id.* Also, on July 25, 2023, RTX's share price fell $9.91 per share, or 10.2%, to allegedly close at $87.10. *Id.* ¶ 42.

On September 11, 2023, RTX issued a Press Release and Form 8-K providing an update on the powdered metal defect. *Id.* ¶ 45. Defendants allegedly admitted that the defect impacted the entire 3,00 engine fleet, and would require "600-700 engines to be removed for inspection in the near term." *Id.* ¶ 46. Defendants allegedly informed investors that these inspections would require engines to be out of service for "as much as 250 to 300 days each . . . . The impact to RTX's bottom line was now [allegedly] projected to be . . . $3 to $3.5 billion to repair the engines and compensate the Company's airline customers for the lost use of their planes." *Id.*

On that same day, RTX's share price fell an additional $6.58 per share, or 7.9 percent, to close at $76.90, more than 27 percent below the stock's Class Period high. *Id.* ¶ 49.

### 2. Procedural History

On August 3, 2023, Joshua Peneycad filed a Complaint against all Defendants. Compl., ECF No. 1 (Aug. 3, 2023).

On October 2, 2023, William Chow, a separate plaintiff, filed a motion to consolidate related cases, appoint a lead plaintiff, and for approval of lead plaintiff's choice of lead counsel. Mot. of William Chow for Consolidation, ECF No. 10 (Oct. 2, 2023). That same day, Michael Jones, a separate plaintiff, filed a motion to consolidate related cases, appoint a lead plaintiff, and for approval of lead plaintiff's choice of lead counsel. Mot. of Michael Jones for Consolidation, ECF No. 14 (Oct. 2, 2023).

Also on October 2, 2023, New England Teamsters Pension Fund, Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund, United Union of Roofers, and Waterproofers & Allied Workers Local Union No. 8 WBPA Fund filed a motion to consolidate related cases, appoint a lead plaintiff, and for approval of lead plaintiff's choice of lead counsel. New England Teamsters et al Mot. to Consolidate, ECF No. 15 (Oct. 2, 2023).

On December 21, 2023, the late Honorable Jeffrey A. Meyer granted the motions to consolidate cases and referred the motions for designation of lead plaintiffs to U.S. Magistrate Judge Robert A. Richardson. Order, ECF No. 43 (Dec. 21, 2023).

On April 11, 2024, Judge Richardson held a hearing regarding the motions for appointment of a plead plaintiff and approval of lead plaintiff's choice of counsel. Minute Entry, ECF No. 57 (April 11, 2024).

On May 2, 2024, Judge Richardson appointed the Northeast Pension Funds group—made up of the New England Teamsters Pension Fund, Westchester Putnam Counties Heavy & Highway Laborer Local 60 Benefits Fund, and United Union of Roofers, Waterproofer & Allied Workers Local Union No. 8 WBPA Fund—as Lead Plaintiffs and its choice of counsel as lead counsel. Order Granting Mot. of Northeast Pension Funds as Appoint. as Lead Pl., ECF No. 63 (May 2, 2024).

On July 23, 2024, Plaintiffs filed an amended consolidated Class Action Complaint. Am. Compl.

On September 23, 2024, Defendants filed a motion to dismiss the amended consolidated Class Action Complaint. Mot.

On November 7, 2024, Plaintiffs filed an opposition to the motion to dismiss the amended consolidated Class Action Complaint. Opp. to Mot. to Dismiss, ECF No. 112 (Nov. 7, 2024) ("Opp.").

On December 9, 2024, Defendants filed a reply to the opposition to Plaintiffs' motion to dismiss the amended consolidated Class Action Complaint. Reply to Opp. to Mot. to Dismiss, ECF No, 114 (Dec. 9, 2024) ("Reply").

On January 17, 2025, following the tragic death of Judge Meyer, the case was transferred to this Court. Order of Transfer, ECF No. 128 (Jan. 17, 2025).

On June 30, 2025, the Court held a hearing on the motion to dismiss the consolidated class action complaint. Minute Entry, ECF No. 131 (June 30, 2025).

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the

complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *see also Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

For most claims brought under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), imposes heightened pleading requirements governed by the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("As the district court observed, the particularity requirement of Rule 9(b) applies to securities fraud claims brought under Section 10(b) and Rule 10b–5 . . . . The district court concluded that the same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud. We agree." (internal citation omitted)); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) (A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the [PSLRA]."); *In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281, 334–35 (S.D.N.Y. 2003) ("Congress intended that the PSLRA supersede the Federal Rules only as to those elements which the PSLRA explicitly mentions (*i.e.*, scienter and material misstatements and omissions). . . . In all other respects, the Rules govern these pleadings." (internal citation omitted)).

10

Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)); *see also* Fed. R. Civ. P. 9(b) (requiring that a complaint that alleges fraud plead "with particularity the circumstances constituting fraud").

## III.   DISCUSSION

Plaintiffs assert two claims for relief: (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants, Am. Compl. ¶¶ 402–13; and (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants, Am. Compl. ¶¶ 414–18.

The Court will address each of these claims.

### A.  The Section 10(b) of the Exchange Act and SEC Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

SEC Rule 10b-5 makes it unlawful for "any person, directly or indirectly ...":

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In monetary damages suits against non-controlling persons, plaintiffs must first specify each allegedly misleading statement or omission. 15 U.S.C. §§ 78u-4(b)(1)(A–B). *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) (internal citation omitted), *cert. denied*, 546 U.S. 935 (2005). Plaintiffs must then demonstrate that each misstatement is material. *In re Initial Pub. Offering Sec. Litig.*, 399 F.Supp. 2d at 306 ("A plaintiff must allege a material misstatement ... and that misstatement must be the cause of the plaintiff's loss....").

Furthermore, a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 requires "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023).

A securities fraud plaintiff must plausibly allege that a statement would be misleading to a reasonable investor given the "total mix" of available information. *Castellano v. Young & Rubicam*, 257 F.3d 171, 180 (2d Cir. 2001); *see also* 15 U.S.C. § 78u-4(b)(1)(A–B) (on PLSRA's heightened pleading requirements for misstatements). Within that mix, "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Id.*; *see also Singh v. Cigna Corp.*, No. 17-3484-CV, 2019 WL 1029597, at *4 (2d Cir. Mar. 5, 2019) (summary order) ("Like the District Court, we think that the statements in Cigna's Code of Ethics are a

textbook example of 'puffery.' We have observed that 'general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.'"); *cf. In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317–18 (S.D.N.Y. 2013) ("While MF Global and the Officers repeatedly represented that the Company had a 'strong' liquidity position ... Plaintiffs allege that MF Global faced substantial strain on its capital and liquidity and met its requirements only through daily intra-company transfers, and collapsed when RTM counterparties demanded additional margin. These facts plausibly allege material misstatements under the Exchange Act and the Securities Act.").

"A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made.*" *Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 571 (S.D.N.Y. 2014), *aff'd* (emphasis in original) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 812–13 (2d Cir. 1996))). "A statement believed to be true when made, but later shown to be false, is insufficient. In such a circumstance, there is a lack of actionable falsity. Put another way, without *contemporaneous* falsity, there can be no fraud." *Id.* (citations omitted) (emphasis in original). The Second Circuit has refused to allow plaintiffs to allege "fraud by hindsight," in other words, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citations omitted).

Misstatements of corporate success come in two varieties: vague and inactionable puffery, and material misrepresentations of existing facts. *Id.* at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.... these statements were plainly false and misleading."). "[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to support a claim of securities fraud. *Id.*

By contrast, "defendants may be liable for misrepresentations of existing facts." *Id.* (*citing In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 74–75 (S.D.N.Y. 1996)). To withstand a motion to dismiss, Plaintiffs must plead more than a laggardly response to problems or lack of corporate skepticism. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 161 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (dismissal of a second amended complaint where the defendants "should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud"). Rather, Plaintiffs must plead material misrepresentations, such as a failure "to timely disclose material data which resulted in misrepresentations of the defendant compan[y's] current finances where it was clearly pled that the defendants knew or should have known better." *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007) (*citing Novak*, 216 F.3d at 311).

Furthermore, "[s]tatements regarding projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *Lululemon*, 14 F.Supp.3d at 571 (citing *In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir. 1998)).

Here, Defendants have moved to dismiss, arguing that Plaintiffs have failed to adequately plead that the statements identified by Plaintiffs were false and misleading, or that Defendants acted with requisite scienter.

The Court will address each of these issues in turn.

### 1. The Allegedly False and Misleading Statements

Plaintiffs allege that Defendants made ten false, material statements during the class period. Defendants argue that Plaintiffs fail to plead contemporaneous falsity with the requisite particularly for any of the ten statements, and that this is a prototypical "fraud by hindsight" lawsuit. Defendants also argue that the statements fall into categories deemed inactionable under the PSLRA—such as opinion statements, puffery, and forward-looking statements.

The Court will address each allegedly false statement in turn.

### a. The February 8, 2021 Annual 10-K Report

#### i. "Technical Issues"

On February 8, 2021, RTX filed its Annual Report on Form 10-K as required by the Securities and Exchange Commission ("SEC"). Am. Compl. ¶ 235. Messrs. Hayes and O'Brien signed the form. *Id.* The form contained the following language.

> Of note, the design, development, production and support of new aerospace technologies is inherently complex and subject to risk. ***Since the PW1000G Geared TurboFan engine entered into service in 2016, technical issues have been identified and experienced with the engine, which is usual for new engines and new aerospace technologies. Pratt & Whitney has addressed these issues through various improvements and modifications***. These issues have resulted in financial impacts, including increased warranty provisions, customer contract settlements, and reductions in contract performance estimates. Additional technical issues, either related to this program or other programs, ***may also arise in the normal course***, which may result in financial impacts that could be material to the Company's financial position, results of operations and cash flows.

*Id.* (emphasis in Am. Compl.).

Plaintiffs allege that these statements were false and misleading because, to the extent that "technical issues" encompassed the powdered metal defect, the statement allegedly led investors to believe the Defected had been "addressed" when Defendants had intentionally not addressed the full scope of the issues. *Id.* ¶ 236.

Plaintiffs also allege that it was false and misleading for Defendants to say that the "technical issues" that had been identified with the GFT engine were related to those "usual for new engines and new aerospace technologies," because the powdered metal defect allegedly occurred during a metalworking process that Defendants had been using for allegedly over half a century. *Id.* ¶ 237. In other words, Plaintiffs allege that the "technical issues" "identified" in the GTF fleet "were the result of manufacturing errors having nothing to do with the novelty of the GTF engine itself[.]" *Id.* Plaintiffs also allege that limiting the disclosure of "technical issues" to those that are "usual for new engines and new aerospace technologies" conceal the pervasiveness of the powdered metal defect from investors. *Id.* ¶ 238.

Plaintiffs allege that Defendants knew the GTF engines contained parts affected by the powdered metal defect by no later than 2020. *Id.* ¶ 239. Specifically, Plaintiffs point to allegations from FE-1, who was employed at Pratt & Whitney from January 2019 through December 2021 as a Validation Expert. *Id.* ¶ 64. FE-1 allegedly recalls a conference call meeting held in approximately August 2019 to discuss the powdered metal problems. *Id.* ¶ 239. The call was allegedly led by the Director of the GTF 1100 engine program for the A321neo/A320neo aircraft. *Id.* During the meeting, FE-1 alleges that there was a discussion about contamination in the powdered metal supplied by Pratt & Whitney's source of the product, a facility by HMI in Clayville, New York. *Id.* FE-1 allegedly noted that the conference call was specifically about the

GTF fleet. *Id.* ¶ 240. FE-1 allegedly said that these problems were common knowledge throughout Pratt & Whitney, but that the company's culture made it so employees were not permitted to speak to anyone outside the Company regarding problems. *Id.* ¶ 239. FE-1 allegedly told his supervisory that the company had to address powdered metal defect, or it would get worse. *Id.* ¶ 240.

FE-1 also allegedly said that senior leadership at Pratt & Whitney were aware of the contaminated metal problems. He allegedly specifically identified Francis "Frank" Preli, Vice President, Propulsion and Materials Technology and Chief Engineer, Materials and Processes Engineering at Pratt & Whitney, as well as Geoff Hunt, Senior Vice President, Engineering. *Id.* ¶ 241. Additionally, Former Employee 5 ("FE-5"), a Mechanical Engineer at Pratt & Whitney's HMI Metal Powders facility in Clayville, New York, recalled that, in approximately 2020, foreign objects were occasionally identified in the powdered metal as it was forming. *Id.* ¶ 242. Former Employee 9 ("FE-9"), who worked as a Senior Analyst and later as a manager in the Quality department, alleged that colleagues from Pratt & Whitney's metallurgical testing labs told him that there had been a problem with its powdered metal since approximately 2016 and that the Company was planning a recall because of this problem. *Id.* ¶ 242.

### ii. Operational Risks

The 2020 10-K contained the following risk factor disclosure.

> Our products and services involve advanced technologies in highly sophisticated products. The impact of a catastrophic product failure or similar event, particularly in our commercial aerospace business, could be significant. Actual or perceived design or production issues can result in significant reputational harm to our business, in addition to direct warranty, maintenance and other costs that may arise. A significant product issue resulting in injuries or death, aircraft grounding or similar systemic consequences could have a material adverse effect on our business, reputation, financial position and results of operations. We may also incur increased

costs, delayed payments or lost equipment or services revenue in connection with a significant issue with a third party's product with which our products are integrated. ***There can be no assurance that we or our customers or other third parties will not experience operational process or product failures and other problems, including through manufacturing or design defects, process or other failures of contractors or third-party suppliers, cyber-attacks or other intentional acts, any of which could result in potential product, safety, quality, regulatory or environmental risks. If our products do not perform as intended, including with respect to safety or reliability, the possible consequences include product recalls and product liability claims, significant financial losses, including fines, as well as a diversion of management attention and reputational damage that could reduce demand for our products and services.*** Further, our insurance coverage may not be adequate to cover all related costs and we may not otherwise be fully indemnified for them.

*Id.* ¶ 243 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading because "operational process or product failures and other problems, including through manufacturing . . . any of which could result in potential product, safety, quality, regulatory or environmental risks" had—by February 8, 2021—already occurred and were not hypothetical, as the risk disclosure implied. *Id.* ¶ 244. Plaintiffs allege that Defendants knew by no later than 2020 that "their entire fleet of GTF engines manufactured and sold since 2015 suffered from the powdered metal defect." *Id.* Plaintiffs further allege that this disclosure was false and misleading because Pratt & Whitney had been under intense pressure from the FAA since March 18, 2020, to determine the root cause of the V2500 engine failure. *Id.* ¶ 245. Thus, Plaintiffs allege that the "regulatory" risk from the powdered metal defect had already materialized. *Id.*

### iii. Industry Risks

Finally, the 2020 10-K contained the following industry risk disclosure.

We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced

technologies. The product, program and service needs of our customers change and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services.

Of particular note, Pratt & Whitney is currently producing and delivering the PW1000G Geared Turbofan engine to power various aircraft, including the A320neo family of aircraft. The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or *if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts*.

*Id.* ¶ 247 (emphasis in Am. Compl.).

Here, Plaintiffs allege that, once again, Defendants were being false and misleading because they gave the impression that the risk of having issues with "service engines" such that they would "failure to meet customers' delivery schedules, which could result in material additional costs . . . or other liabilities" was merely hypothetical. *Id.* ¶ 248. Plaintiffs allege that, "by the time Defendants published this statement on February 8, 2021, Defendants had already undertaken a root cause analysis concerning its HPT disk fractures following the March 18, 2020 Vietnam Airlines engine fire . . . . Thus, Defendants knew full well that its GTF fleet was made using the same exact contaminated powdered metal, from the same exact manufacturing process, and at the same exact manufacturing facility in Clayville, New York," and yet had not shared with investors the connection between the Vietnam Airlines incident and the GTF fleet. *Id.*

Defendants argue that Plaintiffs offer no specific allegations that the makers of these allegedly false statements knew the statements were false at the time they were made—that is,

19

Plaintiffs offer no specific allegations that Defendants knew of the magnitude of the powdered metal defect at the time the 10-K was submitted in February 2021. *See* Mot. at 22.[3]

Regarding FE-1, Defendants argue that Plaintiffs "fail to describe FE-1's roles or responsibilities with sufficient specificity to show that he was in a position to know the facts attributed to him," and that Plaintiffs fail to explain FE-1's job of "validation expert." *Id.* at 24. They further argue that his assertions that contamination of powdered metal was "'common knowledge through the company' the 'entire time' he was a Validation Expert," *id.* (citing Am. Compl. ¶¶ 112, 114, 239), is too conclusory to substantiate a plausible allegation. *See id.* (citing *Chapman* v. *Mueller Water Prods, Inc.*, 466 F. Supp. 3d 382, 399-400 (S.D.N.Y. 2020); *Malin*, 499 F. Supp. 2d at 140-41; *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020)). Defendants thus argue that FE-1 offers no specific facts that allege Defendants were aware of the magnitude of the powdered metal issue before the announcement in September 2023.

The Court agrees.

First, regarding the allegations of FE-1, there is nothing in his allegations that suggest that Defendants were aware of the magnitude of the powdered metal defect at the time of the August 2019 conference call. *See* Am. Compl. ¶ 22 ("FE-1 indicated that this meeting was specifically about contamination in the powdered metal supplied by Pratt & Whitney's source, an entity called *HMI*, based in Clayville, New York. He noted that materials problems – such as contaminated components – are the "worst you can have" because they go to the life of the component, and therefore the life of the engine. FE-1 articulated that the contaminated powdered metal problems were not limited to the GTF series of engines. As an example, he mentioned that

---

[3] Where the internal pagination conflicts with the ECF-generated pagination, this Ruling and Order shall refer to the ECF-generated pagination.

the problem also affected the V2500 engines."). FE-1 only indicates that certain individuals

within Pratt were aware that there was some type of issue with powdered metal that affected

some GTF and V2500 engine manufacturing at a specific facility. *See id.* ("Specifically, FE-1

advised that there was a "telcon" or conference call meeting in approximately August 2019 to

discuss the powdered metal problems. FE-1 recalled that the person who called the meeting was

Sarah Toomey, Chief Engineer. FE-1 recalled that the meeting was led by the Director of the

GTF 1100 engine program, for the A321neo / A320neo aircraft."). Furthermore, no individual

Defendants are alleged to have taken part in any of FE-1's conversations, and Plaintiffs do not

allege any connection between the people FE-1 does allege were aware of the problems and the

Individual Defendants. *See id.* ¶ 23 ("Moreover, FE-1 confirmed that senior leadership at Pratt &

Whitney were aware of the contaminated powdered metals and titanium problems. He indicated

specifically that Frank (Francis) Preli, currently Vice President, Propulsion and Materials

Technology and Chief Engineer, Materials and Processes Engineering at the Company, and

Geoff Hunt, Senior Vice President, Engineering, were aware of the problems.").[4]

Second, both the PSLRA and the common law provide protection from liability for

certain forward-looking statements, such as cost estimates. The PSLRA affords "safe harbor" for

futuristic statements "accompanied by meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the forward-looking

statement." 15 U.S.C. § 78u-5(c)(1). Forward-looking statements are "immaterial as a matter of

law" when reasonable investors would not consider them "important in light of adequate

---

[4] The allegation of FE-5 that, in approximately 2020, "foreign objects were occasionally identified in powder as it was forming," Am. Compl. ¶ 24, also does not indicate that Defendants were aware of the magnitude of the defect before 2023. Even if the Court were to consider FE-9's allegations, they do not allege with sufficient particularity that Defendants were aware of the magnitude of the powdered metal problem or the magnitude of any alleged required recall.

cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

> As the Second Circuit further noted in *Halperin*:

>> We and other courts have referred to this rule of law as the 'bespeaks caution' doctrine. Consequently, when cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

> *Id.* (internal quotations and citations omitted); *see also Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010). ("A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction."); *see also Singh*, 2019 WL 1029597 at *4 ("[E]ach of Cigna's statements was framed by acknowledgements of the complexity and numerosity of applicable regulations. Such framing suggests caution (rather than confidence) regarding the extent of Cigna's compliance. Similarly, Cigna's assertion that it 'expect[s] to continue to allocate significant resources' to regulatory compliance suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness. If anything, these statements seem to reflect Cigna's uncertainty as to the very possibility of maintaining adequate compliance mechanism in light of complex and shifting government regulations.").

> The 10-K filings are replete with the types of warnings and qualifications— "the design, development, production and support of new aerospace technologies is inherently complex and subject to risk . . . . Additional technical issues, either related to this program or other programs,

may also arise in the normal course, which may result in financial impacts that could be material to the Company's financial position, results of operations and cash flows," Am. Compl. ¶ 235— that signify "actual results [could] differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). As a result, these statements are not actionable.

Third, because the Defendants included express warnings about potential financial and reputational damage resulting from any future issues with reliability or safety, *see* Am. Compl. ¶ 243 ("Our products and services involve advanced technologies in highly sophisticated products. The impact of a catastrophic product failure or similar event, particularly in our commercial aerospace business, could be significant. Actual or perceived design or production issues can result in significant reputational harm to our business, in addition to direct warranty, maintenance and other costs that may arise. A significant product issue resulting in injuries or death, aircraft grounding or similar systemic consequences could have a material adverse effect on our business, reputation, financial position and results of operations. We may also incur increased costs, delayed payments or lost equipment or services revenue in connection with a significant issue with a third party's product with which our products are integrated. . . . Further, our insurance coverage may not be adequate to cover all related costs and we may not otherwise be fully indemnified for them."), the "total mix of information," *Castellano*, 257 F.3d at 180, available to an RTX investor included the financial risks of manufacturing issues—particularly for a company whose value allegedly depended on manufacturing and maintaining new technology.

### b. The February 17, 2021 Barclays Industrial Select Conference

On February 17, 2021, Mr. Hayes allegedly spoke at the Barclays Industrial Select

Conference. *Id.* ¶ 250. An analyst allegedly asked a question about how much of the GTF fleet

was up to specification, and Mr. Hayes allegedly responded:

> So, let's just level set everybody in terms of where we are with GTF.
> So, we've delivered roughly 1,800 engines out there that are in
> service today. As you mentioned, the GTF powered A320 fleet, the
> utilization has been remarkably good during the pandemic. About
> 85%, we believe, of the fleet is flying on a regular basis, and that's
> pretty good. That's only about 2% lower than it was a year ago. So,
> utilization is good. ***Dispatch reliability for the last 12 months has
> been 99.97%.***
>
> ***So, all those teething problems that we talked about for the last
> several years seem to be behind us. We have upgraded about 96%
> of the fleet during the past year such that all of those fixes that we
> talked about, all of the reliability upgrades, 96% of those are now
> incorporated.*** And so, all that bodes pretty well in terms of starting
> to see kind of a return to normalcy.
>
> Now, the problem, of course, is that those 1,800 engines, the average
> age is about two years. And we typically don't see aftermarket until
> you get to about year five. So, I wouldn't expect that we're going to
> see a significant bump from GTF aftermarket until we get into the
> late 2023, 2024, 2025. And the program, again, should be breakeven
> by 2025 given the given the progression of the aftermarket and as
> we continue to drive costs down on the OE. So, I think that's all very
> positive. I think the Pratt team did a really good job last year. ***We
> didn't stop any of the overhaul activity, even though people
> weren't sending as many engines and we got everything upgraded
> for the most part. So, I think, at least, knock on wood, all the GTF
> issues that we've been talking about seem to be behind us and the
> engine's performing really well.***

*Id.* ¶ 250 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading because Mr. Hayes

represented that the problems with the GTF engine were "behind them." *Id.* ¶ 251. Plaintiffs

allege that, in fact, Defendants were aware no later than 2020 of "a pervasive manufacturing

defect due to contaminated powdered metal that affected thousands of critical GTF engine parts

over six years." *Id.* Plaintiffs also allege that this statement was false and misleading because Defendants were "scrambling" to fix the defect "by making no less than nine separate changes to RTX's powdered manufacturing process. *Id.*

Plaintiffs allege that this statement was further misleading because Defendant spoke directly to the "fixes" that were "now incorporated" into the GTF fleet while allegedly "deliberately concealing the large, looming, and undisclosed issue of metal parts with the powdered metal defect continuing to operate on in-service planes." *Id.* ¶ 252. Similarly, Defendants said they had "got everything upgraded," but, in fact, had not "upgraded" the GTF fleet to cure the powdered metal defect. *Id.* ¶ 253. Finally, by allegedly stating to investors that the GTF engines had a "99.97% dispatch reliability rate," Mr. Hayes allegedly gave the false impression that the percentage of GTF engines that were not reliable were not suffering from significant issues that would cut into RTX's profitability. *Id.* ¶ 254.

In addition to contesting that Plaintiffs have failed to plead these statements adequately, Defendants argue that statements such as "'I think it's all very positive. I think the Pratt team did a really good job last year . . . and the engine is performing really well' . . . are quintessential puffery." Mot. at 34 (citing *re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019)). Defendants also argue that Mr. Hayes's statement that "all those teething problems that we talked about for the last several years *seem* to be behind us," and "*all that bodes pretty well*," *Id.* (citing Am. Compl. ¶ 250), are non-actionable statements of opinion or forward-looking statements.

The Court agrees.

A securities fraud plaintiff must plausibly allege that a statement would be misleading to a reasonable investor given the "total mix" of available information. *Castellano*, 257 F.3d at 180;

25

*see also* 15 U.S.C. § 78u-4(b)(1)(A–B) (on PLSRA's heightened pleading requirements for misstatements). Within that mix, "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Id.*; *see also Singh*, 2019 WL 1029597, at *4 ("Like the District Court, we think that the statements in Cigna's Code of Ethics are a textbook example of 'puffery.' We have observed that 'general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.'"); *cf. In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 317–18 (S.D.N.Y. 2 ("While MF Global and the Officers repeatedly represented that the Company had a 'strong' liquidity position ... Plaintiffs allege that MF Global faced substantial strain on its capital and liquidity and met its requirements only through daily intra-company transfers, and collapsed when RTM counterparties demanded additional margin. These facts plausibly allege material misstatements under the Exchange Act and the Securities Act.").

As a result, statements like "the engine's performing really well," and "all of the GTF issues that we've been talking about seem to be behind us," Am. Compl. ¶ 250, are the kind of corporate optimism that does amounts to puffery, not fraud. *See Rombach*, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). Mr. Hayes's statement about the GTF engine, "So, I think , at least, knock on wood, all the GTF issues that we've been talking about seem to be behind us," Am. Compl. ¶ 250, thus is protected by the safe harbors of both opinion and forward-looking statements.

Additionally, changes made by the Defendants to their manufacturing process, once they became aware of the potential for contamination in powdered metal, is insufficient to support an allegation that statements omitting details of these changes were false and misleading. *Cf. Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding allegations that a company withheld information about improvements made to industrial processes after failed regulatory inspections insufficient to state a securities fraud claim with particularity).

### c.  The June 8, 2021 UBS Global Industrials and Transportation Virtual Conference

On June 8, 2021, Mr. Mitchill responded to analysts' inquires at the UBS Global Industrials and Transportation Virtual Conference. *Id.* ¶ 256. An analyst remarked on the GTF engine, stating:

> At this point, the crisis for all the bad actually allowed you to resolve a lot of the in-flight issues and reliability and durability issues, at least to a point where it's really cured, I think, some of the customer relationships. And given how active it's been in the fleet, it does seem like, at a minimum it's been an opportunity for Pratt to resolve some of those items that are outstanding.

*Id.* ¶ 257. Mr. Mitchill responded:

> ***Yeah, you're right. We were really able to take advantage of shop visit activity that was down last year to bring in GTFs and overhaul. I might say, we're nearly 99% complete with retrofitting a couple of the issues that we were facing.*** We still have an option to upgrade the combustor. We'll do that over the next several years. That'll improve time on the wing as well.

*Id.* ¶ 258 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading because it gave investors the incorrect impression that RTX had taken "advantage of shop visit activity" to "overhaul" the GTF engines to the point where the company was "99% complete with retrofitting a couple of the issues" facing the GTF fleet. *Id.* ¶ 259 Plaintiffs allege that this statement falsely gave

investors the impression that the issues with the GTF fleet were "cured." *Id.* And, as Plaintiffs allege, Defendants were "avoiding retrofitting the HPT disks that the Company knew were formed using contaminated powdered metal." *Id.*

Plaintiffs allege that this was specifically false and misleading because the statement was "made in direct response to an analyst asking whether the GTF engines were free of problems and doing well from a financial or 'customer relationship' standpoint." *Id.* That is, it allegedly gave the false impression that the GTF fleet was problem free from a customer relationship perspective. *Id.* Plaintiffs allege that, by 2020, Defendants knew that there was a need for "retrofitting" the entire GTF fleet. *Id.* ¶ 260.

In addition to contesting that Plaintiffs have adequately pleaded that these statements were contemporaneously false, Defendants argue that this is a non-actionable forward-looking statement. *See* Mot. at 37 (citing Am. Compl. ¶ 258).

The Court agrees.

Plaintiffs allege no facts that sufficiently support the allegation that, by 2020, Defendants knew there was a need to retrofit the entire GTF fleet. And any statements about the Company's actions in the future, *see, e.g.,* Am. Compl. ¶ 258 ("That'll improve time on the wing as well."), without additional allegations indicating that this statement was deceptively false, is within the PSLRA's safe harbor for forward-looking statements. Furthermore, Plaintiffs allege no specific facts substantiating with particularity the claim that Mr. Mitchill's statement "99% complete with retrofitting a couple of the issues that we were facing," *id.*, misled investors. *See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F.Supp.3d 429, 446 (S.D.N.Y. 2023) ("None of the facts alleged in the SAC impugns the veracity of the statement, 'Over the last five years, on average nearly 99% of our enterprise brand customers,

which accounted for 91% of our active total locations as of December 31, 2020, have continued

using our Ordering module each year.'")

### d. The October 26, 2021 Earnings Call

On October 26, 2021, Defendants held an earnings call discussing RTX's performance

for the third quarter of 2021, which ended September 30, 2021 ("3Q21 Earnings Call"). Am.

Compl. ¶ 262. During the call, an analyst inquired about the increased production and the ratings

related to engines for Airbus, specifically the A320 aircraft equipped with the GTF engine. *Id.*

Mr. Hayes responded:

> [W]e see demand strengthening for the A320. It's a great aircraft
> and it's got great performance characteristics. Now, keep in mind,
> so the GTF, today, ***we've just got over 900 aircraft delivered. We've
> flown about 9.5 million hours. We've got a 99.9% dispatch
> reliability rate. The engine is great***, and we continue to see
> opportunities to grow our market position on the A320. But we don't
> see any shortage of demand in the near term on the A320.

*Id.* ¶ 263 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading because the GTF engines

were allegedly not "great," but, instead, plagued by the powdered metal defect. *Id.* ¶ 264.

Plaintiffs also allege that Mr. Hayes's assertion that the GTF engine was "great," when spoken in

connection with statements that Pratt & Whitney had achieved, "900 aircraft delivered," and

"about 9.5 million hours" flown, and a "99.9% dispatch reliability rate," further bolster the

allegedly false impression that the GTF was performing well and not plagued with service-

threatening issues. *Id.* Plaintiffs thus allege that the company was aware by 2020 that "virtually

every single GTF engine the Company manufactured during the preceding six-year period

contained the powdered metal defect that could lead to a catastrophic engine fire." *Id.*

Additionally, the company was allegedly in the middle of an eighteen-month exercise in

adjusting the manufacturing process, which RTX allegedly did nine times before being satisfied

that it was producing powdered metal free of contaminants. *Id.*

In addition to contesting that Plaintiffs have adequately pleaded these statements were

contemporaneously false, Defendants argue that this statement amounts to mere puffery and is

therefore not actionable. Mot. at 34.

The Court agrees.

Statements about how "great" a product is "are expressions of puffery and optimism, and

are the opinions of [the speaker]." *In re Express Scripts*, 773 Fed. App'x at 13 (citing *Rombach*,

355 F.3d at 174). And reasonable investors would not be misled by such expressions of corporate

optimism. *See City of Hialeah Emps' Ret. Sys. v. Peloton Interactive, Inc.*, --- F. 4th ---, 2025

WL 2457758, at *7 (2d Cir. Aug. 27, 2025) ("In addition, a reasonable investor would not have

been misled because the characterization of the inventories as 'healthy' was the type of

expression of corporate optimism that we consider non-actionable puffery."). Furthermore, as the

Court has discussed previously, that RTX made changes and updates to its manufacturing

process over the course of the Class Period is insufficient to support the allegation that

Defendants were aware of the extent of the powdered metal defect.

### e.  The November 9, 2021 Baird Global Industrial Conference

On November 9, 2021, RTX's management team, including Mr. Mitchill, spoke at the

Baird Global Industrial Conference. Am. Compl. ¶ 266. The moderator of the panel asked Mr.

Mitchill about "key pieces" on the Company's performance in the commercial sector. *Id.* In

discussing the GTF fleet, Mr. Mitchill said: "The engine is performing very, very well. The

platform of engines have flown nearly 11 million hours with a dispatch reliability, well over

99%. The fleet remained highly utilized even through the pandemic. So we're talking 87%, 88% utilization." *Id.* ¶ 267.

Plaintiffs allege that this is materially false and misleading because it gives the impression that the "11 million hours" that the GTF engines had flown combined with "dispatch reliability, well over 99%" meant that the "engine is performing very, very well." *Id.* ¶ 268. Plaintiffs argue that this statement gave investors the false impression that "more hours in the air were bringing the fleet closer to profitability." *Id.* Plaintiff allege that investors knew that hours in the air risked "catastrophic" effects of the powdered metal defect, and that the planes would have to be grounded for nearly a full year to allow for inspection and removal of faulty parts. *Id.*

Defendants argue that Plaintiffs allege no facts demonstrating Defendants were aware these statements were false when made, and that Plaintiffs plead no facts plausibly alleging that Defendants were aware of the magnitude of the issue when the statement was made—let alone alleging with the particularity required by the PSLRA. Mot. 21–22. Defendants also argue that the statement the engine was performing "very, very well" amounts to "quintessential puffery." *See id.* at 34.

The Court agrees.

In addition to the statements that amount to mere puffery—"[t]he engine is performing very, very well," Am. Compl. ¶ 267—Plaintiffs allege no specific facts substantiating that Defendants knew that more flight hours risked allegedly "catastrophic" issues, due to the powdered metal defect, or that the planes would have to be grounded allegedly for months to complete necessary inspection and repairs. *Id.* ¶ 268. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain

disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."

*Novak*, 216 F.3d at 309 (citing *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978); *Acito*, 27 F.3d at 54). Without allegations pleading with particularity that Defendants were aware of the magnitude of the powdered metal defect for the GTF fleet, Plaintiffs' allegations plead "fraud by hindsight," which are not enough to proceed beyond a motion to dismiss. *Id.*

### f.  The January 25, 2022 Earnings Call

On January 25, 2022, Defendants held an earnings call discussing RTX's performance for the fourth quarter of 2021, which ended December 31, 2021 ("4Q21 Earnings Call"). Am. Compl. ¶ 270. During the call, Mr. Hayes said:

> Maybe just to put it in perspective, to date, on the GTF program, ***we have had more than 12 million flight hours*** on that. ***In the last 12 months, dispatch reliability has been 99.96%.*** So I know that we had a lot of teething problems back in '16 and '17, and we talked ad nauseam about all of those teething problems. And obviously, it impacted some of our time on wing, impacted some of those maintenance support contracts. But given where we are from a reliability standpoint today, those programs will start to generate positive cash flow coming up as the first full shop visits happen in the next year forward and beyond. And I actually feel pretty good about where we are on those contracts ***given the robustness of the current engine***.

*Id.* ¶ 271 (emphasis in Am. Compl.).

Plaintiffs allege that the statement regarding the "dispatch reliability" of "99.96%" led investors to believe that the 0.04% of failed departures were immaterial. *Id.* ¶ 272. Plaintiffs allege that this was materially false and misleading because several aborted takeoffs, which would constitute a failure to reliably dispatch the aircraft, were due to the powdered metal defect. *Id.* They allege that "dispatch reliability" was closely associated for investors with "customer satisfaction and, therefore, profitability of the GTF engine fleet," and by "touting a near-perfect dispatch reliability despite ongoing customer disputes concerning the performance of the

engines. . . Defendants falsely led investors to believe that the GTF engine fleet was profitable and airworthy." *Id.*

Also, on the 4Q21 Earnings Call, Mr. Mitchill said:

> ***We've made significant improvements. You mentioned the durability improvements, and we are factoring that in, obviously, as we look at those contracts.*** And I would tell you that as we perform warranty-type work under these contracts today, ***we've been reasonably conservative in our outlook and our bookings on that.*** So we are confident that we're able to see the improvement fall through the bottom line as those major overhauls begin. And we're also confident that we're able to demonstrate significant efficiencies and fuel savings that come from that engine . . . So we feel well-positioned with the product . . .

*Id.* ¶ 274 (emphasis in Am. Compl.).

Plaintiffs allege that by conveying that RTX had "made significant improvements" to the GTF fleet, which it was "factoring" into its "reasonably conservative" financial outlook, Defendants were deliberately concealing the scale and scope of the powdered metal defect. *Id.* ¶ 275.

In addition to contesting that Plaintiffs have adequately pleaded these statements were contemporaneously false, Defendants argue that these statements amount to non-actionable statements of puffery, Mot. at 34; opinion, *id.* at 35; and forward-looking statements, *id.* at 37; Furthermore, Defendants argue that these statements demonstrate that Pratt *was* warning investors about potential issues with the GTF engine and the company's efforts to resolve them. *Id.* at 12.

The Court agrees.

First, the Defendants later discovery and disclosure of the extent of the powdered metal defect does not mean that any statement made before those discoveries were false and

misleading. *See Novak*, 216 F.3d at 309 (noting "fraud by hindsight" is not actionable under the Exchange Act).

Second, the "total mix" of available information, *see Castellano*, 257 F.3d at 180, would not lead a reasonable investor to believe that the failed departures were immaterial. Investors had access to information from before and during the class period about issues with the V2500 and GTF engines that could lead them to a different and reasonable interpretation of the failed departure data: that the GTF engine suffered from technological problems that might impact its future profitability. *See, e.g.,* Am. Compl. ¶¶ 103 ("As a March 15, 2018 Business Insider article explained, despite the GTF's 'game changer' technology, the engine's progress in the market had been stalled, as 'the engines have been plagued by a series of teething problems that have slowed aircraft deliveries, increased maintenance costs, and forced the Indian government to ground a fleet of planes.' As such, Business Insider opined that 'it looks as if we'll have to wait a bit longer for this piece of newfangled equipment to hit its stride.'"), 134 – 38 (detailing Vietnam Airlines incident and the Emergency Airworthiness Directives FAA issues in response), 278 (the 2020 10-K stating "[t]echnical, mechanical and other failures may occur from time to time, whether as a result of manufacturing or design defect, operational process or production issue attributable to us, our customers, suppliers, third party integrators or others. . . . Any of the foregoing could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity."); *see also* Defs. Ex. 5, ECF No. 111-6 (Sept. 23, 2024) (14 C.F.R. § 39 (2020) (Airworthiness Directive re V2500 Series Turbofan)); Defs. Ex. 6, ECF No. 111-7 (Sept. 23, 2024), (14 C.F.R. § 39 (2021) (Notice of Proposed Rulemaking re updated Airworthiness Directive re V2500 Series Turbofan)); Defs. Ex. 7, ECF No. 111-8 (Sept. 23,

2024) (14 C.F.R. § 39 (2022) (Final Airworthiness Directive; Pratt & Whitney Turbofan Engines)).

In short, the "total mix" of information could allow a reasonable investor to conclude that the 0.04% of failed departures indicated by Mr. Mitchill's statement signaled a potential issue with RTX's fleet.

### g. The February 11, 2022 Annual 10-K Report

On February 11, 2022, RTX filed its Annual Report on Form 10-K for the year that ended on December 31, 2021 (the "2021 10-K"). Am. Compl. ¶ 277. The 10-K, which was signed by Messrs. Hayes and Mitchill, said the following concerning the GTF engines:

> ***Technical, mechanical and other failures may occur from time to time, whether as a result of manufacturing or design defect, operational process or production issue attributable to us, our customers, suppliers, third party integrators or others.*** . . .
>
> A product or system failure could lead to negative publicity, a diversion of management attention and damage to our reputation that could reduce demand for our products and services. It could also result in product recalls and product liability and warranty claims (including claims related to the safety or reliability of our products) and related expenses, other service, repair and maintenance costs, significant damages and other costs, including fines and other remedies and regulatory and environmental liabilities. We may also incur increased costs, delayed payments, reputational harm or lost equipment or services revenue in connection with a significant issue with a third party's product with which our products are integrated. Further, our insurance coverage may not be adequate to cover all related costs and we may not otherwise be fully indemnified for them. ***Any of the foregoing could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity.***

*Id.* ¶ 278 (emphasis in Am. Compl.).

Plaintiffs allege that these statements were materially false and misleading because such "[t]echnical, mechanical, and other failures" had already occurred. *Id.* ¶ 279. Plaintiffs also

35

allege that the company was already experiencing "adverse . . . results of operations" through customer disputes and engine failures. *Id.*

In addition to contesting that Plaintiffs have adequately pleaded these statements were contemporaneously false, Defendants argue that these statements are protected by the PSLRA's harbor for forward-looking statements, *see* Mot. at 37–38, and that these statements demonstrate Defendants' efforts to warn Plaintiffs of the risks involved with investing in a company that was incorporating advanced technology into its fleet, *see id.* at 12, and that such statements are non-actionable as they "express[] inherently subjective views of the nature and scope of the risks faced by the Company." *Id.* at 35 (citing *Buhrke Family Revocable Trust* v. *U.S. Bancorp*, 2024 WL 1330047, at *16 (S.D.N.Y. Mar. 28, 2024)) (alteration in original). Furthermore, Defendants argue that Plaintiffs fail to plead any particularized facts demonstrating that Defendants knew a total recall was necessary at the time these statements were made. *Id.* at 36.

The Court agrees.

As noted above, *see supra* III.A.1.a ("February 8, 2021 Annual 10-K Report"), the warning provided in Defendants' 10-K statement are the sort of cautionary, forward-looking statements that the Second Circuit has found not to be fraudulent. *See Halperin*, 295 F.3d at 361 ("An offeror is not liable for securities fraud simply because the investment did not turn out as the investor hoped. . . . The allegedly omitted facts were either disclosed or implied in the offering memoranda.").

As to Plaintiffs' argument that the statements were false because they failed to explicitly state the full extent of the Company's knowledge about the defect, "omissions are only actionable if a defendant is under a duty to disclose information and fails to do so." *Lululemon*, 14 F. Supp. 3d at 571 (citing *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013)).

"Section '10(b) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information.'" *Id.* at 527 (citing *Kleinman*, 706 F.3d at 152 (citations omitted)). Instead, disclosure is required only when necessary "to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting Rule 10b-5(b))).

When evaluating whether a company has the duty to disclose a certain piece of information, the question is "whether a *reasonable* investor would have viewed the nondisclosed information 'as having *significantly* altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 44 (emphasis in original) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)). This inquiry is "contextual." *Id.* In context, specifically mentioning the presence of a powdered metal defect in this filing would likely not significantly alter the total mix of information available to a reasonable investor—which includes a warning regarding the potential for "[t]echnical, mechanical and other failures," that "could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity," Am. Compl. ¶ 278, combined with other publicly available information of mechanical issues with the GTF and V2500 series engines and the ongoing FAA investigations and rulemaking. *See, e.g.* Defs. Ex. 5, ECF No. 111-6 (Sept. 23, 2024) (14 C.F.R. § 39 (2020) (Airworthiness Directive re V2500 Series Turbofan)); Defs. Ex. 6, ECF No. 111-7 (Sept. 23, 2024), (14 C.F.R. § 39 (2021) (Notice of Proposed Rulemaking re updated Airworthiness Directive re V2500 Series Turbofan)); Defs. Ex. 7, ECF No. 111-8 (Sept. 23, 2024) (14 C.F.R. § 39 (2022) (Final Airworthiness Directive; Pratt & Whitney Turbofan Engines)).

### h.  The January 24, 2023 Earnings Call

On January 24, 2023, Defendants held an earnings call discussing RTX's performance for the fourth quarter of 2022, which ended December 31, 2022 ("4Q22 Earnings Call"). Am. Compl. ¶ 281. During the call, an analyst posed a question to Mr. Calio about the GTF's aftermarket profitability. Mr. Calio responded:

> Demand remains really, really strong. As you know, *we continue to do the block upgrades to drive improved time on wing, obviously improved time on wing helps with their contract profitability.* We continue to incorporate upgrades to sort of improve the customer experience. On the aftermarket side, in 2022 turned slightly positive. *And so from this point, it's about accelerating those margins.* You're going to see that through some better contract mix as we talked about back in Investor Day in '21. *You're going to see that through increased time on wing through some of these upgrades.* And so *the GTF aftermarket profitability is something that is of high focus given the growing installed based, gets above 2,500 engines out there* and a very large backlog. So *GTF aftermarket is a huge driver.*

*Id.* ¶ 282 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading because it gave investors the impression that RTX had already performed "upgrades to drive improved time on wing" in an attempt to improve "time on wing" and "contract profitability." *Id.* ¶ 283. Plaintiffs allege that Defendants had not performed the "upgrades" needed to address the GTF's most serious issue: the powdered metal defect. *Id.* Plaintiffs argue that by stating that "aftermarket profitability" was a "high focus" and a "huge driver" of profitability, Defendants falsely gave the impression that the improvements necessary to grow the GTF fleet's profitability had already taken place. *Id.*

An analyst later asked Mr. Calio to address public comments from plane leasing companies that the "time on wing" for the GTF engines had been "falling short of expectations." *Id.* ¶ 285. The analyst asked whether Mr. Calio shared that impression and how the engine's profits could become positive. *Id.* Mr. Calio responded:

So I would say that I generally agree with the sentiment that you're hearing, time on wing, and we've been pretty open about this. And very open dialogue with our customers about time on wing, on newer platforms, not necessarily being where we wanted them to be when we launched the program. We have done a number of block upgrades. As I said, **we've got a block upgrade going on now through MRO that increases time on wing . . . And we've got some other, I'd say durability and reliability hardware and software fixes that we put in as well.** So we want to—we obviously want to get to the contractual levels that we promised, and we've got a plan to do that with these upgrades . . . But even on the—**what I'll call the existing fleet today, we've got upgrade plans to continue to push that time on wing higher and higher.** Our customers are demanding it, and our contracts are dependent on it. So we're aligned there.

*Id.* ¶ 286 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was materially false and misleading for two reasons. *Id.* ¶ 287. First, in responding to the question, Mr. Calio deliberately concealed the powdered metal defect. *Id.* Second, the statement gave investors the false impression that RTX had implemented certain "upgrade plans to continue to push that time on wing higher and higher," when, just months later, the GTF fleet would be grounded to implement inspections and removals of the parts impacted by the defect. *Id.*

The Court disagrees.

As Defendants argue, these statements support the notion that Pratt, at the time these statements were made, believed that "inspections [of GTF engines] could be conducted at scheduled shop visits," rather than with a fleet-wide recall. *See* Mot. at 15. Mr. Calio's statements regarding the planned upgrades for the GTF engine are the sort of "'rosy predictions,' or statements regarding a company's well-being, [that] have been found to be too vague and general to be actionable. *See Lululemon,* 14 F.Supp.3d at 572 (collecting cases where expression of corporate optimism were found to be not actionable). In contrast, in *Novak*, the Second Circuit held that direct statements that "[defendant's] inventory situation was 'in good shape' or 'under

control' while they allegedly knew that the contrary was true." 216 F.3d at 315. But, in this statement, Mr. Calio makes no similar guarantees about the condition of the GTF engine. Instead, he merely offers an optimistic outlook on the Company's future plans for continued upgrades—such statements are not actionable securities fraud. *See In re IBM Corp. Sec. Litig.*, 163 F.3d at 107 ("Statements regarding projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." (citations omitted)).

### i. The April 25, 2023 Earnings Call

On April 25, 2023, Defendants held an earnings call to discuss RTX's performance for the first quarter of 2023, which ended March 31, 2023 ("1Q23 Earnings Call"). Am. Compl. ¶ 289. During that call, when asked to comment on the GTF's aftermarket plans, Mr. Mitchill answered:

> We clearly will see the aftermarket continue to grow in the remainder of the year . . . . The other piece of that, in terms of thinking about the GTF and time on wing, basically, what I can say is ***our estimates today contemplate everything that we know about the engine***. We feel very comfortable with where we are with our contract accounting. ***And any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole. So I don't see that as being a headwind against our expectations for the year.***

*Id.* (emphasis in Am. Compl.).

Plaintiffs allege that the statement that RTX's financial "estimates today contemplate everything that we know about the engine" was materially false and misleading because Defendants already knew they were going to have to ground and inspect more than 3,000 planes. *Id.* ¶ 290. Similarly, they allege that the statement "any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for

Pratt and for RTX as a whole," is false and misleading because it did not inform investors about the massive costs that would come from recalling the GTF engines to address the powdered metal defect, and the recall was not accounted for in the financial outlook. *Id.*

Also, during the 1Q23 call, Mr. Calio said:

> I do want to provide a brief update on the GTF program. As you know, *since the GTF program went into service in 2015, we have continued to introduce upgrades and improvements to increase reliability and durability*. With respect to reliability, *we have met the target level for dispatch reliability*. This is now at mature engine levels. With respect to durability, *we have improved time on wing since program inception*. Again, time on wing, meaning how long engines can be operated before needing to be removed for maintenance. But we are not yet at the level we and our customers expect. This has put stress on the operations of the fleet. *We continue to develop upgrades from the current GTF configuration to improve durability*.

*Id.* ¶ 292 (emphasis in Am. Compl.).

Plaintiffs allege that this was false and misleading because it gave investors the allegedly incorrect impression that "upgrades and improvements" made since the GTF debuted into service had led RTX to achieving its "target level for dispatch reliability." *Id.* ¶ 293. Plaintiffs allege that Mr. Calio purposefully concealed that the "paramount fix" needed to render the GTF profitable was the inspection and removal for defective HPT disks impacted by the powdered metal defect. *Id.* According to Plaintiffs, it was also false for Mr. Calio to state that RTX had "improved time on wing since program inception," because that gave investors the impression that the planes would remain in flight due to the Company's "upgrades." *Id.* Plaintiffs allege that Defendants knew that their upgrades had not remedied the powdered metal defect. *Id.*

In addition to contesting that Plaintiffs have adequately pleaded these statements were contemporaneously false, *see* Mot. at 21, Defendants argue that statements such as "[w]e feel very comfortable," and "I don't see that" are statements of opinion, *id.* at 35.

The Court agrees.

Neither expressing a need to upgrade a product nor carrying out those upgrades are sufficient to sustain an allegation that Defendants were aware of the extent of a problem. *See In re IBM Corp. Sec. Litig.*, 163 F.3d at 107 ("Statements regarding projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." (citations omitted)).

### j.  The June 19, 2023 Investor Meeting at Paris Air Show

On June 19, 2023 at the Paris Air Show, an analyst asked Mr. Eddy about "concerns" regarding the GTF and whether "grounded airplanes and the costs that they're incurring" was leading to "financial exposure" for the company. Am. Compl. ¶ 295. Mr. Eddy responded:

> So if you think about this, as we have designed the improvements that go into the fleet, we've rolled those costs into the cost basis for the portfolio. ***So this is expected costs for us going forward to upgrade the fleet over time, so I think there's not a surprise here coming. When it comes to how we support our customers in terms of the AOG situation, I wouldn't get into specific terms, but clearly, when we're running at this level, 10% of our fleet out of service, we are working very closely with our customers on that to get through this. And we want to get the fleet healthy again. And again all of those costs would be programmed into the portfolio and into our calculation as well.***

*Id.* ¶ 296 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading because he assured investors that there was "not a surprise coming" and that costs of repairing GTFs were "programmed into the portfolio and into our calculation." *Id.* ¶ 297. Plaintiffs allege that Defendants were actually "mere weeks away" from disclosing the "surprise" that nearly the entire GTF fleet would have to be grounded due to the powdered metal defect. *Id.*

During that same meeting, Mr. Eddy spoke about a separate "quality escape"[5] unrelated to the powdered metal contaminant, stating:

> When you think about what we're doing here, block upgrades, the time on wing, the high capture of LTAs, our team is constantly analyzing every visit, and optimizing the fly forward for the customers, but also optimizing the fly forward to maximize our contract margins. ***Our contract portfolio today on GTF is less than 5% complete, so we have significant life remaining, and that enables us to address these technical issues early in the program. And we've assumed all of these activities and the related costs in our contract modeling and of course, in our financial guidance.***

*Id.* ¶ 299 (emphasis in Am. Compl.).

Plaintiffs allege that this statement was false and misleading primarily for two reasons. First, Mr. Eddy's representations that the GTF felt had "significant life remaining, and that enables us to address these technical issues early in the program," omitted mention of the most severe "technical issues" facing the GTF, the powdered metal defect. *Id.* ¶ 300.

The Court disagrees.

Plaintiffs fail to allege with particularity that, at the time Mr. Eddy made these statements, Defendants were aware that the GTF fleet would need to be grounded. His failure to mention the powdered metal defect specifically during this meeting is not sufficient to sustain an allegation of falsity. *See Foley v. Transocean Ltd.*, 861 F.Supp.2d 197, 212 (S.D.N.Y. 2012) (noting that "established precedent" does not require companies to "disclose a laundry list of information"). That Mr. Eddy was incorrect in his opinion that there was not a "surprise" coming is also insufficient to allege fraud. *See In re Loral Space & Commun. Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *18 (S.D.N.Y. Feb. 27, 2004) (finding "statements about predicted future events" that reflect a defendant's "optimism" not actionable under Exchange

---

[5] According to Plaintiffs, the "aviation industry often refers to manufacturing quality defects as 'escapes,' signaling that the manufactured part does not conform to its specifications." Am. Compl. 114 n.20.

Act); *Lululemon*, 14 F.Supp.3d at 571 ("A statement believed to be true when made, but later shown to be false, is insufficient. In such a circumstance, there is a lack of actionable falsity." (citations omitted)).

### k.  The July 25, 2023 Disclosure

On July 25, 2023 RTX issued a press release in which it disclosed a "rare condition" in its powdered metal that "will require Pratt & Whitney to remove some engines from service for inspection earlier than expected." Am. Compl. ¶ 306. In connection to that disclosure, RTX reduced its 2023 cash flow expectations by $500 million to $4.3 billion, "primarily to reflect the developments at Pratt & Whitney" involving the powdered metal defect affecting the GTF engine fleet. *Id.*

Defendants also held the Company's Q2 Earnings Call that day, during which a company representative explained that the newly disclosed "rare condition in powdered metal used to manufacture certain engine parts may reduce the life of those parts." *Id.* ¶ 307. In commenting on the financial impact of the disclosure, Mr. Mitchill allegedly stated:

> Given Pratt's results to date and aftermarket strength, the impact for the first 200 engines is contemplated within the range we just provided. Keep in mind, ***given the percentage of completion accounting for the aftermarket contracts and the relatively early life of the programs, the P&L impact will be less significant today.*** However, for the reasons Chris [Calio] described, the impact of any further engine removals from service for inspection is not currently assumed in our outlook.

*Id.* ¶ 309 (emphasis in Am. Compl.). Mr. Hayes also allegedly explained:

> At the same time, we knew that this contamination had occurred between late 2015 and late 2020, early 2021. So we knew we had a suspect population in the fleet. And we went out and look – and so we started inspecting. We inspected the turbine disc as they were manufactured. We inspected turbine discs as they came back in, not just for the V, but for the whole GTF fleet, in fact, the entire fleet of Pratt products that were manufactured during this timeframe.

> Those inspections, and ***there were over 3,000 of those inspections,***
> ***yielded a very, very small fallout rate, less than 1%. So as Chris***
> ***[Calio] said, all of this data goes into our model for the turbine***
> ***disc. And based upon everything that we knew until very recently,***
> ***we believe that the life of the turbine disc was such that we would***
> ***see these discs in the shop and be able to inspect them before we***
> ***ever had an issue.***

*Id.* ¶ 310 (emphasis in Am. Compl.).

Plaintiffs allege that RTX's press statement was false and misleading because—while powdered metal contamination could be a "rare" occurrence in manufacturing generally, "it [allegedly] was a systemic and regular occurrence throughout Pratt & Whitney's manufacturing process." *Id.* ¶ 307. Plaintiffs also allege that, according to the FEs, the Company was aware of the powdered metal defect "no later than 2020." *Id.* ¶ 308. They allege that Mr. Hayes's and Mr. Mitchill's statements were false because, allegedly, Pratt & Whitney "had determined a root cause of contaminated powdered metal in July 2021." *Id.* ¶ 311. In their view, this allegation is supported by Defendants' alleged reports and service bulletins mandated by the FAA, as well as "its customer Delta's May 9, 2022 request that Pratt & Whitney inspect 'ALL' affected airplanes in the GTF fleet. *Id.* ¶ 311.

Plaintiffs further allege that Defendants' "tout[ing]" of the fallout rate of "less than 1%" misled investors because, in context, the one percent can allegedly equate to "thousands of lives or billions of dollars." *Id.* In the Plaintiffs' view, the "fallout rate" is also less significant to investors than the time off wing to complete the upgrade. *Id.* Additionally, Plaintiffs allege that Defendants' representation that "the P&L impact will be less significant today" was allegedly "false and misleading because defendants knew the catastrophic financial impact at the time the statement was spoken." *Id.*

Defendants argue that Plaintiffs failed to adequately plead that these statements were contemporaneously false for three reasons. Mot. at 33. First, they argue that Plaintiffs plead no

particular facts alleging that the entire fleet would eventually have to be grounded was available to Defendants on July 25, 2023. *Id.* (citing *Slayton v. American Exp. Co.*, 604 F. 3d 758, 777 (2d Cir. 2010)). Second, they argue that Plaintiffs' disagreement with using the 1% fallout rate to explain data is the sort of "competing analysis or interpretation of data," that the Second Circuit has held does not support a fraud claim. *Id.* (citing *Kleinman* v. *Elan Corp.*, 706 F.3d 145, 154 (2d Cir. 2013). Third, they argue that their use of the word "rare" is not actional, as such descriptors are "'neither quantifiable nor factual, but rather subject to interpretation, within reason.'" *Id.* (citing *Saskatchewan Healthcare Emps.' Pension Plan* v. *KE Holdings Inc.*, 2024 WL 775195, at *26 (S.D.N.Y. Feb. 26, 2024) (reaching this conclusion as to words "large" and "growing")).

The Court agrees.

The essence of Plaintiffs' claim is that, by 2020, Defendants "knew that the powdered metal defect was a systemic, serious problem afflicting all Pratt & Whitney engines equipped with parts constructed from the faulty, contaminated material," and were allegedly aware that "revealing the pervasive and costly powdered metal defect to investors would have a cataclysmic impact on RTX's stock price." *Id.* ¶ 27. But Plaintiffs allege no facts to demonstrate that Defendants were, in fact, aware of the magnitude or "systemic" nature of the defect before it was disclosed to investors. Plaintiffs plausibly allege with particularity that Defendants were aware that there was an issue related to powdered metal from the Clayville, New York, facility in some of the V2500 series of planes. But Plaintiffs' allegations that Defendants were aware in 2020 of the magnitude of the defect and thus misled investors until disclosing the need for a large-scale recall of the GTF are merely conclusory and cannot be sustained on a 12(b)(6) motion to dismiss, let alone the more stringent standard required by the PSLRA. *Compare In re Philip* Morris, 89

F.4th at 427 ) ("[A]ny distinction between the disclosures [the Defendant] actually made and the disclosures the Investors insist [the Defendant] *should have* made is a distinction without a difference: although Defendants did not explicitly frame their disclosure in terms of the risk of saturating the market of early adopters and innovators, their disclosure that they increasingly compete on the basis of adult-smoker willingness to convert to their [smoke-free products] describes the flipside of the very same coin.") (citation and internal quotation mark omitted) (emphasis in original)); *with* Am. Compl. ¶ 278 (the 2020 10-K stating that "[t]echnical, mechanical and other failures may occur from time to time, whether as a result of manufacturing or design defect, operational process or production issue attributable to us, our customers, suppliers, third party integrators or others. . . . Any of the foregoing could have a material adverse effect on our competitive position, results of operations, financial condition or liquidity").

Accordingly, having failed to allege a material misrepresentation or omission, Plaintiffs' Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 claims will be dismissed.

### 2. Scienter

Even if Plaintiffs' claims were not otherwise dismissed for the failure to allege a material misstatements or omission by the Defendants, the Plaintiffs have not adequately pled scienter.

"To plead scienter so as to survive a motion to dismiss, a plaintiff must state 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]'" *Westchester Teamsters Pension Fund*, 604 Fed. App'x 5 at *7 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)). Scienter "may be established by facts '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *City of Pontiac Policemen's and Firemen's Retirement Sys.*, 752 F.3d at 184, quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Sodhi*, 2015 WL 273724, at *7 ("A securities plaintiff can plead scienter by alleging that the defendant had a motive and an opportunity to commit securities fraud."), *citing In re Scholastic Corp.*, 252 F.3d 63, 74 (2d Cir. 2001) ("Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness.").

Recklessness means "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Novak*, 216 F.3d 300, 308 (2d Cir. 2000)). "The requisite 'strong inference' of scienter is one which is 'at least as likely as any plausible opposing inference.'" *Id.* (emphasis omitted), quoting *Tellabs, Inc.*, 551 U.S. at 328. The mere fact of defendants' senior positions within a company is insufficient to support an inference of recklessness. *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009) ("The Complaint's general allegations that, by virtue of their senior positions at Gildan, the Individual Defendants necessarily had access to nonpublic information, are insufficient to show recklessness under the law of this Circuit."). However, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the

corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308).

First, as to motive and opportunity, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive'" for purposes of the scienter inquiry. *ECA, Local 134 IBEW Joint Pen. Trust v. JP Morgan Chase Co.*, 553 F. 3d 187, 198 (2d Cir. 2009) (citing *Novak*, 216 F. 3d at 307). Yet, as Defendants point out, Mot. at 31–40, Plaintiffs' allegations of motive do not extend beyond these motives "common to most corporate officers." *ECA*, 553 F. 3d at 198.

Plaintiffs allege that Defendants were motivated by (1) a desire to market and sell the GTF engine, (2) Defendants' dependance on post-warranty Aftermarket MRO for profitability of the GTF, (3) Defendants' desire to convince investors and customers that the defect was solved in the face of rising competition and demand, and (4) Defendants' awareness that disclosure of the powdered metal defect would be immensely costly. *See* Am. Compl. ¶¶ 329–332.

But Plaintiffs fail to point to any "'concrete [personal] benefits that could be realized' from one or more of the allegedly misleading statements or non-disclosures," required to demonstrate motive. *See South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)).

Second, with regard to circumstantial evidence of misbehavior or recklessness, the Second Circuit has, "referred to conduct that 'at the least ... is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it,'"

*South Cherry Street*, 573 F.3d at 109 (citing *In re Carter–Wallace, Inc. Securities Litigation,* 220 F.3d 36, 39 (2d Cir.2000)).

Plaintiffs fail to plead that Defendants' conduct represented such an "extreme departure" from the standards of care. To the contrary, the extent to which Plaintiffs allege Defendants were cooperating with the FAA and complying with FAA directives suggests that Defendants were acting within the ordinary standards of care for their industry. *See, e.g. In re Gen. Elec. Sec. Litig.*, 844 Fed. App'x at 389 (finding no "strong inference" of scienter when "GE had developed what it believed was a workable solution to the oxidation issue—a solution that would not adversely affect the turbines' performance or GE's finances in a material way, and that GE revised its assessment of the issue and its solution when confronted with the blade failure at the Exelon power plant, and disclosed the financial consequences with reasonable promptness") (citing *Tellabs*, 551 U.S. at 323-24, for the proposition that "when we evaluate 'whether the plaintiff has alleged facts that give rise to the requisite strong inference of scienter, [we] must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'").Plaintiffs allege no facts that demonstrate with particularity that it should have been obvious to Defendants that the powdered metal defect affected the entire GTF fleet to the point that a mass recall was required.

The inference drawn from Defendants' argument—that, over time, Defendants grew to realize the magnitude of the problem and, at the appropriate time, disclosed that information to regulators and investors—is more plausible than any inference of scienter. *See Tellabs, Inc.*, 551 U.S. at 328 ("A plaintiff alleging fraud in a §10(b) action . . . must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference.") (emphasis in original).

Accordingly, even if Plaintiffs had sufficiently pleaded that at least one of the statements was false within the meaning of the Section 10(b) of the Exchange Act, they have failed to plead scienter.[6]

### B. The Section 20(a) of the Exchange Act Claims

Section 20(a) of the Exchange Act imposes liability on control persons. 15 U.S.C. § 78t(a). Section § 77o defines a control person as:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title ... unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. §§ 77o(a). To establish the requisite state of mind for a control person, a plaintiff must plead "facts giving rise to a strong inference" that the control person "knowingly or recklessly failed (i) to conduct a reasonable investigation of the rated security with respect to the factual elements relied upon by its own methodology for evaluating credit risk; or (ii) to obtain reasonable verification of such factual elements ... from other sources...." 15 U.S.C. § 78u-4(b)(2)(B). The control person will not be liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

---

[6] Having decided that Plaintiffs fail to allege either a material misrepresentation or the requisite scienter, the Court need not and does not decide whether the other factors have been satisfied. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 417 (holding that a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 requires "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation"). Indeed, Defendants have not moved for dismissal on these other grounds.

Because the Court will dismiss Plaintiffs' claims for primary violations of a securities law, specifically Section 10(b) of the Exchange Act and SEC Rule 10b-5, their derivative claims under Sections 20A and 20(a) claim must also be dismissed. *See Steginsky v. Xcelera Inc.*, 741 F.3d 365, 372 (2d Cir. 2014) ("§ 20A liability requires an independent Securities Exchange Act violation" (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994))); *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, among other things, 'a primary violation by a control[ ] person.'" (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998))).

Accordingly, the Court will dismiss Plaintiffs' claims under Sections 20A and 20(a) in their entirety.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**, ECF No. 111, and Plaintiff's Exchange Act Claims, Am. Compl. ¶¶ 402–418, are dismissed with prejudice.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED** at New Haven, Connecticut, this 12th day of September, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE